IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAUDERLIER & ASSOCIATES, INC.<br><br>Plaintiff<br><br>v.<br><br>SERGIO ZAMBRANA<br><br>Defendant/Third-Party Plaintiff<br><br>v.<br><br>JEAN CLAUDE CAUDERLIER<br><br>and<br><br>LA RUCHE, INC.<br><br>Third-Party Defendants | Civil Action No. 05-1653 (ESH) |

### SERGIO ZAMBRANA'S REPLY TO JOINT PARTIES' OPPOSITION TO HIS MOTION FOR ORDER REQUIRING COUNSEL TO WITHDRAW

Defendant/Counter-Plaintiff/Third-Party Plaintiff, Sergio Zambrana ("Mr. Zambrana"), by and through counsel, respectfully submits this Reply to the Memorandum of Cauderlier & Associates, Inc., La Ruche, Inc., and Jean Claude Cauderlier in Opposition to Sergio Zambrana's Motion for Order Requiring Counsel to Withdraw ("Opposition").

## **PRELIMINARY STATEMENT**

The three parties represented by the law firm of Howrey, LLP ("Howrey") in this case, Cauderlier & Associates, Inc. ("CAI"), La Ruche, Inc., ("La Ruche"), and Jean Claude Cauderlier ("Mr. Cauderlier") (collectively, the "Joint Parties"), open their Opposition, at pages 1-2, by kindly recounting several of the reasons that Mr. Zambrana asserts Howrey must be required to withdraw as counsel for all three Joint Parties.

Rather than address any of the eight (8) recited contentions upon which Mr. Zambrana relies as justification for his Motion, the Opposition follows its recitation with the following statements: "Mr. Zambrana does not contend that Howrey should be disqualified because Howrey acted as his counsel. Instead, he asserts that Howrey should be disqualified because La Ruche has not asserted an ownership interest in CAI."[1] The fact that Howrey does not, and did not, represent Mr. Zambrana has never been an issue in this case and is a curious red herring. The second statement is far from an accurate representation of Mr. Zambrana's stated position, as well.

The Joint Parties do manage to get to the crux of the question regarding the propriety of Howrey's multiple representation, though. Their Opposition asserts, at page 2, that "[a]s the controlling shareholder of both corporations, Mr. Cauderlier has the authority to select counsel of his choosing." Although this is followed by two absurd sentences, the point is made: Mr. Cauderlier believes that he can do as he pleases with the two corporations, because he controls them both. He is in error, however, when he extrapolates that proposition, as he has, to mean that he is not required to avoid conflicts of interest between the corporations or inappropriate dealings between them.

---

[1] Opposition, p. 2.

2

In this case, Mr. Zambrana has put forth proof, by way of his Affidavit, tax returns, and copies of checks drawn on the La Ruche bank account, discussed further below, that Mr. Cauderlier has treated La Ruche and CAI as alter egos; of each other, and of Mr. Cauderlier himself. The proof also demonstrates a commingling of funds, among other corporate wrongdoings. Therefore, while he may be free to "select counsel of his choosing," Mr. Cauderlier is not free to choose the *same* counsel for both corporations (and for himself), in a lawsuit where colorable claims have been made, which, if proven, will demonstrate improper activities on the part of all, or at least two, of the Joint Parties.

## ARGUMENT

Perhaps the single most interesting sentence in the Opposition can be found in the opening of the Discussion, at page 3. The Joint Parties state, without citation, "This Court has held that 'the mere claim of a conflict is not enough; there must be proof . . . .'" What is interesting about this proposition, aside from it being obvious, is that *nowhere* in any of the pleadings filed by them thus far have the Joint Parties offered any proof whatsoever to discredit that which has been proffered by Mr. Zambrana.

This fact was first brought to the Court's attention in Defendant's Reply Memorandum, which Mr. Zambrana refers to in his Motion.[2] In fact, Mr. Zambrana makes this point on the very page of his Reply Memorandum that precedes the pages the Joint Parties elected to copy and attach to their Opposition. In that pleading, Mr. Zambrana asserts that, "Plaintiff relies upon unproven 'facts' to bolster its contention and produces no verifiable evidence. Plaintiff states in its

---

[2] Terms such as "Defendant's Reply Memorandum" and "Building," which are defined in Mr. Zambrana's Motion to Withdraw, will not be redefined here.

3

Memorandum in Opposition,[3] '[a]s stated in the Complaint, La Ruche is a separate and independent entity from CAI. Defendant's relationship with La Ruche is distinct from defendant's relationship with CAI.' The only apparent 'proof' for this proposition is that it was 'stated in the Complaint.' No other verification is offered."[4]

With equal lack of basis, the Joint Parties in their Opposition assert that "[t]he Joint Parties believe that the evidence will establish that corporate form and integrity have been maintained. La Ruche did not purchase the property. Mr. Zambrana's check was to La Ruche and allowed him to purchase a ten percent interest in La Ruche - the only interest he has ever held. The bank and tax records of the two corporations do not suggest or establish that La Ruche owns interest in either CAI or the property. . . The Joint Parties believe that his combined litigation will ultimately affirm their view of the facts."[5]

In stark contrast to the Joint Parties' reliance upon their "view" of the facts, Mr. Zambrana included with his first pleading in this case[6] a 24-paragraph Affidavit setting forth the facts upon which he based that motion to dismiss and upon which he bases the instant Motion. Moreover, Mr. Zambrana included an exhibit (Electronic Case Filing system "Document 3") containing a La Ruche tax return and copies of many dozens of checks drawn on the La Ruche corporate bank account. Since the checks were grouped in 3's when he received them from La Ruche pursuant to a request as a stockholder, some of the checks are not relevant to this dispute, or are ambiguous.

---

[3] Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss the Complaint, or, in the Alternative, to Join Indispensable Parties, p. 8.

[4] Defendant's Reply Memorandum, p. 10.

[5] Opposition, p. 7.

[6] Motion to Dismiss the Complaint or, in the Alternative, Motion to Join Indispensable Parties.

But, there are La Ruche checks totaling over $92,000 that are clearly earmarked for CAI expenses. Fourteen checks drawn on the La Ruche account, aggregating more than $48,600, are payable to Yes and to Mahesh Naithani, the sellers of the Building. There are also others: a check to Charles R. Webb, CAI's accountant, in the amount of $9,480; a check for $6,000 payable to Barnard Locraft for a land survey; a check made out to Riggs Bank for $28,000. Not mentioned above are over a dozen checks payable to First Union Bank, which Mr. Zambrana believes may be related to the financing of the Building, and several $10,000 checks payable to CAI for rent under a putative lease.

The Joint Parties are blatantly mistaken when they argue that "their interests in this matter are the same . . . ."[7] Nor are they correct in their assertions that Mr. Zambrana's Motion is "frivolous" and "tactically inspired." The Motion is directed to what may well be serious improprieties committed Mr. Cauderlier, the man who appears to have conducted his businesses are if they were part of his fief.

The cases cited by the Joint Parties are no more helpful to them than their dearth of proof. Two cases are primarily relied upon in the Opposition, neither of which supports the Joint Parties' contentions. In *Seifert v. Dumatic Industries, Inc.*,[8] the facts of the case immediately disqualify the case from being relevant here. Aside from the fact that the case involved a stockholder derivative suit, in *Seifert* there were two 50% stockholders who each appointed two directors of the corporation. The Supreme Court of Pennsylvania said, "Notwithstanding the lack of precedent, it is clear that

---

[7] Opposition, at 7.

[8] 197 A.2d 454 (Pa. 1964).

under the unique circumstances of this case there exists no possibility of a conflict of interest."[9] On the other hand, in the instant case, based upon the facts thus far adduced, the possibility of potential conflicts of interest is almost self-evident.

The *Seifert* case is also distinguishable because the court found that the closely held corporation, Dumatic Industries, Inc., is "nothing more than a conduit for the reception of patents from Seifert on the one hand and working capital from Globe on the other. As such, it is *merely an appendage* to the separate businesses of these two stockholders[10] (emphasis added). The court concluded, several pages later:

> In consonance with the broad equitable powers possess by courts in stockholders' derivative actions, we reject the result which would issue in the instant case were we to assume that a corporate interest always accompanied the corporate form. Instead, for purposes of representation by counsel, *we regard the principal lawsuits as simply between Seifert and Globe*" (emphasis added).[11]

The court completely ignored the entity that was the closely held corporation, thus obviating the possibility of a conflict of interest. *Seifert* is inapposite.

The Joint Parties' reliance upon *In re Banks*,[12] a case where the defendant attorneys warranted reprimands, is equally puzzling. To begin with, the complicated set of facts render the case inapplicable to the situation that prevails here. The case contains pertinent language, however, to all cases where an attorney encounters a conflict of interests between his clients, even if

---

[9] *Id.*, at 456.

[10] *Id.*

[11] *Id.*

[12] 584 P.2d 284 (Ore. 1978).

unanticipated at first.[13] "The ethical consideration implies that if a corporate officer is represented by a corporate attorney at a time when no conflict exists as we believe was the fact in the present case, and then a conflict arises between the officer and the corporation about the subject of the representation, the attorney is in an untenable position if he represents either one."[14]

Furthermore, the language cited by the Joint Parties in their Opposition, on pages 5-6, implies the exact opposite principle than it is being offered for. This, Mr. Zambrana contends, is because the Joint Parties left out the final sentence of the *Banks* court's train of thought. The point of the court's saying "there is no basis for the individual to believe that the attorney has or ever will have other than his individual interest at heart," is that the controlling stockholder has lulled himself into believing that he and the corporation are one and the same. That is why, earlier in the paragraph, the court says, "it seems to us that the balance should be struck the other way," in weighing the interests of the corporation and the desirability of avoiding conflict of interest.[15]

The critical language the Joint Parties ignored is: "It is our conclusion that the only ethical position for an attorney to adopt when substantially identical interests which he represented become divergent is to represent neither the individual nor the corporation."[16] How the Joint Parties could cite so much of that paragraph and stop short of the conclusion is as hard to comprehend as is Howrey's stubborn refusal to acknowledge that it never should have presumed to represent more

---

[13] As he pointed out in his Motion, Mr. Zambrana contends that the potentiality for serious conflicts among the Howrey clients was obvious from the outset. *See* the Points and Authorities that supported the Motion, at pp. 10-12.

[14] *Id.*, at 292.

[15] *Id.*

[16] *Id.*

than one of the Joint Parties in the first place. Moreover, Howrey did not elect to represent just one corporation and a controlling individual, it is representing *two* corporations, whose interests are patently divergent. Now that all three Joint Parties have been thrown into the same roiling pot, it is up to the Court to take Howrey to task for putting all four parties to this litigation in the position they find themselves.

Mr. Zambrana's Motion should be granted, and the Howrey firm and its attorneys should be disqualified and sanctioned.

                                      Respectfully submitted,

                                      KASS, MITEK & KASS, PLLC

Dated: May 19, 2006                By:_____
                                      Jeffrey M. Hamberger (Bar No. 930362)
                                      1050 17th Street, N.W., #1100
                                      Washington, D.C. 20036
                                      (202) 659-6500
                                      Attorneys for Defendant/Counter-Plaintiff/
                                      Third-Party Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Sergio Zambrana's Reply to Joint Parties' Opposition to His Motion for Order Requiring Counsel to Withdraw was mailed, via first class mail, postage prepaid, and emailed, this 19th day of May, 2006, to

>Robert L. Green, Jr., Esquire
>James B. Boles, Esquire
>HOWREY, LLP
>1299 Pennsylvania Avenue, N.W.
>Washington, D.C. 20004

*[signature]*
Jeffrey M. Hamberger

F:\WP_FILES\CLIENTS\04300.101\Reply to Opposition.wpd

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CAUDERLIER & ASSOCIATES, INC.

Plaintiff

v.

SERGIO ZAMBRANA

Defendant

Civil Case No. 1:05CV01653
Judge Ellen Segal Huvelle
Deck Type: Contract
Date Stamp: August 17, 2005

## AFFIDAVIT OF DEFENDANT, SERGIO ZAMBRANA

I, Sergio Zambrana, defendant herein, do hereby affirm and swear as true, the following:

1. I am over the age of 18 and competent to testify to the matters contained herein.

2. On or about January 20, 2000, I paid the sum of $25,000 to LaRuche by personal check, which check was dated January 21, 2000.

3. The seller of the Building was Mr. Mahesh Natthani.

4. At all times, it was understood between Jean Claude Cauderlier ("J. Cauderlier") and me that the $25,000 mentioned in ¶2 above was to be earmarked for the purchase by CAI of the real property and building located at 1035, 1037 1039 31st Street, N.W., Washington, D.C. 20007 (the "Building").

5. Settlement on the purchase of the Building by CAI took place on or about January 21, 2000, at which settlement I was present.

6. J. Cauderlier, Mr. Natthani, and others were also present at the settlement.

7. Long before January, 2000, J. Cauderlier told me that he made me a part owner of LaRuche, Inc. ("LaRuche"), which corporation operated a restaurant called LaRuche in

Georgetown, D.C.; I had worked in the restaurant for many years, and I was the most highly valued employee during that entire time.

8. J. Cauderlier gave me part ownership in LaRuche in recognition of my many years of excellent performance as an employee of LaRuche and as incentive to keep me in the employ of LaRuche.

9. The $25,000 check I gave to LaRuche on or about January 20, 2000 was not payment for any ownership share in LaRuche and was instead, part of CAI's purchase price of the Building.

10. I wrote the $25,000 check and made it payable to LaRuche at the behest of J. Cauderlier, who told me at the time that I would become a shareholder in CAI.

11. The $25,000 check which I gave to LaRuche was, in fact, used by CAI a part of the down payment toward the purchase of the Building, to the best of my knowledge.

12. I am a part owner of Cauderlier & Associates, Inc. ("CAI").

13. J. Cauderlier stated in the presence of Mr. Natthani and others, at the settlement table, that I am an owner of CAI.

14. J. Cauderlier stated in the presence of Mr. Natthani and others, before and after settlement, that I am an owner of CAI.

15. Mr. Natthani has always recognized me as an owner of CAI.

16. After CAI bought the Building, I received many telephone calls from Mr. Natthani regarding payments from CAI that were past due.

17. Mr. Natthani addressed his inquiries about the overdue payments to me in my capacity as an owner of CAI.

2

18. I believe that CAI's use of funds paid through LaRuche means that LaRuche and CAI did not always distinguish between which company owned which monies.

19. It is my position that, as a result of the commingling of funds between LaRuche and CAI, LaRuche either owns CAI or owns all the assets of CAI, including the Building.

20. Since I am a part owner in LaRuche, and since CAI is the alter ego of LaRuche, I am the owner of an additional share of CAI or the owner of an additional portion of the assets of CAI, including the Building, aside from the shares I own in CAI by virtue of having paid the aforementioned $25,000 to LaRuche.

21. The $25,000 check I made payable to LaRuche the night before the settlement on the Property enabled LaRuche to pay Mahesh Natthani $25,000, as part of the purchase price that CAI was paying for the Building.

22. LaRuche has made many payments directly to Mahesh Natthani, as payment on the note given by CAI to Mr. Nattani in connection with CAI's purchase of the Building.

23. Upon information and belief, LaRuche has made many payments to First Union Bank, as payment on a note given by CAI to First Union in connection with CAI's purchase of the Building.

24. To the best of my knowledge, the copies of checks drawn on the account of LaRuche, Inc., and made a part of Exhibit B are true and accurate.

The foregoing statements are true and correct to the best of my information, knowledge and belief.

_____
Sergio Zambrana

District of Columbia, ss:

I, _____, a Notary Public in and for the District of Columbia, do hereby state that on this ____ day of September, 2005, before me personally appeared Sergio Zambrana, who, being well known to me executed the within document as his act and deed.

GIVEN under my hand and official seal this _____ day of September, 2005.

_____  Kris Megna
Notary Public                    Notary Public, District of Columbia
                                 My Commission Expires 10-14-2009

F:\WP_FILES\CLIENTS\04300.101\Affidavit of Sergio Zambrana.wpd

4