Page 24

```
1    was.

2         Q.   At any time while you were with Shulman

3    Rogers, did that law firm have an attorney-client

4    relationship with Mr. Zambrana?

5         A.   No.

6         Q.   At any point while you were with Shulman

7    Rogers, did Mr. Zambrana ask that he be issued shares in

8    La Ruche, Inc.?

9         A.   Can you give me that again, please?

10        Q.   Sure.   At any time while you were at Shulman

11   Rogers, did Mr. Zambrana ask --

12        A.   Ask me?

13        Q.   Ask you or the firm --

14        A.   Okay.

15        Q.   -- that share in La Ruche, Inc. be issued to

16   him?

17        A.   I don't recall any formal request to Shulman

18   Rogers or me for the issuance of shares to Mr. Zambrana.

19        Q.   Okay.   Are you aware of any request by Mr.

20   Zambrana to anyone that shares be issued to him in La

21   Ruche, Inc.?

22        A.   A specific request for him to have stock
```

1    certificates issued in his name?

2         Q.    Yes.

3         A.    No.

4         Q.    At the time that you first began to represent

5    La Ruche, Inc., Mr. Cauderlier was the one hundred

6    percent owner, at any point between that moment in 1991

7    or 1992 and the formation of CAI in August of 1999 are

8    you aware of any change in the ownership structure of La

9    Ruche?

10        A.    In the actual ownership structure?

11        Q.    Yes.

12        A.    No.

13        Q.    Are you aware of whether Mr. Zambrana at any

14   point between your first association with La Ruche and

15   the formation of CAI in 1999, whether Mr. Zambrana has

16   asserted that he had any ownership interest in La Ruche?

17        A.    He was promised ownership interest in La Ruche

18   by Mr. Cauderlier.  That's why I was so precise in my

19   answers.

20        Q.    And when was this promise made?

21        A.    When the restaurant was renovated sometime in,

22   I think it was in '97 or '98.  You have to understand

Page 42

1   clear recollection, but I believe it was to La Ruche,

2   but I can't be certain.

3       Q.   Did you or Mr. LaForce prepare any documents

4   on the 20th of January, the date of the check, to

5   reflect the transaction with $25,000 going from Mr.

6   Zambrana to La Ruche and something going back to Mr.

7   Zambrana from La Ruche, was there any document, prepared

8   to your knowledge?

9       A.   No.

10      Q.   Did you state to Mr. Zambrana, in words or in

11  substance, that he should have separate counsel because

12  you couldn't represent him?

13      A.   Numerous times I have told Sergio that,

14  numerous and repeated times.

15      Q.   You told him you couldn't protect his interest

16  because you were counsel to Mr. Cauderlier --

17      A.   Yes.

18      Q.   -- or La Ruche --

19      A.   Yes.

20      Q.   -- or CAI?

21      A.   Let me share with you there were times prior

22  to this transaction where some very important

Page 43

1   discussions had to be had between Mr. Cauderlier and Mr.

2   Zambrana, and those had to be done in a very formal way,

3   where I would tell Sergio, "Hey, Sergio, I represent

4   J.C. and the company, you've got to watch out for

5   yourself."

6       Q.   Okay.

7            I'd like to explore those conversations

8   between Mr. Zambrana in which you were present?

9            MR. HAMBERGER: Could we take a break, at

10  this time, for just few minutes.

11           VIDEOGRAPHER: Off the record at 10:01.

12               (Off the record).

13           VIDEOGRAPHER: On the record at 10:09.

14               (On the record).

15  BY MR. GREEN:

16      Q.   Mr. Powers, you mentioned that you were

17  present at a number of discussions in which Mr. Zambrana

18  and Mr. Cauderlier were present.

19      A.   Uh-hum.

20      Q.   When do these occur?

21      A.   I worked with these gentlemen for a decade, so

22  I believe when our questioning left off we were speaking

3/3/2006                    Cauderlier & Associates v. Sergio Zambrana                    James Powers

Page 52

1       Q.    So that I'm clear, between the time that CAI

2    was formed in August of 1999 and closing on January 21st

3    of 2000.   There were discussions between Mr. Cauderlier

4    and Mr. Zambrana, in your presence, about an ownership

5    interest in CAI?

6       A.    Uh-hum.

7       Q.    But, to your understanding, there was no

8    agreement about what that interest would be?

9       A.    Correct.   There's no quantification of the

10   interest.

11      Q.    Was there any quantification of the amount of

12   money that Mr. Zambrana would have to contribute in

13   order gain an ownership interest CAI?

14      A.    Yes, there was, there was an understanding

15   that the $25,000 that was tendered toward the purchase

16   of the property was funds that was tendered toward

17   Mr. Zambrana's acquisition of an interest in CAI.

18      Q.    But not in La Ruche?

19      A.    It wasn't allocated between the two that was

20   the ambiguity, that was the open issue between the

21   parties.   What percent of interest in each entity should

22   be provided in light of the cash that was tendered on

1    the eve of the settlement.

2        Q.    Was there any understanding whether more or

3    less should be allocated to La Ruche or to CAI?

4        A.    No.    And that became a discussion subsequent.

5    I'm still in the time frame formation to 121.

6        Q.    Exactly.    At any point did in Zambrana state,

7    in your presence, what ownership interest in La Ruche he

8    felt he was entitled to?

9        A.    Percentage?

10       Q.    Yes.

11       A.    The allusion to this 25% that around the time

12   of renovation in '97-98, I'm not – Mr. Zambrana never

13   came to us and said, give me my shares for that 25%.

14   And I believe that what happened between these

15   individuals as businessmen is, there was a promise, it

16   then got merged into the big transaction, and the

17   question became what allocation as between the two

18   entity. Mrs. Zambrana would receive some interest in.

19   But my understanding and my belief was that it was

20   promised both and he would get interest in each.    There

21   was no formula or allocation or weighting as between the

22   two.

Page 54

1      Q.    I'm trying focus more on what Mr. Zambrana

2    said.

3      A.    Okay.

4      Q.    Rather than your belief.

5      A.    All right.

6      Q.    In your presence, did Mr. Zambrana state what

7    percentage he believed he was entitled to in La Ruche?

8      A.    He had, at times, referred to the 25% promise.

9    That's all.

10     Q.    Did he state, in your presence, did Mr.

11   Zambrana state, in your presence, what interest he

12   believed he was entitled to in CAI?

13     A.    Only by way of discussion and trying to figure

14   out what the range of interest might be.  So, we had

15   discussions, J.C., Sergio and I about, what does $25,000

16   represent in relationship to the over all value of what

17   we have here, both land and business.  So you have a

18   million dollar piece of dirt, and you have a business

19   that has what, fair market value, and the discussion

20   was, what does 25 represent.  There was discussions

21   about it's either 25% represents 1/40th of the value of

22   land that CAI just bought or 2.5% or it represent this

Page 55

1    in La Ruche.    There was never a definitive agreement

2    reached, in my presence, between these parties as to

3    that allocation.

4                    (Exhibit Number 6 marked).

5        Q.   Mr. Powers, we've been talking about this

6    $25,000 check.

7        A.   Uh-hum.

8        Q.   And I have put before you Exhibit 6 which is a

9    check dated the 21st of year 2000 for $25,000 on

10   Mr. Zambrana's, appears to be his personal checking

11   account, payable to La Ruche.

12       A.   Right.

13       Q.   Did you ever have custody of this check?

14       A.   I don't recall.

15       Q.   Were you present when Mr. Zambrana signed the

16   check?

17       A.   I don't think I was.

18       Q.   I note that the check is payable to La Ruche,

19   Inc., did you have any discussion with Mr. Zambrana

20   about who the payee of the check should be?

21       A.   No.

22       Q.   Do you have any understanding of why the check

Page 61

1    a copy of that.

2        Q.    Were you present when Mr. Cauderlier signed

3    the note?

4        A.    I don't recall.  I don't think I was.

5        Q.    Do you have any understanding of how the

6    original was delivered to Mr. Mahesh I mean

7    Mr. Naithani?

8        A.    No, there was a very friendly deal.

9    Mr. Naithani was then floating in cash.  He had just

10   sold a large business, so he was very magnanimous.  And

11   what he did, I believe, that J.C., they did direct

12   payments themselves.  J.C. paid him for a period of

13   time, they self-dealt.  Mr. Naithani is a sophisticated

14   businessman and J.C., so they administered that

15   relationship directly, I did not need to and was not

16   present during any of those things, I didn't need to be.

17   I helped draft the note and sent it to Mahesh and to

18   J.C., and said look, here is a real simple note.  J.C.,

19   this is awesome for you, if Mahesh will take it.  No

20   interest simple straight and he took it.  So I think I

21   got a very favorable note for J.C.

22       Q.    After the closing occurred, after CAI had

Page 62

1    acquired the Georgetown property, did you have any

2    discussion with Mr. Zambrana about an ownership interest

3    in CAI?

4        A.    I did.

5        Q.    Other than you and Mr. Zambrana and

6    Mr. Cauderlier was anyone else present?

7        A.    No.

8        Q.    Okay.  On how many different occasions did

9    this conversation take place?

10       A.    Subsequent to the closing, there was an

11   expectation from Sergio that something was going to be

12   done as to the promise that had been made to him.

13       Q.    How do you come to that understanding?

14       A.    J.C. said, Sergio's asking about what he gets,

15   what do we do?

16       Q.    All right, so Mr. Zambrana had an expectation

17   that something was going to happen?

18       A.    Correct.

19       Q.    So you had a conversation, you participated in

20   a conversation between Mr. Zambrana, Mr. Cauderlier and

21   yourself?

22       A.    I called a meeting on it.

Page 63

1      Q.    Where was the meeting?

2      A.    In the shell of the recently acquired

3    townhouse.  I reversed these.  I even did during the

4    deal.  Either 1035 is the restaurant or 1031 is the

5    restaurant, 1033 would be the garden, 1035 would be the

6    other building.   Whatever the building, not the

7    restaurant is, it was in that building.  In the shell,

8    the former Yes Bookstore.

9      Q.    When did this conversation take place?

10     A.    I would estimate February or March I had – I'd

11   just gotten engaged, I was about to get engaged.

12   That's why it's such an incredibly dense time of life, I

13   gotten engaged, my wife got pregnant, and I had my

14   daughter all within this year and half time frame.  So I

15   believe it was February, March, the meeting was in the

16   shell.

17     Q.    How long did the meeting last?

18     A.    The tour of the building, we arrived, the

19   demolition had commenced in the shell so it was a

20   largely cut out shell.   We walked the property where

21   J.C. visually toured through how he was going to

22   retrofit it, combine the back kitchens, create a dining,

Page 64

1    a catering facility over here for leasing out.  So, we

2    did a tour of the building for about 45 minutes where

3    Sergio and J.C. talked about plans and dreams and

4    aspirations and how they'd transform this into the La

5    Ruche catering center, or a prep kitchen was another

6    idea that it would be a prep facility.  So they were

7    exploring ideas they could do with the shell.  And

8    eventually we wound our way up to the second floor and

9    at the top of the stairs over looking the garden; we had

10    kind of bruising discussion about what we do here

11    because this issue had come to a head.

12       Q.    What did Mr. Zambrana say?

13       A.    Words to the effect, J.C. what do I get?  What

14    am I getting here?  When are you going to give me my

15    shares?

16       Q.    So, as of this meeting, February or March of

17    2000 there was no agreement or understanding about what

18    interest, if any Mr. Zambrana would have in either of

19    the businesses?

20       A.    No, there was an understanding as a promise

21    made with no quantity as to some interest in La Ruche.

22    And there was an understanding of some interest to be

Page 65

 1    given in CAI, and that was the purpose of the

 2    discussion.

 3        Q.   And Mr. Zambrana asked specifically for an

 4    interest in CAI?

 5        A.   Yes.

 6        Q.   And what did Mr. Cauderlier say?

 7        A.    Mr. Cauderlier said words to the effect of,

 8    Well, we still have to figure out how you hold this

 9    interest, what you get.   And J.C. tried to offer

10    Sergio, in this meeting, interest in La Ruche alone.   To

11    which Sergio indicated, No, I tendered money for the

12    building, I want a piece of CAI which owns the building

13    and that was my understanding of our deal, or our

14    understanding, J.C. when I came forward and gave you

15    this money, that I was helping you buy the building and

16    therefore I should receive an interest in that building.

17              VIDEOGRAPHER: This is the end of tape one

18    off the record at 10:35.

19                   (Off the record).

20              VIDEOGRAPHER: This is the beginning of

21    tape two in the deposition of James Power on the record

22    at 10:41.

Page 66

1    BY MR. GREEN:

2         Q.    Mr. Powers before the break we were discussing

3    this meeting that occurred in February or March of 2000

4    that occurred at the restaurant or in the shell of the

5    building that was under construction.    At this February

6    or March 2000 meeting, Mr. Zambrana said, in words or in

7    substance, what do I get, what are my shares?

8         A.    Correct --

9         Q.    Well, if I misstated it.

10        A.    When, do I get, not what do I get.

11        Q.    When do I get my shares.    Mr. Cauderlier's

12   response was what?

13        A.    Well, let's discuss.    And J.C. then tried to

14   offer him interest only in La Ruche.

15        Q.    And Mr. Zambrana's response to the offer of an

16   interest only in La Ruche was what?

17        A.    That's not what you promised me, J.C.

18        Q.    At that point, what did Mr. Cauderlier say?

19        A.    Well, let's talk about that, how do we

20   approach this.    At that point, I'd indicated that J.C.,

21   and I told J.C. this I said, you indicated to Sergio he

22   was to receive some interest but you guys never agreed

1    on what interest.   So let's talk about that.   I tried

2    to, within my role as an advocate of Mr. Cauderlier

3    personally and of La Ruche and as counsel to CAI, I

4    tried to work with the parties that were having a

5    dispute, having successfully bought the building, as to

6    what they should do between themselves having achieved

7    that success.

8         Q.   What suggestion did you make?

9         A.   That there should be an allocation of the

10   interest in both companies because the restaurant or the

11   La Ruche, Inc. stock alone, and I said this to J.C. and

12   Sergio was illusory or, of potentially no value, because

13   without the land and the lease upon which the restaurant

14   presided on that land, you don't have a restaurant.   So

15   having an interest in the restaurant alone from a

16   tactical and a real point of view was an illusory asset

17   because it could be taken out from under you.   And I

18   indicated to Sergio and J.C. that my understanding of

19   their deal was that there was to be an allocation of an

20   interest in both.   And I suggested to them that we

21   discuss and explore what that should be.

22        Q.   And after you made this suggestion, what did

Page 68

1    Mr. Zambrana say?

2        A.    Mr. Zambrana and Mr. Cauderlier actually

3    talked about it and there was an agreement that the

4    money tendered and the past promises for La Ruche stock

5    would be honored by an allocation of stock to Sergio in

6    both entities.

7        Q.    And what was the allocation to be?

8        A.    That's when we started doing some of those

9    math exercises that had come up before.  What percent of

10   the money that Sergio had tendered represented the value

11   of the deal.  Discussion or figures I recalled, 2.5% in

12   the CAI entity which represented the almost mathematical

13   ratio of the funds tendered by Mr. Zambrana toward the

14   value of asset acquired.    There was also the reference

15   to the La Ruche stock, and I suggested that they resolve

16   their affairs comprehensively and just do one

17   understanding.

18       Q.    Was there any agreement?

19       A.    Yes, there was. There was an agreement by J.C.

20   that stock would be given in both companies.  We

21   recognized that a grant to La Ruche alone was not a

22   grant of significant or real value.  I think he

Page 69

1    recognized the equity of the situation and offered to

2    Sergio that which he had promised Sergio which was

3    interest in the entity, which I believe Sergio was

4    promised in exchange for the cash that he came up with.

5        Q.    And what was the percentage of CAI that he

6    agreed to?

7        A.    The minimum percentage that he said that he

8    could possibly see was 2.5%.  That was a straight --

9        Q.    Who could agree to?

10       A.    J.C.  That's the mathematical ratio of the

11   amount of dollars that were tendered, $25,000, against

12   the deal value.  We used the deal of just calling the

13   building a million, that was just for working purposes

14   so $25,000 works out to be 2.5% of a million.

15       Q.    And that was the minimum that Mr. Zambrana was

16   willing to accept or that Mr. Cauderlier was willing to

17   give?

18       A.    Willing to give.  J.C. had said, I can see

19   2.5%.  And then he looked to giving him value in La

20   Ruche, almost saying I've covered you on the money and

21   I'll give you something in La Ruche, too.  That's where

22   it was substantially left.

Page 70

1       Q.   So at the conclusion of this meeting in

2    February or March of 2000 --

3       A.   Uh-hum.

4       Q.   -- there was no agreement?  A comprehensive

5    agreement?

6       A.   I believe there was an agreement to grant

7    stock, there wasn't quantification of stock to be

8    granted.  I believe it was an absolute meeting of the

9    minds.  That both parties said you'll get interest in

10   both corporations.  The quantum of that interest is not

11   yet fixed.  So, if you use comprehensive, as indicating

12   that both the grant and the quantum of the grant

13   representing comprehensive, there was not a

14   comprehensive agreement reached at that time.

15      Q.   After this meeting, were there any further

16   meetings in which you participated with Mr. Cauderlier

17   and Mr. Zambrana in which the issue of ownership in CAI

18   or La Ruche came up?

19      A.   Not that I recall, because, I was drawn away

20   from the affairs of J.C. about a month or two after

21   that.  I was separating from Shulman Rogers, was going

22   off on my own.

Page 71

```
 1        Q.    I'm confused.

 2        A.    I'm sorry, it's Wilkinson, moving out of WBK

 3   going over to Comscore.  I joined Comscore in July of

 4   2000.

 5        Q.    Is it accurate to say that your active

 6   representation of CAI, La Ruche, Mr. Cauderlier's

 7   stopped when you left Wilkinson?

 8        A.    I think that - it's accurate to say my

 9   substantive and real material representation, but J.C.

10   and I stayed in touch.  It was still very amicable

11   between us throughout that, 2000 for many, many months.

12   He came to my wedding in October of 2000, and it was

13   exquisite then.  It wasn't till about 12-8 months after

14   that.  I would offer this, it tapered down.  After the

15   deal was done as I was moving out of Wilkinson over into

16   being corporate counsel for dot com.  J.C. to my

17   understanding knew that I couldn't be a lawyer in

18   addition to being a general counsel at a privately held

19   company, so yes, my work tapered off.  And then on

20   October 6th of 2000 he and his new wife were at my

21   wedding, Jennifer and I got married at the Washington

22   International School.  Things were good between us.  By
```

Page 72

1    then I was not doing any active work.

2        Q.    Do you know whether Mr. LaForce continued to

3    do work for the corporations or Mr. Cauderlier in

4    person?

5        A.    I don't, but about two years later, and maybe

6    it was when this thing was starting to heat up Pierre

7    called me, and said, You know, what do you want to do

8    with these files.  I said, I'm not representing them

9    anymore, you have to do what you've got to do, it's a

10   firm client, get Andy Tolland, who is the managing

11   partner or someone else to guide you.  I suggest you

12   contact J.C., see what he wants to do with his files, I

13   don't want 'em because I was -

14       Q.    During late 1999, after August through the

15   closing?

16       A.    Okay.

17       Q.    Did you have in Wilkinson, did you have a

18   separate account for CAI, a separate account for La

19   Ruche?

20       A.    You know, I don't recall.  I know the billing

21   by matter, I believe it was opened up - I think La Ruche

22   was the original client, I think the subsequent matters

Page 73

1    that were opened were probably called CAI matter,

2    billing might have been by virtue of establishing the

3    account originally La Ruche, Inc.

4            I don't know if there was a separate retainer

5    agreement established for the entity.  I believe the

6    entity was formed pursuant to the instruction of Mr.

7    Cauderlier, as an individual and working through La

8    Ruche, Inc. for La Ruche to form this sub-entity, CAI,

9    that was going to be a purchase entity.  I do believe it

10   was a matter that we opened, I believe because I believe

11   J.C. came on first.   He was one of the clients that I

12   came down from, or come out of.  April, leave Shulman

13   Rogers.  May, June, July started Wilkinson.

14        Q.   But when CAI was formed, the capital stock was

15   held by Mr. Cauderlier, is that correct?

16        A.   Yes.

17        Q.   Not by La Ruche?

18        A.   Again, I both defered and didn't do that work,

19   so, you know, that's not mine, I don't have actual

20   knowledge.   I'm sorry, I do, as CAI; it was J.C.'s

21   entity from formation as of that summertime period.

22        Q.   After this meeting in February or March of

Page 74

1    2000, did Mr. Zambrana come to you either by telephone

2    or personally and say where are my -- where are my

3    shares, where's my ownership interest?

4         A.   No, not that I recall.

5         Q.   Was it clear to you that as of this meeting,

6    this February, March 2000 meeting that Mr. Zambrana

7    believed that he was entitled to an ownership interest

8    CAI?

9         A.   Yes.

10        Q.   And as of that meeting, February/March meeting

11   he believed he had an ownership interest in La Ruche?

12        A.   By virtue of past promises as well.

13        Q.   And, as of this February/March, 2000 meeting,

14   to your knowledge, no shares in either corporation were

15   given, issued to Mr. Zambrana, is that correct?

16        A.   You are correct.

17        Q.   And you had made it quite clear to Mr.

18   Zambrana that you could not and did not represent his

19   interest?

20        A.   Correct.

21        Q.   And you suggested to him that he seek his own

22   counsel to protect his interest?

Page 75

1        A.    I've done that repeatedly.

2        Q.    To your knowledge, did he ever engage counsel

3    on this matter?

4        A.    Yeah, I learned that first I heard the name

5    Kass, Benny Kass, who is a litigator I had heard about.

6    So yes, after the retention of counsel by Sergio I had

7    learned of it.  I forget exactly how, but, I will tell

8    you, I knew that if they did not resolve it directly it

9    would end up in the hands of counsel.  I told J.C. that

10   same thing about he and Mahesh.  Saying, Look, if you

11   guys ever get not nice on this one, I created the

12   instrument, I'm a witness to it, you'll lose me both.

13   You'll lose me as an advocate because I'll be a fact

14   witness and lawyer is precluded from being, if you know

15   you're likely to be a witness in a matter, I can't do

16   it.  I told J.C. that and he knew it.  Mahesh, he's very

17   sophisticated, a relatively experienced individual.

18   And Sergio repeatedly I would tell him, Sergio, get

19   yourself your own representative and you got to do what

20   you got to do Sergio.  You know, Bob, it's very

21   uncomfortable where you work for your client, where a

22   client secures benefits from a party by promising

Page 76

1    something and the other side comes to you and says

2    where's my stuff. And you say to the other side, Of

3    course, we're not giving it to him because you're

4    getting his cooperation without giving the promise or

5    fulfilling the promise.  So I had a very difficult

6    position with Mr. Zambrana constantly coming forward and

7    talking about the situation.  I just had to kind of

8    stand silent and we can continue to get a way with

9    benefits and work with things without granting a promise

10   that's tactically to my client's advantage.

11        Q.   At some point Mr. Cauderlier called you and

12   asked you to prepare a statement, is that true?

13        A.   He wrote to me, and he called me.

14        Q.   And in response to the request, you did

15   prepare an affidavit?  Correct?

16        A.   Uh-hum.

17        Q.   Did you send a copy to him?

18        A.   I sent a copy to you -

19        Q.   You did not send a copy to me, sir, at the

20   time the request was made.   I did not represent him.

21        A.   At the time the request was made, I recall

22   sending e-mails to both - oh, yeah, then it was probably