# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAUDERLIER & ASSOCIATES, INC.**

        **Plaintiff**

    **v.**

**SERGIO ZAMBRANA**

        **Defendant/Third-Party**
        **Plaintiff**

    **v.**

**JEAN CLAUDE CAUDERLIER and**
**LA RUCHE, INC.**

        **Third-Party Defendants**

        **Civil Action No. 05-1653 (JMF)**

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
## OF CAUDERLIER & ASSOCIATES, INC.

      Defendant and third-party plaintiff, Sergio Zambrana, by and through counsel, hereby

files this Opposition to Motion of Cauderlier & Associates, Inc. for Summary Judgment.

### Introduction

      The memorandum in support of the motion for summary judgment brought by plaintiff,

Cauderlier & Associates, Inc. ("CAI"), and the statements put forth by CAI's sole director and

officer, Jean Claude Cauderlier, in his accompanying "declaration," by their own terms,

demonstrate that CAI's motion should fail because there are genuine issues regarding nearly

every material fact relied upon by CAI. Moreover, even if the facts asserted by CAI were, in

fact, undisputed and true, CAI would not be entitled to a judgement as a matter of law.

Therefore, CAI's Motion for Summary Judgment must be denied.

**Argument**

    A.    THE FACTS OF THIS CASE ARE CLEARLY DISPUTED

In his Declaration,[1] third-party defendant, Jean Claude Cauderlier asserts, among other things, that he initially purchased 100% of the stock of La Ruche, Inc. ("La Ruche"). Mr. Cauderlier states Mr. Zambrana held no interest in La Ruche prior to the year 2000. He avers that Mr. Zambrana's $25,000 check simply paid for a 10% interest in La Ruche in 2000, and had nothing to do with the purchase by CAI of the Building. Mr. Cauderlier says he is the sole owner of CAI and he never promised Mr. Zambrana an interest in CAI or the Building. He says Mr. Zambrana contributed no funds toward the purchase of the Building. Most interesting of all, CAI bases its motion for summary judgment on the argument that all the foregoing assertions are true and undisputed.

Actually, as will be shown below, Mr. Cauderlier's and CAI's contentions are belied by (a) contradictory statements contained in Mr. Cauderlier's declaration; (b) the affidavit of Sergio Zambrana; (c) the corporate records of La Ruche; (d) the loan documents relating to the purchase of the subject Building; (e) the deposition of James Powers; and (f) the affidavit of Mahesh Naithani. These contradictions will be demonstrated after a specific recitation by Mr. Zambrana of the disputed "factual" statements made by Mr. Cauderlier and similar unsupported "facts" relied upon by CAI in its Memorandum.[2]

---

[1] Declaration of Jean Claude Cauderlier, references to which shall be designated by "Decl.," followed by the appropriate paragraph number.

[2] Memorandum of Cauderlier & Associates, Inc. in Support of Motion for Summary Judgment, references to which shall be designated by "Memo.," followed by the appropriate page number.

The "Facts" as Put Forth By Mr. Cauderlier

(1)     "I became the sole La Ruche shareholder by purchasing all outstanding La
        Ruche shares." (Decl., ¶ 4).

(2)     In early 1999, "I remained La Ruche's sole shareholder." (Decl., ¶ 5).

(3)     On August 19, 1999, Mr. Zambrana was not an owner or shareholder in
        La Ruche.  I was the sole shareholder of La Ruche on that date." (Decl., ¶
        7).

(4)     "The [$55,000] deposit was made from the CAI checking account that I
        had funded on August 25, 1999." (Decl., ¶ 8).

(5)     "Later in 1999, Sergio Zambrana, then a La Ruche employee, and I
        discussed the possibility of his becoming a co-owner of La Ruche.  I said
        that he could buy 10 percent of La Ruche for $25,000.  That amount was
        based on the $250,000 purchase price I paid for La Ruche in the mid-
        1980's." (Decl., ¶ 9).

(6)     "None of Mr. Zambrana's funds were used to close on the property."
        (Decl., ¶ 11).

(7)     "On January 21, 2000, Mr. Zambrana gave me a check, payable to La
        Ruche, for $25,000.  Mr. Zambrana's check was deposited in La Ruche's
        corporate bank account on January 21, 2000.  As the chronology of events
        establishes, Mr. Zambrana's $25,000 check played no part in CAI's
        purchase of the Property.  CAI was required to have bank-certified funds
        at the closing, which occurred before Mr. Zambrana's personal check
        could have cleared." (Decl., ¶ 13).

3

(8)     "I understood that Mr. Zambrana had given me his check to purchase 10 percent of La Ruche.  I arranged for La Ruche to issue stock certificate No. 9 for 10 shares to Mr. Zambrana later in January 2000." (Decl., ¶ 14).

(9)     "I told Mr. Zambrana that he had 10 percent of La Ruche.  The 10 percent I was talking about had already been issued in La Ruche certificate No. 9 in January 2000.  This was not an offer of an additional 10 percent in La Ruche."  (Decl., ¶ 166).

(10)    Mr. Zambrana refused to accept my offer of the 10 percent of La Ruche in exchange for $25,000.  Mr. Zambrana instead asked for interest in CAI or the land.  I told him no.  The February/March 2000 meeting ended without an agreement. Mr. Zambrana did not request the return of his $25,000." (Decl., ¶17).

(11)    "Certificate No. 9 and the replacement Certificate No. 10 were, from my perspective, stock issued in exchange for Mr. Zambrana's $25,000 check payable to La Ruche."  (Decl., ¶ 19).

(12)    "I am aware of Mr. Zambrana's testimony concerning his claim of ownership in La Ruche based on salary deferral and/or his agreement to remain as a La Ruche employee when he could have left.  I deny that any such agreement existed in which Mr. Zambrana was given an ownership interest in La Ruche.  While I had discussed selling Mr. Zambrana 10 percent interest in La Ruche for $25,000 prior to January 2000, there was no agreement in which Mr. Zambrana could, by working at La Ruche, 'earn' an ownership interest in La Ruche.  Nor was there any agreement in

4

which Mr. Zambrana would be given ownership in La Ruche in exchange

for his remaining a La Ruche employee and foregoing some other

employment opportunity.  Mr. Zambrana's January 21, 2000 $25,000

check was, and remains, consistent with my offer of a 10 percent interest

in the restaurant only."  (Decl., ¶ 20).

(13)  "The first I heard Mr. Zambrana's claim that he owned an interest in CAI

was in early 2004, after I had offered Mr. Zambrana the opportunity to

buy my remaining 90 percent interest in La Ruche."  (Decl., ¶21).

Mr. Zambrana contends that the contentions and denials contained in subparagraph (12)

above alone establish that there are material facts at issue in this case, which cannot be resolved

by a summary judgment motion.  Moreover, subparagraphs (10) and (13) contradict one another,

raising questions not only about the facts but, as will be further discussed below, whether Mr.

Cauderlier's "testimony" via his Declaration should be given any weight at all.

The "Facts" as Relied Upon by CAI

In its Statement of Undisputed Facts (Memo., pp. 2-6), CAI alleges that the following are

true statements, undisputed, and the basis upon which a motion for summary judgment could be

granted:

(1)  "While present at the closing, Mr. Zambrana played no substantive role in

that transaction." (Memo., p. 2).

(2)  "Mr. Powers[3] confirmed that no agreement existed before Mr. Zambrana

submitted his check.  Mr. Powers testified that '[t]here's no quantification

---

[3]  James A. Powers, Esq., the attorney who represented Mr. Cauderlier personally, and La Ruche and CAI. [*See* page 67 of Mr. Power's deposition, parts of which are attached to CAI's motion, as Exhibit 3.]

5

of the interest' that Mr. Zambrana was to receive in exchange of his check and that '[the interest] wasn't allocated between the two [corporations] that was the ambiguity, that was the open issue..." (Memo., p. 3).

(3)     ". . . Mr. Powers summarized the meeting's outcome as follows: 'I believe there was an agreement to grant stock, there wasn't quantification of stock to be granted. I believe it was an absolute meeting of the minds. That both parties said you'll get interest in both corporations. . . .'"

(4)     "Mr. Cauderlier affirms the lack of an agreement between the parties." (Memo., p. 5).

(5)     "Mr. Cauderlier rejected Mr. Zambrana's counter-offer." (Memo., p. 4).

(6)     "The Zambrana and Powers testimony make clear that, as of February/March 2000, Mr. Zambrana had actual knowledge of a dispute whether he had any ownership interest in CAI. At the meeting, Mr. Cauderlier rejected Mr. Zambrana's demand for shares in CAI or in the land. [Citation omitted.] Mr. Cauderlier's offer of 10 percent of La Ruche was also rejected. [Citation omitted.] There was simply no agreement." (Memo., p. 5).

(7)     "Only after Mr. Cauderlier announced in 2004 that he was considering selling La Ruche and CAI did Mr. Zambrana's assertion of ownership in CAI appear." (Memo., p. 5).

(8)     "On June 23, 2004, La Ruche stock certificate No. 10 (for 10 shares) was issued to Mr. Zambrana. Certificate No. 10 was issued as a replacement for certificate No. 9 (also for 10 shares), previously issued to Mr.

6

Zambrana but lost.  Mr. Cauderlier issued certificate No. 10 consistent

with his offer of 10 percent of La Ruche for Mr. Zambrana's $25,000

check payable to La Ruche. [Citation omitted.] (Memo., pp. 5-6).

(9)    "Although he signed the June 23, 2004 Consent to Action in Lieu of a

Special Meeting of the Shareholders of La Ruche, Inc. [citation omitted],

Mr. Zambrana denied that certificate No. 9 was issued in exchange for his

$25,000 check. [Citation omitted.] Mr. Zambrana testified that certificate

No. 10 was stock issued under an earn-in agreement he had with Mr.

Cauderlier.  While not directly relevant to this motion, it is apparent that

there was no agreement between Mr. Cauderlier and Mr. Zambrana

concerning the ownership of La Ruche." (Memo., p. 6).

<u>The "Facts" as Seen By Mr. Zambrana</u>

In support of his initial Motion to Dismiss the Complaint or, in the Alternative, Motion to

Join Indispensable Parties, Mr. Zambrana included an Affidavit,[4] which affidavit has been cited

and included as an exhibit to several subsequent motions or oppositions filed by Mr. Zambrana;

it is a document with which Mr. Cauderlier and his counsel cannot help but be familiar.  Mr.

Zambrana's Affidavit is attached hereto as Exhibit A.

The following "facts" are asserted by Mr. Zambrana in his affidavit, and, where

indicated, are corroborated by the Affidavit of Mahesh Naithani,[5] the general partner of Yes!

---

[4]  Affidavit of Defendant, Sergio Zambrana, references to which shall be designated by "Zambrana Aff.," followed by the appropriate paragraph number.

[5]  Affidavit of Mahesh Naithani, references to which shall be designated by "Naithani Aff.," followed by the appropriate paragraph number.

1035 Limited Partnership, the entity that sold the building to CAI.  Mr. Naithani's Affidavit is

attached hereto as Exhibit B.

(1)     On or about January 20, 2000, Mr. Zambrana paid the sum of $25,000 to

La Ruche by personal check, which check was dated January 21, 2000.

(Zambrana Aff., ¶2 ).

(2)     At all times, it was understood between Mr. Cauderlier and Mr. Zambrana

that the $25,000 mentioned in subparagraph (1) above was to be

earmarked for the purchase by CAI of the real property and building

located at 1035, 1037 1039 31st Street, N.W., Washington, D.C. 20007.

(Zambrana Aff., ¶4).

(3)     Long before January, 2000, Mr. Cauderlier told Mr. Zambrana that Mr.

Cauderlier made Mr. Zambrana a part owner of La Ruche, Inc.  Mr.

Zambrana had worked in the restaurant for many years, and Mr. Zambrana

was the most highly valued employee during that entire time. (Zambrana

Aff., ¶7).

(4)     Mr. Cauderlier gave Mr. Zambrana part ownership in La Ruche in

recognition of  Mr. Zambrana's many years of excellent performance as

an employee of La Ruche and as incentive to keep Mr. Zambrana  in the

employ of La Ruche. (Zambrana Aff., ¶8).

(5)     The $25,000 check Mr. Zambrana gave to La Ruche was not payment for

any ownership share in La Ruche and was instead, part of CAI's purchase

price of the Building. (Zambrana Aff., ¶9).

(6)     Mr. Zambrana wrote the $25,000 check and made it payable to La Ruche
        at the behest of Mr. Cauderlier, who told Mr. Zambrana at the time that
        Mr. Zambrana would become a shareholder in CAI. (Zambrana Aff., ¶10).

(7)     The $25,000 check which Mr. Zambrana gave to La Ruche was, in fact,
        used by CAI a part of the down payment toward the purchase of the
        Building, to the best of Mr. Zambrana's knowledge. (Zambrana Aff.,
        ¶11).

(8)     Mr. Zambrana contends that he is a part owner of CAI. (Zambrana Aff.,
        ¶12).

(9)     Mr. Cauderlier stated in the presence of Mr. Natthani and others, at the
        settlement table, that Mr. Zambrana was an owner of CAI. (Zambrana
        Aff., ¶13; Naithani Aff., ¶¶8, 9).

(10)    Mr. Cauderlier stated in the presence of Mr. Natthani and others, before
        and after settlement, that Mr. Zambrana am an owner of CAI. (Zambrana
        Aff., ¶14; Naithani Aff., ¶9).

(11)    Mr. Natthani has always recognized Mr. Zambrana as an owner of CAI.
        (Zambrana Aff., ¶15; Naithani Aff., ¶¶9, 14, 21).

(12)    After CAI bought the Building, Mr. Zambrana received many telephone
        calls from Mr. Natthani regarding payments from CAI that were past due.
        (Zambrana Aff., ¶16; Naithani Aff., ¶19 ).

(13)    Mr. Natthani addressed his inquiries about the overdue payments to Mr.
        Zambrana in Mr. Zambrana's capacity as an owner of CAI. (Zambrana
        Aff., ¶17; Naithani Aff., ¶¶9, 14, 21).

(14)     The $25,000 check Mr. Zambrana made payable to La Ruche the night

before the settlement on the Building enabled La Ruche to pay Mr.

Natthani $25,000, as part of the purchase price that CAI was paying for

the Building. (Zambrana Aff., ¶21).

(15)     La Ruche has made many payments directly to Mahesh Natthani, as

payment on the note given by CAI to Mr. Nattani in connection with

CAI's purchase of the Building. (Zambrana Aff., ¶22).

(16)     Mr. Zambrana contends that La Ruche has made many payments to First

Union Bank, as payment on a note given by CAI to First Union in

connection with CAI's purchase of the Building. (Zambrana Aff., ¶23).

<u>The Affidavit of Mahesh Naithani</u>

In addition to corroborating Mr. Zambrana's version of the "facts," Mr. Naithani stated

that he understood at all times that Mr. Zambrana was a co-owner of Café La Ruche and CAI,

and that it was his reliance upon his understanding that Mr. Zambrana was a partner in CAI that

prompted him to take back an $80,000 note from the purchasers at settlement:

(1)     At all times referred to herein, Mr. Naithani was the general partner of

Yes! 1035 Limited Partnership ("Yes!"). (Naithani Aff., ¶2).

(2)     Beginning some time in 1993 or 1994, and continuing until January 21,

2000, Yes! 1035 Limited Partnership was the owner of the property

located at 1035-1039 31st Street, N.W., Washington, D.C. (Naithani Aff.,

¶3).

(3)     In the summer or fall of 1999, Mr. Naithani was approached by the

owners of Café LaRuche, Jean Claude Cauderlier and Sergio Zambrana,

about the possibility of their purchasing the Property, wherein their restaurant, Café LaRuche, was located.  (Naithani Aff., ¶4).

(4)    After a series of discussions and negotiations, Mr. Naithani agreed, as general partner of, and on behalf of, Yes! 1035 Limited Partnership, to sell the property to Messrs. Cauderlier and Zambrana. (Naithani Aff., ¶5).

(5)    Mr. Cauderlier and Mr. Zambrana told Mr. Naithani that they would be forming that a new corporation, [CAI] for the purpose of purchasing the Building. (Naithani Aff., ¶6).

(6)    Two weeks prior to settlement, Mr. Cauderlier advised Mr. Naithani that he, Mr. Cauderlier, could not raise the full amount of the loan necessary to consummate the purchase of the Property, and Mr. Cauderlier asked Mr. Naithani if he would be willing to "take back" a note for $80,000. (Naithani Aff., ¶10).

(7)    Ordinarily, as an experienced businessman, Mr. Naithani would not have acceded to Mr. Cauderlier's request that I take back paper instead of cash at the table. (Naithani Aff., ¶11).

(8)    Mr. Naithani's decision to accept Mr. Cauderlier's request and take back the $80,000 note was based on the comfort he had knowing that Mr. Zambrana was Mr. Cauderlier's business partner in CAI. (Naithani Aff., ¶14).

(9)    Mr. Naithani would not have made the $80,000 loan had Mr. Cauderlier been the only principal in CAI. (Naithani Aff., ¶15).

(10)     Mr. Naithani was initially and consistently told by Mr. Cauderlier and

Mr. Zambrana that they were purchasing the Property together; it is the

only reason Mr. Naithani took back the note.  If Mr. Cauderlier had been

the sole purchaser, or the sole owner of CAI, Mr. Cauderlier would not

have made the loan. (Naithani Aff., ¶21).

What is clear from the foregoing is that there is a genuine dispute over many material

facts in this case.  Contrary to the positions taken by CAI, Mr. Zambrana asserts that there was

an agreement regarding his stock ownership in La Ruche, and asserts that there was a separate

agreement regarding his entitlement to an interest in the building and/or CAI.  At best, from

CAI's point of view, there is a legal issue regarding the sufficiency of the terms of the purported

agreement(s) between Messrs. Cauderlier and Zambrana.  There is clearly no set of undisputed

facts upon which the court, at this stage of the case, could reach a conclusion as to the terms of

the contract, as a matter of law.  The Motion for Summary Judgment must be dismissed, on the

grounds that it lacks undisputed material facts and is, in fact, frivolous.

B.     MR. ZAMBRANA'S OWNERSHIP IN LA RUCHE, INC.

To further support his contention that material facts are at issue, Mr. Zambrana directs

this Honorable Court to the issue of whether Mr. Zambrana owned stock in La Ruche prior to his

tendering the $25,000 check on January 20, 2000.  Mr. Zambrana's intention is to show that,

although said check was payable but to La Ruche, the facts support his position that the proceeds

of the check were intended to be applied toward the purchase of the Building, not to purchase

shares in La Ruche.

In the deposition of James Powers [*see* Exhibit 3 of CAI's Memorandum], there is ample

testimony to corroborate Mr. Zambrana's contention that he had been promised an interest in La

Ruche long before 2000.  At page 69, lines 2-6, Mr. Powers states: "Mr. Zambrana and Mr. Cauderlier actually talked about it and there was an agreement that the money tendered and the past promises for La Ruche stock would be honored by an allocation of stock to Sergio on both entities."  A bit later, when asked whether Mr. Zambrana believed, at a crucial meeting in February/March 2000 among Messrs. Powers, Cauderlier and Zambrana, that he believed he was entitled to an ownership interest in La Ruche, Mr. Powers responded affirmatively, *i.e.*, "By virtue of past promises as well." (Powers deposition, p. 74, lines 10-12.)

In addition to the (disputed) fact that Mr. Cauderlier promised Mr. Zambrana an interest in La Ruche prior to the tendering of the $25,000 check, Mr. Zambrana would point out that La Ruche's corporate records and stock ledger show that Mr. Cauderlier never owned 100% of the shares of La Ruche, Inc.  Rather, when Mr. Cauderlier obtained the remainder of his shares from the Levenson family (the prior owners of La Ruche, Inc.), stock certificate number 8 (transferring 50 shares to Mr. Cauderlier) was apparently written at the same time that certificate number 9 (transferring 10 shares to Mr. Zambrana). The handwriting appears to be the same, and there was no further stock certificates issued, except for certificate number 10, which later replaced certificate number 9.  The stock ledger is attached hereto as Exhibit C.  Unfortunately, the certificate numbers were obliterated when the copies were made, but one need only work backwards, starting with certificate number 10 (clearly designated as a "replacement for #9) to confirm Mr. Zambrana's contention.

There is no indication that the 10 shares represented by certificate number 9 (and 10) were issued from shares owned by Mr. Cauderlier rather than the Levensons.  Rather, it appears that Mr. Zambrana's shares were issued directly to him at the same time that Mr. Cauderlier received the remainder of the La Ruche stock, corroborating Mr. Zambrana's contention that he

13

was promised his shares long before 2000.   Moreover, the Consent in Lieu of a Meeting of the

Board of Directors of La Ruche, Inc., dated "As of October, 2001," recites the history of the

transfer of the shares from the Levensons.  This document was included as part of Exhibit B to

CAI's Memorandum.  Clearly, Mr. Cauderlier received his interest in La Ruche through

Certificate No. 5 (20 shares), Certificate No. 7 (20 shares), and Certificate No, 8 (50 shares).

The remaining 10 shares (represented by Certificate No. 9) were issued directly to Mr.

Zambrana.    The corporate records of La Ruche reveal that falsity of CAI's contention that "*Mr.*

*Cauderlier* issued certificate Number 10 consistent with his offer of 10 percent of La Ruche for

Mr. Zambrana's $25,000 payable to La Ruche" (emphasis added). (Memo., pp. 5-6).

One wonders how Mr. Cauderlier could assert that he "became the sole La Ruche

shareholder" by purchasing all outstanding La Ruche shares. (Decl., ¶4).  He may have

purchased all the shares, but 10 shares were bought for Mr. Zambrana.  It is equally puzzling that

Mr. Cauderlier would contend that he "remained La Ruche's sole shareholder" in early 1999.

(Decl., ¶5).  It also calls into question how Mr. Cauderlier can declare under oath that Mr.

Zambrana did not become entitled to an interest in La Ruche until he tendered his $25,000 check

in 2000.

C.    MR. ZAMBRANA'S OWNERSHIP IN CAI.

In its Memorandum, CAI asserts that "By his testimony, Mr. Zambrana admits that there

was no contract between the parties when he wrote the check." (Memo., p. 11).  This

disingenuous statement is transparently false, if it is intended to suggest, as it seems to be, that

Mr. Zambrana never had a clear understanding with Mr. Cauderlier that the $25,000 check was

intended to be a part of the down payment toward the purchase of the Building by CAI, and, by

virtue of his making this investment, Mr. Zambrana would be a part owner of CAI and/or the Building.

For some reason, CAI repeatedly makes reference to the fact that Mr. Zambrana made the $25,000 check payable to La Ruche. Mr. Zambrana's affidavit provides an ample explanation in an of itself. But, CAI says, "There is no factual support for Mr. Zambrana's alleged belief that a check written to La Ruche could somehow enable him to purchase either CAI shares or an interest in property purchased by CAI." (Memo., p. 9). "Mr. Zambrana's check was written to La Ruche, not CAI." (Memo., p. 11).

Perhaps CAI has forgotten the $92,000 in checks written on La Ruche's account for the benefit of CAI, including over $48,000 payable to the seller of the Building.[6] So, CAI's argument rings hollow when it taunts that Mr. Zambrana's check was *not* made payable to CAI, the Bank that financed the purchase, or even the former owner of the property" (emphasis in original). [Memo., p. 12].

Additionally, Mr. Power's deposition provided a clear explanation as to why Mr. Zambrana might have been asked to make the check payable to La Ruche rather than CAI: "There was discussion between Sergio, J.C. and myself about the way they were putting together the financial packages, but Mr. Webb [CAI'S accountant] was doing that, so when they went to the Money Store, when they presented everything, I believe much of it was being driven through using La Ruche. So, that's why I do have an understanding as to why I think the check might

---

[6] There are La Ruche checks totaling over $92,000 that are clearly earmarked for CAI expenses. Fourteen checks drawn on the La Ruche account, aggregating more than $48,600, are payable to Yes and to Mahesh Naithani, the sellers of the Building. There are also others: a check to Charles R. Webb, CAI's accountant, in the amount of $9,480; a check for $6,000 payable to Barnard Locraft for a land survey; a check made out to Riggs Bank for $28,000. [*See* Sergio Zambrana's Reply to Joint Parties' Opposition to His Motion for Order Requiring Counsel to Withdraw, filed herein on May 19, 2006.]

15

have been made to La Ruche. . . ." [Exhibit 3 to Memorandum, p. 41.]  "La Ruche was the

vehicle being used when Mr. Webb presented the financials." [ *Id.*]

Mr. Powers' deposition clarifies, too, whether the funds from Mr. Zambrana were

actually needed by CAI in order to close the deal:

> "Those funds were the subject of numerous and frequent discussion between Sergio, J.C. and myself.  Mr. Cauderlier lacked sufficient funds to make the down payment that was required for this transaction, he turned to Mr. Zambrana for those funds, Mr. Zambrana produced those funds." [Exhibit 3 to Memorandum, p. 41.]

> "The consideration for the CAI interest was always in part the capital that he brought to bear prior to closing, the $25,000 and any other consideration or work that he had promised J.C. he would do, perhaps stay on longer.  So it was consideration, cash, and perhaps other in-kind.  That's all I know." [Exhibit D hereto, p. 49.]

> "Yes, there was an understanding that the $25,000 that was tendered toward the purchase of the property was funds that was tendered toward Mr. Zambrana's acquisition of an interest in CAI." [Exhibit 3 to Memorandum, p. 52.]

Mr. Zambrana would make one other point while on the subject of the funding for CAI's

purchase of the Building and monies obtained from La Ruche.  While Mr. Cauderlier claims that

*he* had funded the CAI checking account on August 25, 1999 [Decl., ¶ 8], those monies were

obtained from La Ruche by way of a $60,000 loan. [*See* Exhibits C and D to the Memorandum].

Ironically, nowhere in Mr. Cauderlier's Declaration, nor in CAI's Memorandum and exhibits

thereto, is there even a suggestion that Mr. Cauderlier ever repaid La Ruche the $60,000, with

interest at 9.25%.  By its terms, the promissory note was due on August 20, 2004. [Exhibit C to

the Memorandum].  Even if extended by the note's terms, the full payment was due no later than

August 20, 2005.  One would think that, had the note been repaid, Mr. Cauderlier and/or CAI

might have mentioned it.

Finally, the loan documents show that La Ruche was the co-borrower with CAI on the purchase money loan from SBA. [*See* Exhibits H and J to the Memorandum].  The SBA business loan name is actually "Café La Ruche." [Exhibit J], and the "operating company" is La Ruche, Inc., while the "passive company" is CAI. [exhibit H].

D.     THE STATUTE OF LIMITATIONS

CAI argues, beginning at page 6 of its Memorandum, that Mr. Zambrana's counterclaims against CAI are foreclosed by the statute of limitations.  CAI contends, "At the latest, Mr. Zambrana was aware that he had been injured after his $25,000 check had been accepted by La Ruche in January 2000 but his demands for CAI share were rebuffed in February or March 2000." [Memo, p. 7].  "Mr. Zambrana has neither pled nor stated in his deposition testimony any rationale for the unreasonably long delay and lack of inquiry." [Memorandum, p. 8].

CAI has obviously overlooked not only testimony from Mr. Zambrana, but testimony from Mr. Powers that gives an adequate, if not compelling, reason why Mr. Zambrana did not bring suit before it was "nearly three years out of time." [*See* Memorandum, p. 8].  In his deposition, Mr. Zambrana clearly stated that the first time he was advised that Mr. Cauderlier denied that Mr. Zambrana owned an interest in CAI was 2004. [Zambrana deposition, Exhibit 2 to Memorandum, p. 57, line 10, through p. 58, line 21].  Mr. Zambrana clearly stated that, prior to that time, it was his belief that he was a co-owner of CAI. [*Id*., at p. 58, lines 17-22.] A copy of the February 17, 2004 letter from Mr. Cauderlier referred to by Mr. Zambrana, attached hereto as Exhibit E, shows that Mr. Cauderlier asserted, on page one, under the subtitle "Lease," that "*Seller is the sole shareholder in Cauderlier & Associates, Inc*., a D.C. corporation, which owns the building at 1035, 1037 and1039 31st Street and leases it to LaRuche, Inc. for restaurant use" (emphasis added).

17

Mr. Powers likewise confirms that Mr. Cauderlier had agreed with Mr. Zambrana that the latter would own an interest in both La Ruche and CAI. "Mr. Zambrana and Mr. Cauderlier actually talked about it and there was an agreement that the money tendered and the past promises for La Ruche stock would be honored by an allocation of stock to Sergio in both entities. [Powers deposition, p. 68, lines 2-6.] "Yes, there was [an agreement]. There was an agreement by J.C. that stock would be given in both companies." [*Id.*, at lines 19-20]. And, of course, CAI itself cited Mr. Powers' statement that "I believe there was an agreement to grant stock, there wasn't a quantification of stock to be granted. I believe it was an absolute meeting of the minds. That both parties said you'll get interest in both corporations." [Memorandum, p. 4].

Since CAI acknowledges that "[A] claim accrues when the [claimant] know of (1) an injury, (2) its cause, and (3) some evidence of wrongdoing" [Memo, p. 7], it is difficult to understand how CAI could suggest that Mr. Zambrana should have acted before Mr. Cauderlier's reversal of position in 2004. Another point to consider is that neither Mr. Zambrana nor Mr. Powers ever said they heard Mr. Cauderlier deny Mr. Zambrana's claim for an interest in both corporations. Only Mr. Cauderlier himself, in his Declaration states that he told Mr. Zambrana "no" at the February/March 2000 meeting, when Mr. Zambrana requested an interest in CAI or the land. [¶ 17]–it is that statement alone on which CAI can base its argument that the statute of limitations has run on Mr. Zambrana's counterclaims.

E.    Mr. Zambrana's Entitlement to an Accounting

Despite its assertion that Mr. Zambrana has "no right to an accounting," CAI gives the very reason why Mr. Zambrana might be shown to be entitled to such relief, at the end of this case. CAI, in its Memorandum, relies upon the fact that, while Mr. Cauderlier and Mr.

Zambrana agreed (by Mr. Zambrana's lights) that the latter has an interest in both La Ruche and CAI, Mr. Zambrana's interests have not been *quantified*.  Yet, at page 12 of its Memorandum, CAI recognizes that "An accounting is 'a species of disclosure, *predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another*'" (emphasis added).

It would be well within the Court's purview to order that an accounting, or accountings, be conducted in order to determine the respective rights of the parties, and to determine the true financial interests among Mr. Cauderlier, CAI and La Ruche.  No summary judgment on this issue would be appropriate at this time.

WHEREFORE, the Motion of Cauderlier & Associates, Inc. for Summary Judgment should be denied, and Mr. Zambrana should be awarded his costs and expenses associated herewith.

<div style="margin-left: 40%;">

Respectfully submitted,

O'REILLY & MARK, P.C.

</div>

Dated: May 22, 2007          By: *Jeffrey M. Hamberger*
                                 11200 Rockville Pike
                                 Suite 301
                                 N. Bethesda, MD 20852
                                 301-231-6330
                                 *jmh@oreillymark.com*
                                 Attorneys for Sergio Zambrana

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Motion of Cauderlier & Associates, Inc.

for Summary Judgment was filed electronically through the Court's ECF system, and was

emailed this 29th day of May, 2007, to:

Robert L. Green, Jr., Esquire
James B. Boles, Esquire
HOWREY, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
*greenr@howrey.com*
*bolesj@howrey.com*


*Jeffrey M. Hamberger*
Jeffrey M. Hamberger


H:\-JEFFREY-\My Files\7246 Zambrana\Opposition to CAI Motion for Summary Judgment.wpd