Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x
                                    :
CAUDERLIER & ASSOCIATES, INC.       :
                                    :
    Plaintiff                       :
                                    :
    v.                              : CA No. 1:05CV01653
                                    :
SERGIO ZAMBRANA,                    :
                                    :
    Defendant/Third-Party           :
    Plaintiff                       :
                                    :
    v.                              :
                                    :
JEAN CLAUDE CAUDERLIER              :
                                    :
    And                             :
                                    :
LA RUCHE, INC.                      :
                                    :
    Third-Party Defendants          :
                                    :
- - - - - - - - - - - - - - - - - - x

        Deposition of JAMES A. POWERS

Washington, D.C.

Friday, March 3, 2006

9:11 a.m.

Reported by: Kimberly Turnage

----------------------------------------------------

DIGITAL EVIDENCE GROUP
11 Dupont Circle, NW Suite 400
Washington, DC 20036
(202) 232-0646

## Page 42

1  clear recollection, but I believe it was to La Ruche,
2  but I can't be certain.
3  Q. Did you or Mr. LaForce prepare any documents
4  on the 20th of January, the date of the check, to
5  reflect the transaction with $25,000 going from Mr.
6  Zambrana to La Ruche and something going back to Mr.
7  Zambrana from La Ruche, was there any document, prepared
8  to your knowledge?
9  A. No.
10 Q. Did you state to Mr. Zambrana, in words or in
11 substance, that he should have separate counsel because
12 you couldn't represent him?
13 A. Numerous times I have told Sergio that,
14 numerous and repeated times.
15 Q. You told him you couldn't protect his interest
16 because you were counsel to Mr. Cauderlier --
17 A. Yes.
18 Q. -- or La Ruche --
19 A. Yes.
20 Q. -- or CAI?
21 A. Let me share with you there were times prior
22 to this transaction where some very important

## Page 43

1  discussions had to be had between Mr. Cauderlier and Mr.
2  Zambrana, and those had to be done in a very formal way,
3  where I would tell Sergio, "Hey, Sergio, I represent
4  J.C. and the company, you've got to watch out for
5  yourself."
6  Q. Okay.
7     I'd like to explore those conversations
8  between Mr. Zambrana in which you were present?
9     MR. HAMBERGER: Could we take a break, at
10 this time. for just few minutes.
11    VIDEOGRAPHER: Off the record at 10:01.
12    (Off the record).
13    VIDEOGRAPHER: On the record at 10:09.
14    (On the record).
15 BY MR. GREEN:
16 Q. Mr. Powers. you mentioned that you were
17 present at a number of discussions in which Mr. Zambrana
18 and Mr. Cauderlier were present.
19 A. Uh-hum.
20 Q. When do these occur?
21 A. I worked with these gentlemen for a decade, so
22 I believe when our questioning left off we were speaking

## Page 44

1  about when we had discussions at which time I made Mr.
2  Zambrana clear, for whom I was a lawyer, to whom my
3  duties flowed.
4     And about '97, '98, I believe Mr. Zambrana's
5  sister was dying. I think he was going through a period
6  of great personal difficulty; I believe there were
7  marital issues at home. There was a concern on the part
8  of Mr. Cauderlier and Mr. Webb that Mr. Zambrana was
9  drinking too much. And one occasion, went out with
10 staff after work, and the concern with my point of view
11 was, Sergio, if you drive a waitress or waiter home and
12 you're intoxicated and you cause an accident, we'll lose
13 everything. 'Cause it will be respondeat superior. He
14 would be an employee of the company working for La
15 Ruche, driving an employee home while intoxicated, cause
16 an accident. So there was a concern while Sergio was
17 struggling with his personal problems that he be keenly
18 aware and Mr. Webb was quite aggressive if not hostile
19 around this issue. I was more sympathetic and
20 understanding of it. But the point was this, we had to
21 have frank discussions with Sergio about his duties to
22 the company, his ability to create great peril for the

## Page 45

1  company, and if he wanted to look at those issues and he
2  wanted to get anyone to examine his rights or
3  privileges. he can get his own lawyer and go to it,
4  because. I represented J.C., and I and my the firm
5  represented the corporation that employed Mr. Zambrana.
6  Q. Were you present in any discussions with Mr.
7  Zambrana and Mr. Cauderlier in which the acquisition of
8  the Georgetown property was the topic of discussion?
9  A. Many.
10 Q. Are you able to separate those conservations
11 one from another?
12 A. Some conversations are more memorable than
13 others.
14 Q. Okay. Now, you had this dinner in summer of
15 1999 in which the acquisition of the Georgetown property
16 came up?
17 A. It was the subject of the dinner, didn't just
18 come up, it was the focus.
19 Q. Right. And as a result of that conversation,
20 was there any agreement or understanding about what
21 should occur?
22 A. Yeah.

**Page 46**

1  Q. What was that?
2  A. There was a general consensus, that an effort
3  would be made to see if J.C. personally could muster,
4  and the business, La Ruche could muster the resources
5  necessary to buy the land that was being sold by Mahesh
6  Naithani.
7  Q. After the - after that dinner at your home, at
8  some point CAI was formed, the documents suggest
9  August 19th.
10 A. Okay.
11 Q. Was Mr. Zambrana, to your knowledge, aware
12 that CAI had been formed?
13 A. Yes, I believe he knew.
14 Q. Did he, at the time say to you or to Mr.
15 LaForce, to your knowledge, that he had an ownership
16 interest in CAI?
17 A. He always spoke to me that he'd been promised
18 an ownership interest, but I don't know what he ever
19 told Mr. LaForce on that issue. I was not a witness to
20 any conversation. I can't even recall if they ever even
21 spoke to each other.
22 Q. When was the first time that Mr. Zambrana told

**Page 47**

1  you that he had been promised an ownership interest in
2  CAI?
3  A. Probably '97-'98.
4  Q. Well, wait a minute. CAI wasn't formed till
5  1999.
6  A. I'm sorry; I thought you met La Ruche, my bad.
7  Q. Let me ask the question again.
8     At any point after CAI was form in the August
9  of 1999, did Mr. Zambrana say in words or substance to
10 you that he had an ownership interest in CAI?
11 A. He did.
12 Q. When did he say that?
13 A. He indicated it probably November, October.
14 Q. Of 1999?
15 A. Yeah. That he had been, again, promised an
16 interest or was going to be given an interest, it was
17 either prospective, it was a past promise unfulfilled or
18 a prospective promise to be fulfilled.
19 Q. Were you present when any of the promises were
20 made?
21 A. Yes.
22 Q. And when were those promises first made?

**Page 48**

1  A. The only express promise where J.C. and Sergio
2  had - I would say an agreement was subsequent to the
3  purchase - the closing of the purchase.
4  Q. Okay, I want to - I --
5  A. Time frames.
6  Q. I'm trying to keep time frames before and
7  after.
8  A. Okay.
9  Q. Before the acquisition of the property?
10 A. Uh-hum.
11 Q. Did Mr. Zambrana say to you in words or in
12 substance that he had an ownership interest in CAI?
13 A. He indicated he had been promised.
14 Q. Were you present when that promise was made by
15 Mr. Cauderlier?
16 A. No.
17 Q. Did Mr. Zambrana indicate to you what his
18 interest, what interest in CAI he had been promised?
19 A. This is pre-November?
20 Q. Well, before closing.
21 A. No.
22 Q. Did he indicate in words or in substance that

**Page 49**

1  there was an understanding about what his percentage
2  would be?
3  A. He indicated there was an understanding that
4  he would get an equity interest. It was not a
5  discussion that I recall about what that percentage
6  would be in the time frame we're speaking.
7  Q. And prior to the closing, was there any
8  discussion of what Mr. Zambrana would have to do in
9  exchange for an ownership interest in CAI?
10 A. Not that I recall.
11 Q. Was it your understanding that it was a gift,
12 as it were?
13 A. No.
14 Q. So he was going to have to produce something
15 in the form of money?
16 A. The consideration for the CAI interest was
17 always in part the capital that he brought to bear prior
18 to closing, the $25,000 and any other consideration or
19 work that he had promised J.C. he would do, perhaps stay
20 on longer. So it was consideration, cash, and perhaps
21 other in-kind. That's all I know.
22 Q. Were you present when Mr. Zambrana said in

Pages 46 to 49
www.digitalevidencegroup.com    Digital Evidence Group C'rt 2005    (202) 232-0646
2ac592e6-a42c-4b16-ab80-5ab7a8daec20

**Page 50**

1  words or substance that unless I have an ownership
2  interest CAI, I'm going to leave?
3      A. Sergio had threatened to leave many times.
4  Or indicated that he couldn't keep this up if he wasn't
5  made more whole or made an equity owner or somehow given
6  a future so that he could raise his children or somehow
7  secure his own financial future.
8      Q. So Mr. Zambrana had complained in the past
9  about his lack of ownership interest in La Ruche?
10     A. Complained? He had raised the issue of what
11 he should get for what he had done on repeated
12 occasions.
13     Q. Okay. Well, the topic had come up in your
14 presence?
15     A. It had.
16     Q. And when's the earliest that that conversation
17 occurred?
18     A. As CAI or La Ruche?
19     Q. La Ruche.
20     A. The late '90s, during the time of Debbie,
21 Anne, departures, some periods of rough spots in the
22 business.

**Page 51**

1      Q. And so his comments were, unless I have an
2  ownership interest in La Ruche, I've got to go on a
3  different direction?
4      A. Well put. To protect my future I have to
5  look after my family's interest.
6      Q. And despite the fact that this had come up on
7  numerous occasions those shares were never issued to Mr.
8  Zambrana, is that correct?
9      A. Correct.
10     Q. Focusing on CAI, after it was formed, were you
11 present when Mr. Zambrana said in words or in substance
12 that unless I have an ownership interest in CAI, I'm
13 going to leave?
14     A. I don't recall that specific statement.
15     Q. Well, I'm not, the exact words, but the
16 substance the substance was -
17     A. Everything was very positive then. There was
18 no such, that's a precipitating event. That's a threat.
19 There's no such statement like that during this really
20 positive time between September of '99 and call it March
21 of 2000. So, no, I do not recall that statement or a
22 statement to that effect being made.

**Page 52**

1      Q. So that I'm clear, between the time that CAI
2  was formed in August of 1999 and closing on January 21st
3  of 2000. There were discussions between Mr. Cauderlier
4  and Mr. Zambrana, in your presence, about an ownership
5  interest in CAI?
6      A. Uh-hum.
7      Q. But, to your understanding, there was no
8  agreement about what that interest would be?
9      A. Correct. There's no quantification of the
10 interest.
11     Q. Was there any quantification of the amount of
12 money that Mr. Zambrana would have to contribute in
13 order gain an ownership interest CAI?
14     A. Yes, there was, there was an understanding
15 that the $25,000 that was tendered toward the purchase
16 of the property was funds that was tendered toward
17 Mr. Zambrana's acquisition of an interest in CAI.
18     Q. But not in La Ruche?
19     A. It wasn't allocated between the two that was
20 the ambiguity, that was the open issue between the
21 parties. What percent of interest in each entity should
22 be provided in light of the cash that was tendered on

**Page 53**

1  the eve of the settlement.
2      Q. Was there any understanding whether more or
3  less should be allocated to La Ruche or to CAI?
4      A. No. And that became a discussion subsequent.
5  I'm still in the time frame formation to 121.
6      Q. Exactly. At any point did in Zambrana state,
7  in your presence, what ownership interest in La Ruche he
8  felt he was entitled to?
9      A. Percentage?
10     Q. Yes.
11     A. The allusion to this 25% that around the time
12 of renovation in '97-98. I'm not - Mr. Zambrana never
13 came to us and said, give me my shares for that 25%.
14 And I believe that what happened between these
15 individuals as businessmen is, there was a promise, it
16 then got merged into the big transaction, and the
17 question became what allocation as between the two
18 entity Mrs. Zambrana would receive some interest in.
19 But my understanding and my belief was that it was
20 promised both and he would get interest in each. There
21 was no formula or allocation or weighting as between the
22 two.