## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**CAUDERLIER & ASSOCIATES, INC.,**
      **Plaintiff,**

   **v.**

**SERGIO ZAMBRANA,**
      **Defendant/Third-Party**
      **Plaintiff,**

   **v.**

**JEAN CLAUDE CAUDERLIER and**
**LA RUCHE, INC.,**
      **Third-Party Defendants.**

</td><td>

Civil Action No. 05-1653 (JMF)

</td></tr>
</table>

### MEMORANDUM OPINION

Currently pending before me is <u>Motion of Cauderlier & Associates, Inc. for Summary Judgment</u> ("Motion"). For the reasons stated herein, the Motion will be granted in part and denied in part.

### BACKGROUND

Plaintiff Cauderlier & Associates, Inc. ("CAI") asks this court to rule, as a matter of law, that: (1) Sergio Zambrana's counterclaims have been extinguished by the statute of limitations; (2) Zambrana has no ownership interest in CAI; and (3) Zambrana has no right to an accounting or a monetary judgment from CAI.

### STATEMENT OF FACTS NOT IN DISPUTE

1.      CAI was incorporated on August 19, 1999, with the Board of Directors consisting of Jean Claude Cauderlier, Zambrana, and James Powers.

2.    On that day, the Directors of CAI issued a Unanimous Written Consent in Lieu of the Organizational Meeting of the Board of Directors of Cauderlier & Associates, Inc. ("1999 CAI Written Consent"), attached as Exh. D to Exh. 1 of the Motion.

3.    The 1999 CAI Written Consent was signed by Cauderlier, Zambrana, and Powers. Id. at 9.

4.    Pursuant to the 1999 CAI Written Consent, Cauderlier was elected President/Treasurer, Powers was elected Secretary, and Zambrana was elected Vice President/Assistant Secretary.  Id. at 2.

5.    CAI was authorized to issue 500 shares of common stock to Cauderlier in exchange for $60,000.  Id. at 2.  No other shares were authorized to be issued.  Id.

6.    Cauderlier was authorized to purchase 1035-1039 31st Street, N.W, in Washington, D.C. (the "Property") for $1,100,001.  Id. at 3.

7.    On August 20, 1999, Cauderlier obtained a promissory note from La Ruche, Inc. ("La Ruche") for $60,000.  Jean-Claude Cauderlier Promissory Note, attached as Exh. C to Exh. 1 of the Motion.  This was used by Cauderlier to purchase 500 common shares of CAI, pursuant to the 1999 CAI Written Consent.  Cauderlier Decl. ¶¶ 5-6, attached as Exh. 1 to the Motion.

8.    On November 19, 1999, CAI provided a deposit of $55,000 to Yes, Inc. ("Yes!"), the owner of the Property, for the purchase of the Property.  See Official Check, attached as Exh. G to Exh. 1 of the Motion; Cauderlier Decl. ¶ 8.

9.    On January 20, 2000, Zambrana gave a check to Cauderlier, payable to La Ruche, for $25,000, dated January 21, 2000 (the "Check").  Cauderlier Decl. ¶ 13; Zambrana Dep. at 33, attached as Exh. 2 to the Motion; Zambrana Aff. ¶ 2, attached as Exh. A to defendant's Opposition to Motion for Summary Judgment of Cauderlier & Associates, Inc. ("Opposition").

10.     CAI closed the purchase of the Property on January 21, 2000.  Cauderlier Decl. ¶ 10.  The purchase price was $1,020,000.  Powers Letter to Naithani dated Dec. 28, 1999, attached as Exh. I to Exh. 1 of the Motion.  Present at the closing were Cauderlier, Zambrana, and Powers.  Cauderlier Decl. ¶ 12; Naithani Aff. ¶ 8, attached as Exh. B to the Opposition.

11.     Part of the price was paid with a loan of $965,000 secured from the Small Business Administration ("SBA"), via the Money Store Investment Corp., with CAI and La Ruche as co-borrowers.  Application for Business Loan, attached as Exh. H to Exh. 1 of the Motion; Unconditional Guarantee, attached as Exh. J to Exh. 1 of the Motion.

12.     On August 24, 2000, in a Written Consent in Lieu of an Annual Meeting of the Shareholders of Cauderlier & Associates, Inc., Cauderlier was elected Director of the Corporation; that same day, in a Written Consent in Lieu of an Annual Meeting of the Board of Directors of Cauderlier & Associates, Inc. (together, the "2000 CAI Written Consents"), Cauderlier was elected President/Treasurer, Secretary, and Vice President of CAI.  2000 CAI Written Consents, attached as Exh. E to Exh. 1 of the Motion.

13.     The 2000 CAI Written Consents were signed only by Cauderlier.  Id.

14.     On June 23, 2004, La Ruche issued Certificate No. 10 to Zambrana for 10 shares in La Ruche.  Pursuant to a Consent to Action in Lieu of a Special Meeting of the Shareholders of La Ruche, Inc., signed by Cauderlier and Zambrana, Certificate No. 10 was a replacement of Certificate No. 9, issued in January 2000, which "was never received by Mr. Zambrana and is lost."  Exh. K to Exh. 1 of the Motion.  Zambrana now argues that Certificate No. 9 was issued long before January 2000.  Opposition at 13-14; Zambrana Dep. at 79-81.

## I.  Statute of Limitations

On October 24, 2005, Zambrana filed his Answer and Counterclaim ("Answer"), which included counterclaims for: (1) an accounting of the assets owned by CAI; (2) a declaratory judgment determining "his ownership share in the assets of CAI and/or in the Building"; and (3) under a theory of unjust enrichment, "a monetary judgment equal to the value of his share in the assets of CAI and/or in the Building."  Answer at 6-12.  CAI argues in its Motion that these counterclaims have been extinguished by the District of Columbia's three-year statute of limitations.[1]  Motion at 6-8.

A cause of action does not accrue "until the [claimant] knows or by the exercise of reasonable diligence should know of the injury, its cause in fact and some evidence of wrongdoing." Brown v. District of Columbia, 853 A.2d 733, 737 n.4 (D.C. 2004) (internal quotation and citation omitted).[2]  Zambrana's counterclaims are based, generally, on two allegations: (1) he obtained "an ownership interest in CAI and/or the Building (to be) owned by CAI" in return for the Check; and (2) La Ruche was used by Cauderlier as the "alter ego" of CAI for purposes of purchasing the Property.  Answer at 7-10

### a.  Zambrana's Ownership in CAI and/or the Property

In regard to Zambrana's allegation that he bought an ownership interest in CAI and/or the Property in exchange for the Check, CAI asserts that Zambrana's counterclaims accrued at a meeting in either February or March 2000 (the "Meeting"), at which time his "demands for CAI shares were rebuffed."  Motion at 7-8.  According to Cauderlier, Zambrana "refused [at the

---

[1]      Zambrana does not oppose CAI's assertion that, pursuant to D.C. Code § 12-301(7) and (8), his counterclaims must have been brought within three years of their accrual.  Motion at 6-7.  Zambrana does, however, dispute CAI's contention of *when* his counterclaims accrued.  Opp. at 17.

[2]      District of Columbia law applies to this diversity action.  Jankovic v. Int'l Crisis Group, 494 F.3d 1080, 1086 (D.C. Cir. 2007).

Meeting] to accept my offer of the 10 percent of La Ruche in exchange for $25,000 [and instead] asked for interest in CAI or the land. I told him no." Cauderlier Decl. ¶ 17. Cauderlier also asserts that Zambrana was advised at the Meeting to retain his own attorney. Id. at 14, Powers Dep. at 42, attached as Exh. 3 to the Motion.

Powers also recalls that Cauderlier refused to issue Zambrana an interest in CAI at the Meeting. Powers Dep. at 66. According to Powers, however, this refusal was the starting point of a negotiation that culminated in an understanding that Zambrana would receive an interest in both La Ruche and CAI. Id. at 68-69. Despite this broad understanding, however, Powers recalls that there was not a comprehensive agreement concerning the "quantification of stock to be granted." Id. at 70.

Zambrana, for his part, does not recall the Meeting. Zambrana Dep. at 63. He does deny, however, that Cauderlier refused a demand that Zambrana be given shares in CAI. Id. at 63. He instead asserts that he was unaware until 2004 that his ownership interest in CAI was in dispute. According to Zambrana, he was promised an ownership interest in CAI by Cauderlier at the time he submitted the $25,000 check. Zambrana Aff. ¶ 10. Cauderlier "stated in the presence of [third parties] before and after settlement that [Zambrana was] an owner of CAI." Id. at ¶ 14. Cauderlier "initially and consistently" stated that the Property was being purchased by both him and Zambrana. Naithani Aff. ¶ 21. Zambrana, "in [his] capacity as an owner of CAI[,] received many telephone calls" regarding payments from CAI. Zambrana Aff. ¶¶ 16-17. He asserts that it was not until February 17, 2004, that he became aware that his ownership interest in CAI was disputed by Cauderlier. Opp. at 17; Zambrana Dep. at 57-58. On that day, Cauderlier asserted in a letter that he was "the sole shareholder" of CAI. Id.

Determining when Zambrana's counterclaims concerning his ownership in CAI accrued requires the untangling of a web of competing recollections.  If Cauderlier is correct that he flatly refused to extend ownership of CAI to Zambrana at the Meeting, it seems clear that the counterclaims would have accrued at that time and would now be barred.  On the other hand, if Zambrana is to be believed that there was an agreement to grant him ownership in CAI and that he was not aware until 2004 that this was disputed by Cauderlier, the counterclaims would not be barred by the three-year limitation period.  Finally, Powers' description of events – that there was agreement at the Meeting that Zambrana would become an owner of CAI, but not over the specific details – supports Zambrana's assertions, yet raises the question of whether, for purposes of triggering the three-year limitation period, Zambrana *should have* been on notice at the Meeting that his ownership of CAI was in dispute.

Such a factual dispute is to be resolved by the finder of fact.  "Although what constitutes the accrual of a cause of action is a question of law, the specific moment when accrual occurs is usually a jury question."  Smith v. Brown & Williamson Tobacco Corp., 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (citing Diamond v. Davis, 680 A.2d 364, 370 (D.C.1996)).  A court may dismiss a claim on statute of limitations grounds only if "no reasonable person could disagree on the date" on which the cause of action accrued.  Kuwait Airways Corp. v. American Security Bank, N.A., 890 F.2d 456, 463 n.11 (D.C. Cir. 1989.  A reasonable person could, after weighing the competing testimony presented by the parties, disagree on the date on which Zambrana's counterclaims accrued.  See Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 892 n.29 (D.C. 2003) (en banc) ("Unless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as a matter of law, the jury should decide the issue on appropriate instructions.").

### b.  La Ruche as Alter Ego of CAI

To the extent that Zambrana's counterclaims are based on the alleged misuse of La Ruche by Cauderlier for the benefit of CAI's purchase of the Property, the accrual point would have been when Zambrana was made aware, or should have become aware, of such misuse.  Nowhere in Zambrana's Answer or Opposition does he state when this discovery occurred, but there are clues to be found in the record.

The first moment when Zambrana could have become aware that Cauderlier was using La Ruche for the benefit of CAI's purchase of the Property was on January 20, 2000, when he made the Check payable to La Ruche.  Answer at 9.  Zambrana claims he "made [the Check] payable to La Ruche at the behest of J. Cauderlier, who told [him] at the time that [he] would become a shareholder in CAI."  Zambrana Aff. at ¶ 10; Zambrana Dep. at 34, 57.  At this moment Zambrana was reasonably put on notice that there may be "commingl[ing]" of assets between the two corporations.  Answer at 9.  Zambrana claims he was an owner of La Ruche before this occurred.  Opposition at 14.  As an owner of La Ruche, then, Zambrana could reasonably be expected to have inquired at that time about the use of La Ruche to fund CAI and/or the Property.

There is further evidence in the record that Zambrana was aware, or should have been aware, of the relationship between La Ruche and CAI around the time the Property was purchased in 2000.  For example, in his Opposition, Zambrana cites testimony from Powers that there "was discussion between [Zambrana, Cauderlier around the time the Property was purchased] about the way they were putting together the financial packages, but Mr. Webb [CAI's accountant] was doing that, so when they went to the Money Store, when they presented everything, [Powers] believe[d] much of it was being driven through using La Ruche."  Opp. at

1; Powers Dep. at 41.  Moreover, the SBA Application, SBA Note, and the SBA Unconditional

Guarantee list CAI and La Ruche as co-borrowers of the $965,000 used to purchase the Property.

SBA Application, SBA Note, attached as Exh. H to Exh. 1 of the Motion; SBA Unconditional

Guarantee, attached as Exh. J to Exh. 1 of the Motion.  Zambrana was present at the closing and

would have had access to these documents.  Zambrana Dep. at 60.

Zambrana, then, either knew or should have known in 2000 of his allegation that La

Ruche was being misused by Cauderlier to benefit CAI's purchase of the Property.   Because his

Answer was filed on October 24, 2005, any counterclaims based upon this allegation are time-

barred by the three-year statute of limitations.

## II.  Zambrana's Ownership in CAI and/or the Property

CAI seeks an entry of summary judgment on its declaratory judgment claim that

Cauderlier is the sole shareholder and has 100 percent ownership of CAI.  Complaint at 5-6

(Count I).  In support of its Motion, CAI asserts that: (1) no more than five hundred shares of

common stock have been issued by CAI, all of which were purchased by Cauderlier for $60,000

on August 19, 1999; and (2) Zambrana has produced "no contract, diary entry, contemporaneous

writing, or other written evidence suggesting that he either owns or was owed stock in CAI.

Motion at 8-9.  Zambrana, in response, argues that he purchased an ownership interest in CAI

and/or the Property for $25,000.

### a.  The Record Construed In The Light Most Favorable To Zambrana

"[S]ummary judgment requires that the factual record be construed in the light most

favorable to the non-moving party."  Mahoney v. U.S. Marshals Service, 454 F. Supp. 2d 21, 26

(D.D.C. 2006).  Moreover, it is appropriate for the court to go further and test the legal validity

of Zambrana's claim by taking as true the allegations he makes in support of his claim, in order

to ascertain whether he is entitled to judgment in his favor if the finder of fact were to accept the truth of his allegations.  Fed. R. Civ. P. 12(b)(6) and 12(d).[3]

1.      Zambrana paid the Check to La Ruche.  Zambrana Aff. ¶ 2.

2.      "At all times, it was understood between" Cauderlier and Zambrana that the Check "was to be earmarked for the purchase by CAI of" the Property.  Id. ¶ 4.

3.      Zambrana made the Check out to La Ruche "at the behest of" Cauderlier, who told Zambrana at that time that he "would become a shareholder in CAI."  Id. ¶ 10.

4.      The Check was used by La Ruche and Cauderlier to pay for the Property.  Zambrana Aff. ¶ 22; Powers Dep. at 41.

5.      Zambrana was given part ownership in La Ruche "in recognition of [his] many years of excellent performance as an employee of La Ruche and as incentive to keep [him] in the employ of La Ruche."  Id. ¶ 8; Powers Dep. at 25 (Zambrana "was promised ownership interest in La Ruche by Mr. Cauderlier . . . in '97 or '98").  His ownership in La Ruche, then, was not consideration for the Check.  Id. ¶ 9.

6.      Stock Certificate No. 9, granting 10 shares of La Ruche to Zambrana, was issued at the same time that Cauderlier received Stock Certificate No. 8, granting him 50 shares of La Ruche.  Opp. at 13.  In other words, Stock Certificate No. 9 (later replaced by Stock Certificate No. 10) was issued far in advance of, and not consideration for, Zambrana's $25,000 payment to La Ruche.  Id.

---

[3]      This was the function of the now abolished demurrer.  5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, Federal Practice § 1355 (3d ed. 2004). ("The Federal Rule 12(b)(6) motion to dismiss for failure to state a claim for relief is a lineal descendant of the common law general demurrer which put in issue the legal sufficiency of the plaintiff's declaration.  The party who demurred admitted all the well pleaded facts in his opponent's pleading and challenged the plaintiff's right to any recovery on the basis of those facts, thereby taking the position that even if all of the plaintiff's allegations were true, he still was not entitled to recover.") (footnotes omitted).

7.      Powers recalls that Zambrana "at times" referred to "the 25% promise" in regard to what percentage of La Ruche he was promised by Cauderlier. Powers Dep. at 54. There was discussion between the parties as to how this 25% interest would be allocated between CAI, La Ruche, and the Property. Id.

8.      Powers recalls discussions between Zambrana and Cauderlier subsequent to the closing of the Property involving "an expectation from [Zambrana] that something was going to be done as to the promise that had been made to him." Powers Dep. at 62.

9.      At the Meeting, "there was an understanding as a promise made with no quantity as to some interest in La Ruche. And there was an understanding of some interest to be given in CAI, and that was the purpose of the discussion." Powers Dep. at 65. Zambrana said at the meeting: "I tendered money for the building, I want a piece of CAI which owns the building and that was my understanding of our deal . . . when I gave you this money, that I was helping you buy the building and therefore I should receive an interest in that building." Id.

10.      La Ruche, in which all parties agree Zambrana has an ownership interest, was a co-borrower with CAI on the purchase money loan from SBA for the Property. Exhibits H and J, attached to Exh. 1 of the Motion.

11.      According to Powers, "there was an agreement [between Cauderlier and Zambrana] that the money tendered and the past promises for La Ruche stock would be honored by an allocation of stock to [Zambrana] on both" CAI and La Ruche. Powers Dep. at 69. See also id. at 52 ("there was an understanding that the $25,000 that was tendered toward the purchase of the property was funds that was tendered toward Mr. Zambrana's acquisition of an interest in CAI.").

12.    Powers recalls discussion, but not agreement, of "2.5% in the CAI entity which represented the almost mathematical ratio of the funds tendered by Zambrana toward the value of asset acquired."  Powers Dep. at 68.

13.    Cauderlier stated in the presence of third parties "at the [Property] settlement table" that Zambrana was an owner of CAI.  Id. ¶ 13.  Similar statements were made by Cauderlier after the settlement.  Id. ¶ 14; Naithani Aff. ¶ 9.

14.    Mahesh Naithani, general partner of Yes!, would not have sold the Property to CAI if Zambrana was not an owner.  Naithani Aff. ¶¶ 14- 15, 21.

15.    Naithani routinely addressed his inquiries about payment from CAI to Zambrana, whom he believed to be an owner of CAI.  Zambrana Aff. ¶ 16; Naithani Aff. ¶ 19.

This record, viewed in the light most favorable to Zambrana, is sufficient to permit a reasonable juror to find that there was an understanding between he and Cauderlier that the $25,000 was consideration for an ownership interest in CAI and/or the Property.

### b.  Material Terms

The devil is always in the details, however: exactly *what* was the ownership interest? CAI asserts, and Zambrana does not refute,[4] that an oral contract may only exist where there is an intent to be bound *and* an agreement as to all material terms.  Motion at 9, citing Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995); Georgetown Entertainment Corp. v. District of Columbia, 496 A.2d 587, 590 (D.C. 1985); Owen v. Owen, 427 A.2d 933, 937 (D.C. 1981); Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 547 (D.C. 1981); D.C. Area

---

[4]       "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003).  It is not this "court's role ... to act as an advocate for the [the parties] and construct legal arguments on [their] behalf in order to counter those" in the motion for summary judgment.  Stephenson v. Cox, 223 F. Supp. 2d 119, 122 (D.D.C. 2002).  This court has, nevertheless, conducted an independent analysis of this issue.

Cmty. Council, Inc. v. Jackson, 385 A.2d 185, 187.  See also Cauderlier & Associates, Inc.

Reply In Support of Motion for Summary Judgment ("Reply") at 2, citing Hollywood Credit

Clothing Co., Inc. v. Gibson, 188 A.2d 348, 349 (D.C. 1963); Anderco, Inc. v. Buildex Design,

Inc., 538 F. Supp. 1139, 1142 (D.D.C. 1982).[5]

      CAI is correct that, "[f]or an enforceable agreement to exist under District of Columbia

case law, the parties both must (1) agree on all material terms and (2) intend to be bound."

Steven R. Perles, P.C. v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007); Rosenthal v. National

Produce Co., 573 A.2d 365, 369-70 (D.C.1990) (quoting 1 CORBIN ON CONTRACTS § 95, at 394

(1963)) (a "court cannot enforce a contract unless it can determine what it is").  See also

Rosenthal, 573 A.2d at 370 (quoting Robinson v. Gardiner, 76 A.2d 354, 356 (Md. 1950)) ("If

the agreement be so vague and indefinite that it is not possible to collect from it the intention of

the parties, it is void because neither the court nor jury could make a contract for the parties.

Such a contract cannot be enforced in equity nor sued upon in law.").

      Zambrana, as "the party asserting the existence of a[n oral] contract[,] has the burden" of

demonstrating completeness.  Jack Baker, 664 A.2d at 1238.  See also Gilles v. Ware, 615 A.2d

533, 550 (D.C. 1992) ("[A]fter the moving party makes a *prima facie* showing that no genuine

issue of fact is in dispute and as a matter of law he is entitled to judgment, the burden shifts to

the opposing party to rebut that *prima facie* showing with specific evidence demonstrating

contested facts.").  For his part, however, Zambrana has not presented any evidence[6] of what

---

[5]      The court notes that, in addition to being silent on this issue, Zambrana fails to cite a single case in his nineteen-page opposition.

[6]      In addition to the lack of testimonial evidence, Zambrana has made available to the court no documentary evidence to support his position.  In contrast, plaintiff has produced numerous records in support of his Motion, including a corporate document signed by Zambrana indicating that CAI has issued shares only to Cauderlier.  1999 CAI Written Consent at 2, attached as Exh. D to Exh. 1 of the Motion.

specifically he received in exchange for $25,000.  To the contrary, his deposition testimony

leaves little doubt that Zambrana does not know what he was to receive:

> Q:    And when you wrote the check, what was your understanding of what you were getting for $25,000?
> A:    I was putting in $25,000 as investment to buy a building.
> . . .
> Q:    Okay.  What portion of the purchase price did the $25,000 represent?
> A:    I don't know.
> Q:    What portion, what percentage of the property were you purchasing for $25,000?
> A:    I don't know.  I guess that's what the judge have to decide.
> Q:    No, no, no.  I'm asking when you gave the check, when you wrote the check on the 20th of January, what did you think you were getting?  What percentage?
> A:    I didn't think in percentage.
> Zambrana Dep. at 34-35.

> Q:    Okay.  Now, were you buying a percentage, a portion of CAI, or were you buying the land for your $25,000?
> A:    CAI was an instrument to buy the land.
> Q:    Okay.  So you weren't actually buying the land yourself personally?
> A:    That was the purpose.
> Q:    I'm sorry?
> A:    That was the purpose of my $25,000.
> Q:    No, but were you going to be an individual owner of the land?
> A:    Yes.
> Q:    You were?  So the title of the property was going to be in the name of Sergio Zambrana?
> A:    I never have any titles or anything.  I trust Jean-Claude all my –
> Q:    No, No.  Just answer my question.  My question is was the land to be titled in your name as an owner, Sergio Zambrana, or were you to be a shareholder in CAI?
> A:    We never went to this – that deeply discussions.  I never understand that.  I didn't understand at that time the type of transactions.
> Q:    So you didn't have any understanding or agreement on how the property would be titled?
> A:    The agreement that we had, we were – we create CAI in order to buy the building.
> Zambrana Dep. at 36-38.

> Q:    All right.  So what percentage of CAI were you going to get for your $25,000?
> . . .
> A:    Well, we never have that – I mean, we never agree on a percentage.
> Zambrana Dep. at 39.

Q:    Now, when you were sitting at this table on January 20th writing this check, was there any kind of written document that was prepared that showed what you were to get for the $25,000?

A:    We never had any written document.

Q:    Okay.  Did you make any notes?

A:    I never make notes.

Q:    Okay.  So there's – you don't have a napkin, or an envelope, or a single sheet of paper, or something in your checkbook on the back of a deposit slip that memorializes, says what you're to get for the $25,000?

A:    I was dealing with a person who I thought was close as my family.  And I don't write things with my family.

Zambrana Dep. at 42.

Q:    What percentage of CAI do you believe that you purchased for the $25,000?

A:    That's why I'm here.  I guess the judge have to decide that.

Q:    No, no.  I'm asking you.  I want to know what you think you own.

A:    I'm not an expert.

Q:    Well, you're the one who wrote the check, sir.

A:    I wrote a check as an investment to buy a building, and a partner.

Q:    But you have no understanding of what percentage of CAI you were to get for that $25,000?

. . .

A:    Not right now.

Q:    Have you had at any time an understanding?

A:    I guess it's very complicated.  That's why we here.

Q:    So the answer's no, you don't – you've never had an understanding of what you were to get?

A:    On CAI?

Q:    Yes.

A:    I supposed to be a partner.

Q:    But you can't tell me how much – what percentage of CAI you were to own?

A:    That's why we're in this dispute.

Q:    Okay.  Is it correct, sir, that you cannot, as you sit here today, tell me what percentage of CAI you claim to own?

A:    I can tell you at least 10 percent.

Q:    Of CAI?

A:    Yes.

Q:    And what's the basis for that, sir?

A:    My $25,000 investment.

Q:    And how did you calculate the 10 percent?

A:    I didn't calculate.

Zambrana Dep. at 43-45.

Q:    After the closing, sir, did you ask Mr. Cauderlier for a percentage of CAI?

A:    Not for percentage.

Q:    Did you ask him for shares?

- 14 -

A:    I know I was getting shares in La Ruche.  And, you know, I was getting shares from everywhere buying.  CAI was our retirement plan for both of us.  That's the idea.

Zambrana Dep. at 56-57.

This uncertainty over the precise terms of Zambrana's ownership in CAI is further illustrated by the deposition testimony of Powers:

I believe there was an agreement to grant stock, [but] there wasn't quantification of stock to be granted.  I believe it was an absolute meeting of the minds.  That both parties said you'll get interest in both corporations.  The quantum of that interest is not yet fixed.  So, if you use comprehensive, as indicating that both the grant and the quantum of the grant representing comprehensive, there was not a comprehensive agreement reached at that time.

Powers Dep. at 70.  Powers also testified that there was "no quantification of the interest" Zambrana was to receive in CAI, "no formula or allocation or weighting as between" CAI and La Ruche, and that these details were "ambigu[ous and] open."  Id. at 52-53, 56.

### c. Analysis

The absence of evidence of any agreed upon material terms leaves the court no choice but to hold that, as a matter of law, Zambrana did not enter into an enforceable contract for an ownership interest in CAI or the Property.  See Brown v. George Washington Univ., 802 A.2d 382, 385 (D.C. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)) (to defeat a motion for summary judgment there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  See also Rosenthal, 573 A.2d at 369 n.9 (existence of enforceable agreement is a question of law).

Zambrana states in his Opposition that "[t]here is clearly no set of undisputed facts upon which the court, at this stage of the case, could reach a conclusion as to the terms of the contract, as a matter of law."  Opp. at 12.  Zambrana misses the point.  CAI is alleging that there were no

terms, and thus <u>no</u> contract.[7]  In this case, defendant has presented no evidence upon which the finder of fact could predicate the conclusion that the parties were in agreement on any material term – and, in fact, as outlined above, the evidence in the record strongly indicates that they were not.

The facts and holding of <u>Kramer Assocs., Inc. v. Ikam, Ltd.</u>, are instructive.  888 A.2d 247 (D.C. 1990).  In <u>Kramer</u>, the District of Columbia Court of Appeals affirmed the trial court's holding that an enforceable contract did not exist where there was no "meeting of the minds" on material terms – even where there was a payment and partial performance.  The parties in <u>Kramer</u> came to an oral agreement whereby, in exchange for $75,000, appellant would secure financing for a housing construction project being developed by appellee.  <u>Id.</u> at 249.  Appellee expressed concerns over, and did not sign, a proposed contract drafted by appellant.  <u>Id.</u> at 249-50.  Nevertheless, appellee transferred $75,000 to appellant as per their oral agreement, and sent several correspondences referring to their "joint venture" and "project," and describing themselves as a "winning team."  <u>Id.</u> at 250.

Appellee brought suit for breach of contract, alleging that appellant had made no effort to secure financing.  Appellee argued that the $75,000 was intended as "seed money," held as a "good faith deposit" in an effort to induce investors.  <u>Id.</u> at 253.  Appellant, in turn, argued that the $75,000 was "a non-refundable start-up fee to induce [appellant] to begin work on the projects, which [it] did."  <u>Id.</u>  Appellant further argued that the terms of the unsigned contract controlled because there was consideration and performance.  Noting the conflicting evidence

---

[7]      Agreement on all material terms is necessary even where parties come to a general understanding but agree to memorialize the specific terms at a later date.  <u>Baker</u>, 664 A.2d at 1239 ("[P]arties [may] make an enforceable contract binding them to prepare and execute a subsequent documentary agreement . . . [but] that agreement shall have been expressed on all essential terms that are to be incorporated in the document . . . If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract' to make a contract is not a contract at all.").

about the "purpose of the $75,000 transfer," the trial court held that there was no enforceable contract because there had never been "a meeting of the minds between the parties."[8]  Id. at 250-251.  The Court of Appeals affirmed, and noted that "even if both parties believed that a contract had been formed, it would be impossible for any court to determine what the terms of that contract were, since nowhere in the record is there any clear indication of the actual purpose of the $75,000 transfer."  Id. at 253.

The evidence surrounding the $75,000 payment in Kramer is far more indicative of a meeting of the minds than Zambrana's $25,000 payment to La Ruche.  First, the parties in Kramer agreed (as substantiated by correspondence and performance) that the $75,000 would trigger efforts by appellant to secure funding for the housing development.  Id. at 250.  In contrast, Zambrana has not provided any evidence of action taken by either party reflecting the rights or obligations that he alleges were to follow his payment to La Ruche.  Second, there was a proposed contract in Kramer that might have guided a court in crafting a remedy or ordering specific performance.  Id. at 249-50.  In the present case, however, there is nothing in the record other than the ambiguous deposition testimony of Powers[9] that would provide the court any guidance in fashioning a remedy.

Finally, in Kramer, the party seeking relief presented the court with a theory of how the alleged contract should be interpreted (the $75,000 was "seed money" and a "good faith deposit"), and evidence in support thereof (written communication and testimony).  The same can hardly be said for Zambrana, who apparently believes this to be the sole responsibility of

---

[8]    Though holding that the parties did not enter into an enforceable contract, the trial court awarded $75,000 to appellee on the basis of unjust enrichment.  Id. at 251.  The Court of Appeals affirmed.  Id. at 255.

[9]    Powers recalled that the parties discussed, but did not agree upon, a 2.5% interest in CAI for Zambrana. Powers Dep. at 68.  He also recalled a "25% promise."  Id. at 54.

experts and judges.  Zambrana Dep. at 34-35, 43-45.  If there was not an enforceable contract in

Kramer, there surely could not have been one here.

Because no reasonable person could find that there was an agreement as to material terms

between Zambrana and Cauderlier, the Motion will be granted insofar as it seeks a declaratory

judgment that Zambrana did not enter into an enforceable contract for an ownership interest in

CAI.

### III.  Zambrana's Counterclaims

Cauderlier also seeks summary judgment on Zambrana's counterclaims.  Motion at 12-

13; Proposed Order, attached as Exh. 4 to the Motion.

### a.  Accounting

Zambrana seeks "an accounting of the assets owned by CAI."  Answer at 9 (Count I).[10]

An accounting is "a detailed statement of the debits and credits between parties arising out of a

contract or a fiduciary relation."  Bates v. Northwestern Human Servs., Inc., 466 F. Supp. 2d 69,

103 (D.D.C. 2006) (internal quotation omitted).  Zambrana's standing is based either on his

alleged ownership in CAI and/or the Property,[11] or because of his ownership in La Ruche.[12]  As

discussed in detail above, Zambrana does not have a contractual ownership interest in CAI or the

Property.  His standing must rest, then, on his ownership in La Ruche, which he claims entitles

him to an ownership of CAI.  Id. at ¶ 25.  Even if true, his purported basis for an accounting is

the "commingl[ing]" of assets between La Ruche and CAI.  As described above, claims based

upon this allegation are time-barred.

---

[10] Zambrana cites no legal authority for this counterclaim in either his Answer or Opposition.

[11] "Since Mr. Zambrana paid $25,000 on behalf of CAI, which monies enabled CAI to purchase the Building, Mr. Zambrana holds an ownership position in CAI, and/or the Building."  Answer at ¶ 24.

[12] "Since Mr. Zambrana (i) owns stock in La Ruche, (ii) La Ruche owns some of (sic) all of the stock in CAI, and (iii) CAI owns the Building or purchased the Building on behalf of its shareholders, Mr. Zambrana holds an ownership position CAI (sic), and/or the Building."  Answer at ¶ 25.

There are other reasons, however, why Zambrana's counterclaim for an accounting must fail. First, an accounting "is necessary when 'accounts between the parties are of such a complicated nature that they can be satisfactorily unraveled only by a court of equity.'" Donovan v. U.S. Postal Service, 530 F. Supp. 894, 900-01 (D.D.C. 1981) (quoting Dairy Queen v. Wood, 369 U.S. 469, 478 (1962) (Harlan, J. concurring)). Zambrana has not alleged that the accounts between CAI and La Ruche are so complicated in nature that an accounting is appropriate. Cf. Donovan, 530 F. Supp. at 901 ("The rights of between 500,000 and 700,000 employees are at stake. Each employee will have worked a different amount of [calculable] time, under differing circumstances, with different salary scales. Only a full accounting can insure that each individual is compensated."). Second, a party requesting an accounting must "show that the remedy at law is inadequate." Bates, 466 F. Supp. 2d at 103 (internal citation omitted). Zambrana has not made any showing that he was unable to obtain sufficient information during discovery in this case, nor has he explained why a derivative or private shareholder suit would not adequately protect his interests.[13]

For these reasons, summary judgment will be granted and Zambrana's counterclaim for an accounting will be dismissed with prejudice.

**b. Declaratory Judgment**

Zambrana also seeks a "judicial determination of his ownership share in the assets of CAI and/or in the Building." Answer at ¶¶ 29, 34. He presents this as two separate counterclaims for a declaratory judgment.

The first counterclaim for a declaratory judgment is based upon the allegation that he holds an ownership position in CAI and/or the Building because the Check was "intended to be

---

[13]     Indeed, CAI has asserted (and Zambrana has failed to oppose) that this counterclaim must be brought on behalf of La Ruche. Motion at 12-13.

used, and [was], in fact used, to enable CAI to purchase the Building." Answer at 9-10 (Count II). As discussed in detail above, Zambrana does not have a contractual ownership interest in CAI or the Property, nor has he presented any legal theory upon which ownership could otherwise exist. As a result, summary judgment will be granted as to this counterclaim.

The second counterclaim for a declaratory judgment is based upon the allegation that "[a]s a result of the commingling of funds between La Ruche and CAI, La Ruche [and Zambrana] either owns CAI or owns all the assets of CAI, including the Building." Answer at 10 (Count III). As described above, claims based upon this allegation are time-barred. As a result, summary judgment will be granted as to this counterclaim.

Moreover, a recurring legal theory of Zambrana's – that, because he is a La Ruche shareholder, the alleged commingling of funds between CAI and La Ruche entitles him to an ownership interest in CAI and/or the Property – is a non-sequitur. At best, Zambrana may be able to bring a derivative action on La Ruche's behalf to have restored to La Ruche any funds that it made available to CAI without consideration. It hardly follows that, because some of the money La Ruche made available to CAI was used to buy the Property, that La Ruche – let alone Zambrana – is thereby to be granted an ownership interest in the assets of CAI and/or the Property. There is no basis in law or equity for a court to force divestiture of a corporate asset and to transfer that asset to an individual because the funds used to buy it came from another corporation in which that individual is a minority stockholder.

### c. Unjust Enrichment

Zambrana seeks a "monetary judgment equal to the value of his share in the assets of CAI and/or in the Building" under the theory of unjust enrichment. Answer at 10-11 (Count IV). "Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and

equity belongs to another." Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.,

870 A.2d 58, 63 (D.C. 2005).  Unjust enrichment is "based on equitable principles, and it is not

contingent upon the niceties of the law of contracts."  Id. at 64.  That Zambrana paid $25,000 is

not in dispute.  CAI asserts that this payment was consideration for 10 shares of La Ruche,

whereas Zambrana asserts that the money was intended for CAI and was used for the purchase of

the Property.  If a jury were to side with Zambrana, the lack of an enforceable contract would not

preclude his claim that his payment – with nothing tangible received in return – unjustly enriched

CAI, Cauderlier, and/or La Ruche.[14]  For that reason, summary judgment as to this counterclaim

will be denied.

## IV.  CONCLUSION

For the reasons explained, the Motion will be: (1) granted as to CAI's claim for

declaratory judgment, insofar as Zambrana has no contractual ownership of CAI or the Property;

(2) granted as to Zambrana's counterclaim for an accounting; (3) granted as to Zambrana's

counterclaims for a declaratory judgment; and (4) denied as to Zambrana's counterclaim of

unjust enrichment.

An Order accompanies this Memorandum Opinion.


Date:   December 28, 2007                      _____/s/_____
                                              JOHN M. FACCIOLA
                                              UNITED STATES MAGISTRATE JUDGE

---

[14] It is important to note that, as discussed above, Zambrana's counterclaim for unjust enrichment may be time-barred depending on the fact-finder's assessment of the competing testimony surrounding the Meeting.  Supra, at 4-6.  See also Construction Interior Sys., Inc. v. Donohoe Cos. Inc., 813 F. Supp. 29, 33 n.4 (D.D.C. 1992) ("The statute of limitations for breach of contract claims in the District of Columbia is three years[, which] would also apply to any equitable claims, such as unjust enrichment, arising from the same conduct.").