# EXHIBIT 2

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2
    - - - - - - - - - - - - - - - -x
 3  CAUDERLIER & ASSOCIATES, INC.,  :
                                    :
 4      Plaintiff,                  :
                                    :
 5           v.                     :  Civil Case No.
                                    :  1:05CV01653
 6  SERGIO ZAMBRANA,                :
                                    :  Judge Ellen Segal
 7      Defendant/Third-Party       :   Huvelle
        Plaintiff,                  :
 8                                  :
             v.                     :
 9                                  :
    JEAN CLAUDE CAUDERLIER          :
10      AND                         :
    LA RUCHE, INC.,                 :
11                                  :
        Third-Party Defendants.     :
12  - - - - - - - - - - - - - - - -x

13                                    Washington, D.C.

14                                 Tuesday, January 30, 2007

15  Deposition of

16       SERGIO ZAMBRANA, called for examination by

17  counsel for Plaintiff and Third-Party Defendants,

18  pursuant to notice, at the Law Offices of Howrey, 1299

19  Pennsylvania Avenue, N.W., Washington, D.C.,

20  commensing at 9:10 a.m., before Barbara A. Huber,

21  Notary Public in and for the District of Columbia,

22  when were present on behalf of the respective parties:
```

Sergio Zambrana  
Washington, DC  
January 30, 2007

Page 2

1  APPEARANCES:

2     On behalf of Plaintiff and Third-Party Defendants:

3        ROBERT L. GREEN, JR., ESQUIRE
         JAMES B. BOLES, ESQUIRE
4        Howrey, LLP
         1299 Pennsylvania Avenue, N.W.
5        Washington, D.C. 20004-2402
         (202) 383-6506
6        greenr@howrey.com

7     On behalf of Defendant and Third-Party Plaintiff:

8        JEFFREY M. HAMBERGER, ESQUIRE
         Kass, Mitek & Kass, PLLC
9        1050 17th, Street, N.W.
         Suite 1100
10       Washington, D.C. 20036-5596
         (202) 659-6500
11       jhamberger@kmklawyers.com

12    Also Present:

13       Jean-Claude Cauderlier

14

15                    *   *   *   *   *

16

17

18

19

20

21

22

Sergio Zambrana January 30, 2007
Washington, DC

Page 3

1              C O N T E N T S

2  EXAMINATION BY:                                  PAGE

3     Mr. Green                                        4

4     Mr. Hamberger                                  184

5

6              E X H I B I T S

7  DEPOSITION EXHIBITS:                             PAGE

8  No. 1 - Copy of Check, January 21, 2000           32

9  No. 2 - Handwritten Document, June 23, 2004       77

10 No. 3 - Certificate Number 10                     77

11 No. 4 - Affidavit                                 96

12 No. 5 - Answer and Counterclaim Answer           124

13 No. 6 - Third-Party Complaint                    136

14 No. 7 - Copy of Checks                           144

15

16

17

18

19

20

21

22

Page 4

```
1                    P R O C E E D I N G S
2   Whereupon,
3                    SERGIO ZAMBRANA,
4   was called as a witness by counsel for Plaintiff/
5   Third-Party Defendant, and having been duly sworn,
6   by the Notary Public, was examined and testified as
7   follows:
8            EXAMINATION BY COUNSEL FOR PLAINTIFF/
9            THIRD-PARTY DEFENDANT
10  BY MR. GREEN:
11       Q    Please state your name.
12       A    Sergio Zambrana.
13       Q    Where do you live, Mr. Zambrana?
14       A    726 Gormley Drive, Rockville, Maryland
15  20850.
16       Q    Have you ever been deposed before?
17       A    No.
18       Q    I'll be asking you questions today,
19  Mr. Zambrana.  And your obligation as a witness is
20  to answer the questions to the best of your
21  ability, and tell the true.  If at some point you
22  don't understand one of my questions, please tell
```

Sergio Zambrana                                               January 30, 2007
                          Washington, DC

Page 5

```
1    me.  If it's unclear, I will try to ask it so that
2    it is clear.
3            If you don't know, just tell me you
4    don't know.  But don't guess, don't speculate,
5    unless I ask you to.  Unless you tell me that you
6    don't understand a question, then I will assume
7    that the question is clear enough for you to
8    provide an answer.
9            Is that satisfactory with you?
10   A    Yeah.
11   Q    Okay.  When were you born?
12   A    December 6, 1960.
13   Q    And where were you born, sir?
14   A    Bolivia.
15   Q    Please describe for me your education.
16   A    I went to high school.  I went to a
17   school call Anglo American School.  I graduate in
18   1978.
19   Q    And where is that school located?
20   A    In Bolivia.
21   Q    Okay.
22   A    I went to the University of Bolivia for
```

Page 6

1  a year, study electric engineering. Then I moved
2  to Houston, Texas. And I went to Houston
3  University for a year. Then I transferred to
4  Maryland University. I went there for a
5  year-and-a-half.
6      Q    What field of study did you pursue at
7  the University of Houston?
8      A    Electrical engineer started in Bolivia.
9      Q    So you started that at the University of
10 Bolivia?
11     A    Yeah.
12     Q    And then you continued those studies --
13     A    Yeah.
14     Q    -- at the University of Houston?
15          The court reporter is taking down what I
16 say --
17     A    Okay.
18     Q    -- and what you saw. And it works best
19 for her and for everybody if you let me complete
20 the question before you start your answer.
21          And then you transferred to the
22 University of Maryland?

Page 7

```
1      A    Yes.
2      Q    When was that?
3      A    1982.
4      Q    And do you recall -- and you were at the
5  University of Maryland for a year-and-a-half?
6      A    Yes.
7      Q    Were you in a degree program at
8  Maryland?
9      A    No.  I was trying to -- I wasn't sure if
10 I want to study electrical engineering, so I was
11 taking some courses there, different.
12     Q    Were you a full-time student?
13     A    No.
14     Q    Were you also working at the time?
15     A    Yes.
16     Q    Where did you work -- when did you
17 first -- let me ask this.
18          When did you first move to the
19 Washington metropolitan area?
20     A    '82.  Actually, that was -- that was in
21 19 -- 1981.  Yeah, '81.
22     Q    Okay.  And when you moved to the
```

Page 8

```
 1    Washington area, what did you do?
 2              Were you employed?
 3         A    I work, yeah.  I was working also
 4    part-time.
 5         Q    And where did you work part-time?
 6         A    At the restaurant called Vittorio's.
 7         Q    And where is Vittorio's restaurant, or
 8    where was Vittorio's restaurant?
 9         A    It was in Georgetown Park Mall.
10         Q    And what job did you have there?
11         A    I was a waiter, and then assistant
12    manager.
13         Q    How long did you work at Vittorio's
14    restaurant?
15         A    I did it for four years.  I'm --
16         Q    Until --
17         A    -- I'm not sure.  '84, probably.  I
18    don't recall.
19         Q    And while you were working at
20    Vittorio's, either as a waiter or as an assistant
21    manager, you also took some classes --
22         A    Yes.
```

Page 9

```
 1      Q    -- at the University of Maryland; is
 2  that correct?
 3      A    Yes.
 4      Q    What's the next thing that happened in
 5  terms of your employment?
 6           Where did you go after Vittorio's?
 7      A    Filomena's restaurant.
 8      Q    In 1984?
 9      A    1985.
10      Q    What position did you hold at
11  Filomena's?
12      A    Metro lead.  It's a dining room manager.
13      Q    How long were you the dining room
14  manager at Filomena's?
15      A    Until I moved to Cafe La Ruche.
16      Q    When was that?
17      A    '87.
18      Q    What position did you hold at Cafe
19  La Ruche?
20      A    What, at the beginning?
21      Q    Yes.
22      A    Manager.
```

Page 10

```
 1    Q    And who hired you, sir?
 2    A    Jean-Claude Cauderlier.
 3    Q    Was he the owner of the restaurant?
 4    A    I think he -- what I heard at the time,
 5  he was taking over the business.
 6    Q    Taking over the business from whom?
 7    A    The family, Levenson's family.
 8    Q    At the time you were hired at La Ruche,
 9  had Mr. Cauderlier purchased the restaurant, to
10  your knowledge?
11    A    He was in the process.
12    Q    Do you know whether it was complete or
13  not?
14    A    I know it -- at that time, no.
15    Q    You don't know or --
16    A    At that time.
17    Q    It wasn't complete?
18    A    No, I didn't know at that time all the
19  details.
20    Q    Okay.  Were you part of Mr. Cauderlier's
21  purchase of the restaurant in 1987?
22    A    No.
```

```
1      Q    So you had no ownership interest in
2  La Ruche beginning in 1987?
3      A    No.
4      Q    No you did not, or no you --
5      A    No, I did not.
6      Q    Thank you.
7           Now, as the manager at La Ruche in 1987,
8  what did you do?
9      A    I ran the business on the front of the
10 dining room -- I mean, the dining room part.
11     Q    What does that entail?
12     A    I was hiring staff, you know, management
13 of the alcohol, waitress, and all the -- all the
14 business of that.
15     Q    Are you a chief?
16     A    No.
17     Q    Did you have any responsibility for the
18 kitchen operations?
19     A    No.  Jean-Claude Cauderlier was taking
20 care of the kitchen.
21     Q    And is that how it was split:  You had
22 the dining room, he had the kitchen?
```

Sergio Zambrana                                                                 January 30, 2007
Washington, DC

Page 32

```
 1       A     Probably $2,000 a week.
 2             MR. GREEN:  Mark that, please.
 3                    (Deposition Exhibit No. 1
 4                    marked for identification.)
 5   BY MR. GREEN:
 6       Q     Mr. Zambrana, I've placed before you a
 7   document marked as Exhibit 1, which is a -- do you
 8   recognize it?
 9       A     Yes.
10       Q     What is Exhibit 1?
11       A     It's a check.
12       Q     Is that your signature on the check?
13       A     Yes.
14       Q     And it's dated January 21st, 2000,
15   correct?
16       A     Correct.
17       Q     And it's in the amount of $25,000?
18       A     Correct.
19       Q     Payable to La Ruche, Inc.?
20       A     Yes.
21       Q     After you wrote the check, Mr. Zambrana,
22   what did you do with it?
```

```
 1      A    Could you repeat it?
 2      Q    After you wrote the check, what did you
 3   do with it?
 4           Did you give it to anyone?
 5      A    Yes.
 6      Q    To whom did you give it?
 7      A    To Jean-Claude and Jamie Powers.
 8      Q    When did you write the check?
 9      A    On the twenty -- the night before the
10   21st, on the twenty -- the night of the 20th,
11   2000.
12      Q    So you wrote the check the night before
13   and you dated it the next day?
14      A    Yes.
15      Q    Did you fill in the whole check on the
16   20th when you wrote it?
17      A    Yes.
18      Q    So the way Exhibit 1 appears is the way
19   that you completed the check on the 20th of
20   January in 2000; is that right?
21      A    That's the way they directed to me to
22   write it.
```

1    Q    Okay. Now, you say they directed you to
2    write it?
3    A    Yes.
4    Q    Who directed you?
5    A    Jean-Claude and Jamie Powers.
6    Q    Together?
7    A    Yes. We were sitting at the table. I
8    asked them who I should write the check, CAI or La
9    Ruche. They said write to La Ruche.
10   Q    And when you wrote the check, what was
11   your understanding of what you were getting for
12   $25,000?
13   A    I was putting in $25,000 as investment
14   to buy a building.
15   Q    What building?
16   A    Where La Ruche stays, the building La
17   Ruche stay and next -- the next door to.
18   Q    So you were purchasing -- was $25,000
19   the entire purchase price of the building?
20   A    No.
21   Q    Okay. What portion of the purchase
22   price did the 25,000 represent?

```
1      A     I don't know.
2      Q     What portion, what percentage of the
3  property were you purchasing for $25,000?
4      A     I don't know.  I guess that's what the
5  judge have to decide.
6      Q     No, no, no.  I'm asking when you gave
7  the check, when you wrote the check on the 20th of
8  January, what did you think you were getting?
9  What percentage?
10     A     I didn't think in percentage.
11     Q     Had you had any conversation with
12 Mr. Powers about what percentage you were to get?
13     A     To Mr. Powers?
14     Q     Well, you said that Mr. Powers told you
15 to make the check out to La Ruche, right?
16     A     No.  I said Jean-Claude Cauderlier and
17 Mr. Powers were setting at the same table, and I
18 asked both of them.
19     Q     Okay.  And which one told you La Ruche?
20     A     They look at -- they look at each other.
21 And they had a conversation.  I don't remember
22 what.  And they said to La Ruche.
```

```
 1      Q    They had a conversation in front of you?
 2      A    Yeah.
 3      Q    Okay.  And did they both say La Ruche?
 4   Did Jean-Claude --
 5      A    Yes.
 6      Q    -- Cauderlier say --
 7      A    Both say La Ruche.
 8      Q    Okay.  Now, you mentioned CAI.
 9           You know that to be a corporation, do
10   you not?
11      A    I was the officer and director for,
12   yeah.
13      Q    That's Cauderlier & Associates, Inc.,
14   right?
15      A    Yes.
16      Q    Okay.  So we can call it CAI, and you
17   and I will both know that we're talking about
18   Cauderlier & Associates, Inc.; is that correct?
19      A    That's correct.
20      Q    Okay.  Now, were you buying a
21   percentage, a portion of CAI, or were you buying
22   the land for your $25,000?
```

```
 1      A    CAI was an instrument to buy the land.
 2      Q    Okay.  So you weren't actually buying
 3 the land yourself personally?
 4      A    That was the purpose.
 5      Q    I'm sorry?
 6      A    That was the purpose of my $25,000.
 7      Q    No, but were you going to be an
 8 individual owner of the land?
 9      A    Yes.
10      Q    You were?  So the title of the property
11 was going to be in the name of Sergio Zambrana?
12      A    I never have any titles or anything.  I
13 trust Jean-Claude all my --
14      Q    No, no.  Just answer my question.
15           My question is was the land to be titled
16 in your name as an owner, Sergio Zambrana, or were
17 you to be a shareholder in CAI?
18      A    We never went to this -- that deeply
19 discussions.  I never understand that.  I didn't
20 understand at that time the type of transactions.
21      Q    So you didn't have any understanding or
22 agreement on how the property would be titled?
```