```
 1     A    The agreement that we had, we were -- we
 2   create CAI in order to buy the building.
 3     Q    So there was an understanding that CAI
 4   was going to purchase the building?
 5     A    Yes.
 6     Q    Okay.  Now, when did you have this
 7   conversation with Mr. Powers and Mr. Cauderlier at
 8   the table?  When did that occur?
 9     A    This particular conversation?
10     Q    Yes.
11     A    The 20.
12     Q    The 20 --
13     A    I mean the -- of the whole -- are you
14   referring right now, or who write it -- who I
15   should write the check?
16     Q    No, no.  When you were writing the
17   check?
18     A    Repeat the question, please.
19     Q    Okay.  You said that you were sitting at
20   a table with Mr. Powers and Mr. Cauderlier, and
21   you were writing out this check, right?
22     A    Yes.
```

1    Q    Where did that meeting take place?

2    A    On the restaurant.

3    Q    And it took place on January 20th?

4    A    Yes.

5    Q    At what time of day, sir?

6    A    What time?

7    Q    Yes.

8    A    Night, late at night. We were getting
9    ready and excited to leave for the closing the
10   next day, doing the last touchups.

11   Q    All right. So what percentage of CAI
12   were you going to get for your $25,000?

13        MR. HAMBERGER: He's answered that
14   question, sir. He stated he didn't know.

15        MR. GREEN: He can answer it one more
16   time.

17   BY MR. GREEN:

18   Q    You may answer.

19        MR. HAMBERGER: I'll tell him if he may.

20        But you may.

21        THE WITNESS: Well, we never have
22   that -- I mean, we never agree on a percentage.

Page 40

```
 1    BY MR. GREEN:
 2        Q    You mentioned Mr. Powers.
 3             Who was Mr. Powers?  Who is he?
 4        A    A lawyer.
 5        Q    At the time, in January of 2000, he
 6    represented La Ruche; is that correct?
 7        A    I believe so.
 8        Q    Did he represent Mr. Cauderlier?
 9        A    At that time, I didn't -- never thought
10    about it.
11        Q    Had Mr. Powers ever represented you
12    personally?
13        A    No.
14        Q    He'd never done any legal work for you?
15        A    No.
16        Q    Hadn't represented you on any traffic
17    offenses or contracts or buying or selling a house
18    or anything?
19        A    Never.
20        Q    Have you ever paid him any money to be
21    your lawyer?
22        A    To --
```

```
1      Q    Mr. Powers, have you ever --
2      A    No.
3      Q    -- paid Mr. Powers any money?
4      A    No.  He was never my lawyer.
5      Q    Did Mr. Powers ever tell you that he
6   couldn't be your lawyer because he represented
7   La Ruche?
8      A    Later on, yes.
9      Q    Had he told you prior to January of 2000
10  that he couldn't represent you?
11     A    We never discussed that matter.
12     Q    Did he ever advise you to get your own
13  lawyer?
14     A    Later on, yes.
15     Q    Prior to January of 2000, had he ever
16  advised you to get your own lawyer?
17     A    I never thought I'd need a lawyer in my
18  life.
19     Q    That wasn't my question.
20          My question was whether Mr. Powers ever
21  said to you, in words or in substance,
22  Mr. Zambrana, I'm the lawyer for La Ruche; I can't
```

```
 1   represent you, you need to get your own lawyer?
 2             Not those exact words.
 3        A    I don't recall.  I mean, I don't
 4   remember.  I'm not going to speculate.
 5        Q    You can't remember one way or the other?
 6        A    Not at this time.
 7        Q    Now, when you were sitting at this table
 8   on January 20th writing this check, was there any
 9   kind of written document that was prepared that
10   showed what you were to get for the $25,000?
11        A    We never had any written document.
12        Q    Okay.  Did you make any notes?
13        A    I never make notes.
14        Q    Okay.  So there's -- you don't have a
15   napkin, or an envelope, or a single sheet of
16   paper, or something in your checkbook on the back
17   of a deposit slip that memorializes, says what
18   you're to get for the $25,000?
19        A    I was dealing with a person who I
20   thought was close as my family.  And I don't write
21   things with my family.
22        Q    My question is, is there a single piece
```

1    of paper that reflects what you were to get for
2    the $25,000?
3        A    No.
4        Q    No e-mails?
5        A    No.
6        Q    No handwritten documents?
7        A    I never do -- deal with any type of
8    things like that on this problem.
9        Q    And you didn't prepare a typewritten or
10   a computer-generated document of any kind?
11       A    We always talk by mouth, since I start
12   to work there.  I never had a contract as employee
13   of La Ruche.
14       Q    What percentage of CAI do you believe
15   that you purchased for the $25,000?
16       A    That's why I'm here.  I guess the judge
17   have to decide that.
18       Q    No, no.  I'm asking you.  I want to know
19   what you think you own.
20       A    I'm not an expert.
21       Q    Well, you're the one who wrote the
22   check, sir.

1    A    I wrote a check as an investment to buy
2    a building, and a partner.
3    Q    But you have no understanding of what
4    percentage of CAI you were to get for that
5    $25,000?
6    A    Can you repeat the question?
7    Q    You don't have any understanding of what
8    percentage of CAI you were to get for that
9    $25,000?
10   A    Not right now.
11   Q    Have you had at any time an
12   understanding?
13   A    I guess it's very complicated. That's
14   why we here.
15   Q    So the answer's no, you don't -- you've
16   never had an understanding of what you were to
17   get?
18   A    On CAI?
19   Q    Yes.
20   A    I supposed to be a partner.
21   Q    But you can't tell me how much -- what
22   percentage of CAI you were to own?

Page 45

1     A    That's why we're in this dispute.

2     Q    Okay. Is it correct, sir, that you

3  cannot, as you sit here today, tell me what

4  percentage of CAI you claim to own?

5     A    I can tell you at least 10 percent.

6     Q    Of CAI?

7     A    Yes.

8     Q    And what's the basis for that, sir?

9     A    My $25,000 investment.

10    Q    And how did you calculate the 10

11 percent?

12    A    I didn't calculate.

13    Q    Now, you were present at Mr. Powers'

14 deposition, right?

15    A    Yes.

16    Q    And have you read that deposition?

17    A    No.

18    Q    Did you attend a meeting after the

19 closing, in February or March, that was held at

20 the building, in which you and Mr. Powers and

21 Mr. Cauderlier were present?

22    A    We have many meetings that time.

Page 46

```
 1      Q    Well, Mr. Powers testified that the
 2 three of you met in the shell of the building?
 3      A    We meet many times.
 4      Q    And that you asked at that meeting, that
 5 he described, what you got for your $25,000.
 6           Do you recall that testimony?
 7      A    No.  Can I read it, please?
 8      Q    The testimony?
 9      A    Yes.
10      Q    No, I'm just going to ask do you recall
11 the testimony?
12      A    Can you repeat what he said?
13      Q    Sure.  Mr. Powers testified --
14      A    Okay.
15      Q    -- that there was a meeting in February
16 or March of 2000, after the closing.  And at that
17 meeting you asked:  What do I get for my $25,000?
18           Did that meeting occur?
19           And did you ask that question?
20      A    I don't recall at this time.  We had a
21 lot of meetings.
22      Q    Did you have a lot of meetings in which
```

Sergio Zambrana                                                January 30, 2007
                         Washington, DC

Page 47

```
 1   the issue of what you got for the 25,000 was
 2   discussed?
 3        A    Yes.
 4        Q    Okay.  When was the first time you had a
 5   meeting where the issue of what you were to get
 6   for your $25,000 was discussed?
 7        A    The same day of the closing.
 8        Q    Before, or after?
 9        A    After.
10        Q    So this is January 21st, after the
11   closing?
12        A    Yes.
13        Q    Okay.  I don't think I asked you.
14             Who did you give the check to, the
15   Exhibit 1?
16        A    Who handled the check?
17        Q    No.  You wrote the check --
18        A    Yeah.
19        Q    -- but when did you give it -- you gave
20   it to --
21        A    I put on the table.  And I guess
22   Jean-Claude took it.  I mean, he --
```

```
 1    say that -- that CAI -- I was claiming, or --
 2        Q    Let me start over.  I just want to be
 3    clear.
 4             After the closing, when was the first
 5    time that you did had a conversation with
 6    Mr. Powers or with Mr. Cauderlier or with both of
 7    them in which you asked, in words or in substance,
 8    what do I get for my $25,000?  When did that
 9    occur?
10        A    I guess I start to ask when Jean-Claude
11    fire Jamie.
12        Q    And when was that?
13        A    I don't recall the exactly dates.  It
14    was a sad part of the business.
15        Q    Mr. Zambrana, you gave this check in
16    January of 2000.  And you had no understanding
17    about what percentage of CAI you were to get for
18    the check at the time you wrote it; and you never
19    asked what percentage you were to get until
20    sometime after Mr. Powers was no longer the
21    attorney for La Ruche?
22        A    Yes.  I never asked for La Ruche, how
```

1   many years.

2       Q    I'm sorry?

3       A    I never ask for La Ruche my percentage.
4   I trust Jean-Claude hundred percent.

5       Q    Other than this $25,000 check, had you
6   ever written a check or provided any other money
7   to Mr. Cauderlier to acquire an interest in
8   La Ruche?

9       A    Yes, I did.

10      Q    What money was that?

11      A    Well, in '96, when he make -- he made me
12  part of La Ruche, he give me the incentive first
13  of all because Lee offered me a partnership on her
14  new restaurant to help.  So just told me I had an
15  incentive to be a partner of La Ruche.  And that's
16  when I talk with her.  And, also, he was gratified
17  for the ten years of excellent employ-wise, and I
18  loyal to him on all his travels and -- and things
19  we had to go through with the last five years with
20  the ex-wife.  And, also, I receive a -- a cut of
21  my salary in '96 for several years.  I had a cut
22  from my salary.

```
 1      Q    And what was this cut of your salary?
 2      A    Well, it was on -- you know, from '95 to
 3   '96, I cut from $5,000 for several years.  I mean,
 4   that -- you got the payroll checks.  You can
 5   check.
 6      Q    And what was the reason for this
 7   reduction in your salary?
 8      A    I was becoming a part of La Ruche.
 9      Q    And what part of La Ruche were you
10   gaining in 1996?
11      A    What part?
12      Q    Yes.  What percentage?
13      A    I never discussed percentage with either
14   for La Ruche or CAI.  I was concentrating working,
15   making successful restaurant.
16      Q    My question to you was did you ever
17   write any check to become an owner in La Ruche
18   other than Exhibit 1?
19           Is that the only check you ever wrote?
20      A    Could you repeat the question?
21      Q    Sure.  Other than Exhibit 1, did you
22   write any other checks to purchase a share of
```

```
1    La Ruche?
2         A    I didn't write a to purchase --
3              OMR. HAMBERGER:  Answer this question.
4    It's just a "yes" or "no" question.
5              THE WITNESS:  No.
6    BY MR. GREEN:
7         Q    Did you ever write a check payable to
8    CAI to become an owner of CAI?
9         A    No.  All the monies were coming for
10   La Ruche.
11        Q    When your salary was reduced in 1995 or
12   1996, was that -- did you discuss that with
13   Mr. Cauderlier?
14        A    Of course.  I don't have any -- I'm not
15   going to take a cut just because.  He was cutting
16   my salaries for a reason.
17        Q    And what did Mr. Cauderlier say to you?
18        A    He -- I was becoming a part of La Ruche.
19        Q    Was that the only reason he was cutting
20   your salary?
21        A    Yeah.  I mean, we have a -- we had to
22   work harder.  People left, actually.  Two managers
```

1   left. It was just me and him. We don't a -- most
2   of the staff left. They were leaving with the
3   other manager. It was a challenge.
4       Q   Did you receive shares at that time in
5   La Ruche?
6       A   I think I -- I mean, that's what I
7   thought. I thought, you know, he -- I receive
8   personally? I never received anything from
9   Jean-Claude until just 2004.
10      Q   Did you ask for shares?
11      A   No. We were partners. I mean, we
12  were -- I trust him hundred percent.
13      Q   Are there any documents that reflect
14  what percentage of La Ruche you were to own after
15  this reduction in salary?
16      A   I guess the 10 dollar -- I guess the --
17  yeah, the certificate of ten shares that I have.
18      Q   Is there any document --
19      A   Yes, the number nine certificate for ten
20  shares.
21      Q   And when was that issued to you, sir?
22      A   I don't know when he was issued.

Page 56

1   He's -- was in charge of all the papers.

2       Q    Were those shares issued to you -- well,
3   I'll ask that question in a different way.  I'd
4   like to go back to this meeting that Mr. Powers
5   described.

6            Did you, sometime in the first half,
7   first quarter of 2000, ask Mr. Cauderlier for a
8   percentage ownership of CAI?

9       A    Yes.

10      Q    You did?

11      A    I mean, that was the understanding.

12      Q    And did he agree to give it to you?

13      A    Yes.

14      Q    On how many different occasions did this
15  subject come up?

16           MR. HAMBERGER:  Can we clarify the
17  timeframe, please?

18  BY MR. GREEN:

19      Q    Yes.  First quarter of 2000.

20           MR. HAMBERGER:  He's talking about --

21  BY MR. GREEN:

22      Q    After the closing, sir, did you ask

```
 1   Mr. Cauderlier for a percentage of CAI?
 2       A    Not for percentage.
 3       Q    Did you ask him for shares?
 4       A    I know I was getting shares in La Ruche.
 5   And, you know, I was getting shares from
 6   everywhere buying.  CAI was our retirement plan
 7   for both of us.  That's the idea.
 8       Q    Well, that's not responsive.  And I move
 9   to strike that.
10            My question is did you ask him for
11   shares in CAI?
12       A    I know -- yes.  I mean, we -- I supposed
13   to get shares in CAI.
14       Q    You asked Mr. Cauderlier for shares?
15       A    Yeah.
16       Q    Did he give them to you?
17       A    I thought.
18       Q    In the first quarter of 2000?
19       A    I never receive anything that day, the
20   first quarter of 2000, either received from my
21   check or for my past ownership of La Ruche.  Never
22   produced any documents until 2004.
```

Page 58

```
1      Q    Did Mr. Cauderlier ever refuse?
2           Did he ever say no, I'm not selling you
3  CAI or any portion of CAI shares?
4      A    I discovered that on the letter he
5  commit to purchase the building, when he denied
6  that I own -- I don't own CAI.  2004, first time.
7      Q    So that's your testimony, that the first
8  time that you became aware that you didn't own any
9  part of CAI was sometime in 2004?
10     A    That I did not own?
11     Q    Yes.
12     A    Or that he denied?
13     Q    Your testimony is that you first learned
14 that Mr. Cauderlier denied that you were a
15 co-owner in CAI sometime in 2004; is that correct?
16     A    Yes.
17     Q    And that prior to that, whenever that
18 occurred, it was your belief that you were a
19 co-owner of CAI?
20     A    Yes.  That was our investment of
21 retirement for me and him.
22     Q    Now, did you fill out any of the forms
```

Page 59

1   to purchase the land that CAI bought?
2        A    I never filled any forms or documents
3   for either La Ruche or CAI.
4        Q    Did you execute a guarantee, a personal
5   guarantee connected with the purchase?
6        A    I trust Jean-Claude hundred percent.
7        Q    Whether you trusted him or not, my
8   question is did you execute a guarantee as part of
9   the purchase by CAI of the land?
10       A    I don't understand the question.
11       Q    Okay.  Do you know what a guarantee is?
12       A    Yes.
13       Q    All right.  Did you sign a guarantee as
14  part of the purchase by CAI of the land?
15       A    Yes.  My $25,000 check.
16       Q    No, no.  No, sir.
17            I'm asking, did you execute --
18            MR. HAMBERGER:  Listen to the question.
19  BY MR. GREEN:
20       Q    -- a document?
21       A    A document?
22       Q    A document.  It's called a guarantee.

```
1    And I'll represent to you a personal guarantee is
2    a document that says that if the corporation
3    doesn't meet its debts, that the individual is
4    personally liable for the entire amount of the
5    debt.
6             Now, with that understanding, did you
7    execute a personal guarantee for the purchase
8    price of the land when CAI bought the land in
9    January of 2000?
10        A    No.
11        Q    You were present at the closing,
12   correct?
13        A    Yes.
14        Q    Now, other than yourself, Mr. Cauderlier
15   was present?
16        A    Yes.
17        Q    Mr. Powers was present?
18        A    Yes.
19        Q    Who else was present?
20        A    The owner of the building.
21        Q    Who's that?
22        A    Mr. Mahesh Natthani.
```