Page 83

1      A    Yes.

2      Q    -- to be a partner?

3           And my question, and you just testified,
4  is that these ten shares were not for the $25,000
5  check that you wrote in January of 2000; but these
6  ten shares were the shares that you were entitled
7  to for staying with the restaurant in 1996; is
8  that correct?

9      A    No.

10     Q    It's not correct?

11     A    No.

12     Q    All right.  What --

13     A    I don't know what Jean-Claude was doing
14  with the certificates number nine or ten or what
15  he did with all the paperwork.  I never see any
16  paperwork, so I don't know what he did.  I cannot
17  testify of something.

18     Q    You and I are not communicating very
19  well, Mr. Zambrana.

20          Certificate number ten is the only
21  certificate for shares that you've ever received
22  in La Ruche; is that correct?

Page 84

1      A    Yes.

2      Q    Your testimony is that whether or not

3  certificate nine was issued, you never got it?

4      A    I never got any document of La Ruche

5  period.

6           MR. HAMBERGER:  "Yes" or "no."

7  BY MR. GREEN:

8      Q    I'm not asking for --

9      A    I never got --

10     Q    -- a long explanation --

11     A    No.

12     Q    -- Mr. Zambrana.

13          I'm just trying to establish:  You never

14 got certificate number nine, correct?

15     A    No.

16          MR. HAMBERGER:  Yes.  That's correct.

17          THE WITNESS:  I mean, yes.  I mean,

18 yeah, I never got it, yes.

19 BY MR. GREEN:

20     Q    Did you receive certificate number nine,

21 Mr. Zambrana?

22     A    No.

Sergio Zambrana                                                                January 30, 2007
Washington, DC

Page 85

```
 1        Q    Thank you.
 2             Certificate number ten is the only
 3   certificate of shares in La Ruche stock that
 4   you've ever received?
 5        A    Yes.
 6        Q    Are the ten shares in certificate number
 7   ten the shares to which you were entitled because
 8   you stayed with the restaurant in 1996 rather than
 9   going off to start a new venture with Ann Lee?
10        A    I don't know.
11        Q    Why not?  Do you think you were entitled
12   to more?
13        A    Jean-Claude is the person who issued all
14   these things.  I never ask him for a papers.
15   That's the first time I saw a document, that you
16   show me.  And the other time, I came -- I went to
17   that meeting for a different reason.  And it was
18   supposed to be a meeting of shareholders.  I
19   didn't even have any advice of lawyers.  I never
20   had a lawyer at that time.  And they told me you
21   had to sign this paper.
22        Q    Well, did you have any understanding of
```

```
 1    how many shares you were to get for staying with
 2    the restaurant in 1996?
 3              MR. HAMBERGER:  I believe he's testified
 4    several times that he did not have an
 5    understanding.
 6    BY MR. GREEN:
 7         Q    Okay.
 8         A    I don't know.  Or I don't have an
 9    understanding.
10         Q    When you got these shares in 2000 --
11    that's when you got them, right?
12         A    Yes.
13         Q    Certificate number ten?
14         A    Yes.
15         Q    All right.  Who gave them to you?
16         A    Jean-Claude's lawyer.
17         Q    Was Jean-Claude there?
18         A    Yes.
19         Q    Did you ask what they were for, why you
20    were getting them?
21         A    The lawyer told me this is the
22    replacement of certificate.  For me at that time,
```

1   the only thing I told was I need to get something

2   from now from this man because he change hundred

3   percent.  I didn't have any document.  And I feel

4   very nieve and stupid, that how come I never him

5   ask for papers.

6           MR. HAMBERGER:  Why don't you ask a

7   clarification question?  I believe you said 2000.

8   Did you mean 2000, or 2004?

9   BY MR. GREEN:

10      Q   Let me ask the question again, so the

11  record's clear.

12          When you received certificate number ten

13  in 2004, did you ask what the shares were for,

14  Mr. Zambrana?

15      A   No.  Either they told me.

16      Q   He had told you?

17      A   Either they told me.

18      Q   Okay.  And what did they tell you in

19  2004?

20      A   We had a meet -- I went there for a

21  meeting of a shareholder.

22      Q   Shareholders of La Ruche?

Sergio Zambrana                                      January 30, 2007
Washington, DC

Page 88

```
 1     A    Yes.
 2     Q    When was --
 3     A    That was the original of why I went
 4  there, not to receive a certificate.
 5     Q    Right.  Okay.  You went to a
 6  shareholders meeting?
 7     A    Yes.
 8     Q    And where was the meeting held?
 9     A    Jean-Claude's attorney.
10     Q    At his office?
11     A    Yes.
12     Q    And who was that attorney?
13     A    Rich or Rick.
14     Q    I'm sorry?
15     A    I think his name is Rick or Rich.
16     Q    Had you ever been to the office before?
17     A    Never.
18     Q    When you received certificate number ten
19  in 2004, did you believe that this was what you
20  were purchasing for $25,000 --
21     A    No.
22     Q    -- Exhibit Number 1?
```

Page 89

1   A   No.

2   Q   Okay. So this is a replacement for
3   certificate number nine, which you never received,
4   correct?

5   A   Yes.

6   Q   Whether it was certificate number nine
7   or certificate number ten, what did you understand
8   those ten shares to represent?

9   A   That was my partnership in La Ruche.

10  Q   Was that the entire partnership of La
11  Ruche?

12  A   No. From '96. I went there to fix the
13  papers starting '96. I never saw any papers of
14  the company.

15  Q   But was this to take care of the shares
16  that you got beginning in 1996?

17  A   I assume. I don't -- I --

18  Q   Were you entitled to any more than ten
19  shares for staying with the restaurant in 1996?

20  A   Sure.

21  Q   Why?

22      Did you have a discussion with

1   Mr. Cauderlier that you should get more than ten

2   shares?

3       A    No.

4       Q    Did he agree to give you more than ten

5   shares?

6       A    We never agree about anything with

7   shares, talking about shares.

8       Q    Had you asked for more than ten shares?

9       A    We never agree about -- we never

10  discussed with shares with Jean-Claude.

11      Q    Okay. So in June of 2004, you took

12  these shares believing that -- certificate number

13  ten -- that these were the shares that you were

14  entitled to for staying with the restaurant in

15  2006 and thereafter; is that correct?

16      A    No.

17      Q    Why did you take them then?

18      A    That was the only document for the first

19  time I saw in my hands. And after I saw lawyers

20  and trying to make me sign things on the

21  meeting -- which I didn't sign it. I didn't

22  agree. And I didn't read this paper, I just want

Sergio Zambrana                                                       January 30, 2007
Washington, DC

Page 91

1    to get some document in my hand to see that I have
2    something. Things were changing completely.
3            I never had a -- that's why I decide to
4    hire an attorney for the first time. I start to
5    lost my trust in Jean-Claude.
6        Q   Did you say to Jean-Claude, in June of
7    2004, what is this ten shares for?
8        A   No.
9        Q   Did you say to him it should be more?
10       A   I didn't discuss about him about this.
11       Q   Did you say that I'm entitled to 20
12   shares in La Ruche?
13       A   I didn't discuss about any papers or
14   what we sign with him that day.
15       Q   Did you say to him or to his lawyer
16   where are my shares in CAI, in June of 2004?
17       A   What I asked that lawyer that day is who
18   he was representing that day, Jean-Claude, JC, or
19   Cauderlier. And he told me it's not my business.
20       Q   Did he say that he was your lawyer?
21       A   That's what he say.
22       Q   He said he represented --

```
 1      A    No, no.
 2      Q    -- you?
 3      A    No.  That's what he say when I ask him
 4  who he was representing that day on the meeting,
 5  Jean-Claude personally, CAI, or La Ruche.  And he
 6  told me it's not my business.
 7      Q    He did not say he that represented your
 8  interest, correct?
 9      A    I didn't ask that question.
10      Q    And he didn't -- whether you asked it or
11  not, he didn't say, Mr. Zambrana I'm your lawyer,
12  too?
13      A    I don't think he told me who his lawyer
14  was.  That's why I asked him who he was
15  representing.
16      Q    Mr. Zambrana, after you got these
17  shares, did you continue to work at La Ruche?
18      A    Yes.  That's my business.
19      Q    Did you have a conversation with
20  Mr. Cauderlier after June 23rd of 2004, in which
21  you said I got the ten shares, but that's not what
22  I'm entitled to?
```

```
 1      A    I don't think we converse anymore after
 2   that point.
 3      Q    You quit talking to him about the
 4   shares?
 5      A    I think we talk about -- we quit talking
 6   about anything related to La Ruche.  It was very
 7   basic.
 8      Q    After June of 2004, did you ask
 9   Mr. Cauderlier for shares in CAI?
10      A    After -- repeat the question.  After two
11   thousand --
12      Q    '4, uh-huh, June of 2004.
13      A    I stopped talking to him about any type
14   of business regarding to CAI or La Ruche to him.
15   And I decide to get a lawyer.
16      Q    Okay.  When did you hire a lawyer?
17      A    Around that time.  Mr. Kass.
18      Q    And Mr. Kass is a lawyer with
19   Mr. Hamberger's firm, correct?
20      A    Yes.
21      Q    In addition to your salary,
22   Mr. Zambrana, did you receive any bonuses when you
```

Page 94

```
 1   were at La Ruche?
 2       A    Yes.  I think some, some years.
 3       Q    Okay.  Did you receive a bonus every
 4   year?
 5       A    Not every year.
 6       Q    How much were the bonuses?
 7       A    I don't recall.  I remember when I
 8   received $20,000.  I'm not sure what year.  I have
 9   to look at my -- my documents.
10       Q    Was that the largest bonus you received?
11       A    Yes.
12       Q    Were there any years in which you did
13   not receive a bonus?
14       A    Yes.
15       Q    Between 1996 and 2005, did you receive a
16   bonus in each year?
17       A    No.
18       Q    In which years did you not receive a
19   bonus?
20       A    I don't recall.  Many years we didn't
21   receive bonuses.  Restaurant was going down the
22   drain.  Second wife took a lot of money from
```

1    La Ruche, with drug problems.
2         Q    Excuse me. I didn't hear your answer.
3         A    On the '80s, we have a lot of problems,
4    '90s, I mean, with mis -- mishandling of money.
5    La Ruche was going -- was in a difficult times.
6    And so I don't think that -- I was trying to --
7         Q    No, you said something about drug
8    problems, Mr. Zambrana. And I did not hear what
9    you said. I want you to tell me what you meant.
10             Are you accusing Mr. Cauderlier of
11   having a drug problem?
12             MR. HAMBERGER: Let him answer your
13   question, sir.
14             THE WITNESS: I'm saying -- I said when
15   second wife of Jean-Claude have some drug
16   problems, and she was the accountant of La Ruche,
17   we have a difficult in La Ruche economically. So
18   I don't believe at that time I receive any bonus,
19   because the restaurant was almost going out of
20   business.
21   BY MR. GREEN:
22        Q    Are you accusing Mr. Cauderlier of

Page 96

1  having a drug problem, sir?

2       A    No.

3            MR. HAMBERGER:  He didn't mention --

4            THE WITNESS:  No.

5            MR. HAMBERGER:  -- Mr. Cauderlier, sir.

6            THE WITNESS:  I said the wife, sir,

7  second wife.

8  BY MR. GREEN:

9       Q    And what is her name?

10      A    Her name was Cindy Nelms.

11      Q    How do you spell her last name?

12      A    I believe N-E-L-M-S.

13           MR. GREEN:  4, please.

14                  (Deposition Exhibit No. 4

15                  marked for identification.)

16 BY MR. GREEN:

17      Q    Mr. Zambrana, do you recognize Exhibit 4

18 as an affidavit that you signed in September of

19 2005?

20      A    (Witness examined document).  Yeah.

21 Yes.

22      Q    Now, did you draft this affidavit

```
                                                                    Page 97
 1   yourself personally?

 2        A    No.

 3        Q    This was drafted by your lawyer?

 4        A    Yes.

 5        Q    Would you review the affidavit, please?

 6             I have some questions I'd like to ask

 7   you.

 8        A    (Witness examined document).

 9        Q    Have you finished looking at it?

10        A    Do you want me to read the whole thing

11   or --

12        Q    Yeah, I want you to read the whole

13   thing.

14             Did you read the entire document?

15        A    No.

16        Q    Please do.

17        A    Okay.

18             (Witness examined document).  Okay.

19        Q    Have you had a chance to read Exhibit 4,

20   Mr. Zambrana?

21        A    Yeah.  Yes.

22        Q    All right.  If you look at paragraph
```

```
 1    four, you state, At all times it was understood
 2    between Jean-Claude Cauderlier (J. Cauderlier) and
 3    me that the $25,000 mentioned in paragraph two
 4    above was to be earmarked for the purchase by CAI
 5    of the real property and building located at 1035,
 6    1037, 1039 31st Street Northwest, Washington, D.C.
 7    20007 (the building).
 8             Do you see that language?
 9        A    Yeah.
10        Q    All right.  Now, I'd like you to tell me
11    about this understanding that you had with
12    Mr. Cauderlier about the $25,000 to purchase the
13    property.
14             When did you reach this understanding?
15        A    When they asked me how much money I
16    have.
17        Q    Who is "they"?
18        A    Jean-Claude and Jamie.  Jamie was always
19    in there.
20        Q    When did they ask you this?
21        A    Have to be probably -- I don't know, a
22    week maybe.  I have to get the money.
```

```
 1      Q    A week?
 2      A    I'm not -- I don't remember the time,
 3  sir.
 4      Q    A week when?
 5      A    I say I don't remember exactly the time.
 6  Was prior to they ask me how much money I can put
 7  in the business.
 8      Q    Was this before the closing?
 9      A    No.  This is before I issued the check.
10      Q    Yes.
11      A    I had to --
12      Q    You wrote the check on the 20th, you
13  said?
14      A    Yes.
15      Q    And it's dated the 21st.
16           So they asked you a week or so --
17      A    Yeah.
18      Q    -- before?
19           And they said -- who said -- who asked
20  you how much money you could put into the
21  business?
22      A    I don't know if it's a week or days, no,
```

Page 100

```
 1    I don't -- I don't want to speculate.  It was
 2    before the night we meet they asked me how much
 3    money I can put.  That's why, for the business, to
 4    buy the building.  And that's why we meet that
 5    night.  And that's why I wrote the check.
 6         Q    Did they ask you how much you could put
 7    into the business, or how much you could put in to
 8    buy the building?  Which was it?
 9         A    My understanding in CAI was the same --
10    the reason CAI was there is to buy the building,
11    instead to be liability to La Ruche, if La Ruche
12    would buy the building.  That was the reason it
13    was created.
14         Q    CAI was created to buy the building and
15    the land, correct?
16         A    Yeah.  Because La Ruche -- in order to
17    keep out of liability for La Ruche.
18         Q    And who asked you how much money you
19    could put into the business?
20         A    JC.
21         Q    That's Mr. Cauderlier?
22         A    Jean-Claude --
```