# EXHIBIT 3

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLUMBIA

 3     - - - - - - - - - - - - - - - - - - x
                                           :
 4     CAUDERLIER & ASSOCIATES, INC.       :
                                           :
 5              Plaintiff                   :
                                           :
 6         v.                              :CA No. 1:05CV01653
                                           :
 7     SERGIO ZAMBRANA,                    :
                                           :
 8              Defendant/Third-Party      :
                Plaintiff                   :
 9                                         :
           v.                              :
10                                         :
       JEAN CLAUDE CAUDERLIER              :
11                                         :
           And                             :
12                                         :
       LA RUCHE, INC.                      :
13                                         :
                Third-Party Defendants     :
14     - - - - - - - - - - - - - - - - - - X

15

16              Deposition of JAMES A. POWERS

17     Washington, D.C.

18     Friday, March 3, 2006

19     9:11 a.m.

20     Reported by:  Kimberly Turnage

21     -------------------------------------------------
                    DIGITAL EVIDENCE GROUP
21           11 Dupont Circle, NW Suite 400
                    Washington, DC  20036
21                  (202) 232-0646

22
```

Page 2

1            Deposition of JAMES A. POWERS  held at the

2    offices of:

3        HOWREY, LLP

4        1299 PENNSYLVANIA AVENUE, NW

5        WASHINGTON, D.C. 20004-2402

6        202.383.7312

7

8        Pursuant to agreement, before Kimberly Turnagae,

9    Professional Reporter and Notary Public for The District

10   of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1                    A P P E A R A N C E S

2        ON BEHALF OF PLAINTIFF AND THIRD-PARTY DEFENDANTS

3    CAUDERLIER & ASSOCIATES, INC., LA RUCHE, INC. AND JEAN

4    CLAUDE CAUDERLIER:

5            ROBERT GREEN, ESQUIRE

6            HOWREY, LLP

7            1299 PENNSYLVANIA AVENUE, NW

8            WASHINGTON, D.C. 20004-2402

9            202.383.7312

10

11           JAMES BOLES, ESQUIRE

12           HOWREY, LLP

13           1299 PENNSYLVANIA AVENUE, NW

14           WASHINGTON, D.C. 20004-2402

15           202.383.7312

16

17        ON BEHALF OF DEFENDANT AND THIRD-PARTY PLAINTIFF

18    SERGIO ZAMBRANA:

19           JEFFREY M. HAMBERGER, ESQUIRE

20           KASS, MITEK & KASS

21           1050 SEVENTEENTH STREET, NW

22           SUITE 1100

Page 4

```
 1          WASHINGTON, D.C. 20036-5596

 2          202.659.6500

 3

 4     ALSO PRESENT:

 5          SERGIO ZAMBRANA

 6          DEFENDANT/THIRD-PARTY PLAINTIFF

 7          726 GORMLEY DRIVE

 8          ROCKVILLE, MARYLAND 20850

 9          301.762.8671

10

11          RICK SANBORN

12          VIDEOGRAPHER

13          DIGITAL EVIDENCE GROUP, LLC

14          11 DUPONT CIRCLE, N.W.

15          SUITE 400

16          WASHINGTON, D.C. 20036

17          202.232.0646

18

19

20

21

22
```

Page 5

1                     C O N T E N T S

2    EXAMINATION OF JAMES A. POWES              PAGE

3        By Mr. Green                          7

4        By Mr. Hamberger                      86

5

6

7

8

9                     E X H I B I T S

10           (Attached to the Transcript)

11                 Exhibit                     Page

12      1    Notice of Deposition            14

13      2    Stockholder Agreement           20

14      3    Articles of Incorporation       32

15      4    Unanimous Written Consent       32

16      5    SBA Borrower's Certification    34

17      6    Photocopy of $25,000 Check      55

18

19

20

21

22

Page 6

1          VIDEOGRAPHER: This is tape number one of

2     the video deposition of James A. Powers, Esquire, taken

3     by the plaintiff, Mr. Green, in the matter of Cauderlier

4     and Associates, Incorporated vs. Sergio Zambrana vs.

5     Jean Claude Cauderlier and La Ruche, Incorporated, in

6     the U.S.  District Court for the District of Columbia

7     Case Number 1:05CV01653.   The deposition is being held

8     at the offices of Howrey, LLP., Washington, D.C. on

9     March 3rd, 2006.

10          The time on the video screen is 9:11 a.m.

11     I'm Rick Sanborn, legal videographer, from Digital

12     Evidence Group.   The court reporter is Kimberly Turnage

13     in association with Digital Evidence Group.   Will

14     counsel and others please introduce themselves for the

15     record.

16          MR. GREEN:  I'm Robert Green, counsel for

17     Cauderlier and Associates, Inc., Mr. Cauderlier and La

18     Ruche.

19          MR. HAMBERGER:  I'm Jeffrey Hamberger.  I

20     represent the defendant and third-party Plantiff, Sergio

21     Zambrana.

22          MR. BOLES:  James Boles for CAI, La Ruche

Page 7

```
 1   and Mr. Cauderlier.

 2              VIDEOGRAPHER:  Will the court reporter

 3   please swear in the witness.

 4                      (Whereupon the witness is sworn).

 5

 6                      EXAMINATION

 7   BY MR. GREEN:

 8       Q.   Would you please state your name?

 9       A.   Thank you. My name is James A. Powers.

10       Q.   Mr. Powers, we've been previously introduced.

11   As you know, I'm counsel to Cauderlier and Associates,

12   La Ruche and Mr. Cauderlier personally.   Why don't we

13   get some housekeeping matters out of the way.

14           What is your home address?

15       A.   Thank you.  6808 Brennon Lane, Chevy Chase,

16   Maryland 20815.

17       Q.   And what's your business address please?

18       A.   11465 Sunset Hills Road, Suite 510, Reston,

19   Virginia 20190.

20       Q.   And the name of your employer?

21       A.   I'm self-employed.

22       Q.   Do you trade as a -
```

Page 8

1       A.    I have both a law firm that I run direct legal

2   services, James A. Powers, Esquire, and I'm also a data

3   and privacy consultant, I have a firm called Data Rights

4   and Privacy Advisors LLC, we specialize in the council

5   and representation involving ethical commercialization

6   of personal information.

7       Q.    Mr. Powers, I'm going to be asking you

8   questions today, and I ask that you be sensitive to

9   attorney-client privilege matters.   None of my

10  questions are intended to invade the attorney-client

11  privilege that you had with either Cauderlier and

12  Associates Inc., La Ruche, Inc. or Jean Claude

13  Cauderlier individually.

14      A.    That's good because I was concerned that areas

15  of my examination, I'd have to, as I indicated to you,

16  I'd be guiding myself as to whether I was being stray

17  any question of privilege.   And since Mr. Cauderlier is

18  not here to waive and we didn't make any mechanism for

19  that, I'll be sensitive and if I feel its close, I'll

20  indicate to you and perhaps you can re-phrase your

21  question.

22      Q.    I want to advise you Mr. Cauderlier has not

Page 18

1              THE DEPONENT:  Sure.

2              MR. GREEN:  Not at the moment.  I will

3    give them back to the witness, and we'll go through them

4    one at a time.

5              THE DEPONENT:  Thank you.  Do you have a

6    time estimate, Bob, roughly?

7              MR. GREEN:  I'm hopeful we'll be done by

8    lunchtime.   That's what I'm shooting for.

9              THE DEPONENT:  I'm here to give what I

10   can.

11   BY MR. GREEN:

12      Q.   What was your first association with Mr.

13   Cauderlier, when did you first meet him?

14      A.   I believe I met him in '91.

15      Q.   What were the circumstances in 1991?

16      A.   1990 I met a woman named Jennifer Marie

17   Scherer, I think we started dating in the fall of 1990.

18   Ms. Scherer had been a cooking student and her teacher

19   was Jean Claude Cauderlier, your client.

20      Q.   Okay.

21      A.   She introduced us.

22      Q.   When did you first begin to represent Mr.

Page 19

1    Cauderlier?

2         A.   I personally started representing J.C.

3    individually around that time frame.   I was trying to

4    look at my own, just mental, notes with '91-'92. He had

5    already negotiated a stock purchase agreement for the

6    acquisition of La Ruche Inc., the stock in that company

7    from the Levenson family.   The Levenson family is

8    pretty prominent, old man Levinson founded the

9    restaurant back in the '70s, he brought J.C. over.  So

10   the Levenson family was selling their business over to

11   J.C. pursuant to a stock purchase agreement.  After we

12   became friends socially, he asked me if I would look at

13   that agreement for him, as the purchaser to say, Hey,

14   what can I do.   Plus, he was doing really well and

15   wanted to accelerate the buyout.   So he basically said

16   to me, would I help him approach Bruce Levenson.   There

17   are two, working under old man Levenson, there were two

18   brothers that would represent kind of the business

19   interest, the father was going on in years.  So, I

20   worked with J.C. initially on working on his personal

21   acquisition of those shares so he could control the

22   restaurant you guys know as La Ruche, Inc.

Page 20

1                      (Exhibit Number 2 marked).

2         Q.   Mr. Powers, I've handed you, you've been

3    handed, Exhibit 2, which is a document captioned

4    Agreement and then behind it is a document captioned

5    Commercial Promissory Note.

6         A.   Okay.

7         Q.   This is the agreement is between Bruce

8    Levenson and Randy Levenson as sellers and La Ruche,

9    Inc. as the buyer.  Is this the purchase and sale

10   agreement you were referring to?

11        A.   Actually, I believe this is an earlier

12   agreement.

13        Q.   All right.  So -

14        A.   I can't be certain.

15        Q.   All right, well -- did you assist, Mr.

16   Cauderlier in this transaction that's set forth in the

17   agreement?

18        A.   I believe I did, or those working with me at

19   Shulman Rogers would have.  That has to be clear, I

20   worked with a firm, and I would involve those with

21   expertise and/or licensure appropriate to the work

22   involved.  Yes, I do believe this was a transaction I

Page 21

1   was referring to.  We're talking this was 14 years ago.

2        Q.   The representation between Shulman Rogers and

3   Mr. Cauderlier was it with him individually or was it

4   with La Ruche or was it both?

5        A.   I think it was both.

6        Q.   All right.

7        A.   But I am telling you, I don't have a retainer,

8   I don't know, I believe it was both.   I believe we

9   conducted it in that way, Mr. Hoffman would do certain

10  things, so would I and actually others -- yes, I believe

11  it was corporate and individual.

12       Q.   So there was a - there was an attorney-client

13  relationship between Shulman Rogers and La Ruche, Inc.

14  and Jean Claude?

15       A.   Definitely between La Ruche, Inc. because

16  Amita Verma was the paralegal who administered his

17  books.  That became a point of friction at one point,

18  they're both custodians of the books, and it was my

19  understanding from talking with Jim Hoffman, I referred

20  him some business, that about a year ago or two years

21  ago, within a reasonable time all that work has been

22  pulled from Shulman Rogers corporate maintenance work

Page 22

1    etc. is being done by someone else.

2         Q.   Was it your understanding in May of 1992 that

3    Mr. Cauderlier was the owner after the completion of

4    this transaction, was the sole owner of La Ruche?

5         A.   Yes, it was.

6         Q.   I would like you to skip forward now to 1999.

7         A.   Okay.

8         Q.   In 1999 did you assist Mr. Cauderlier in the

9    formation of Cauderlier and Associates?

10        A.   I caused to be involved Mr. Pierre LaForce in

11   that transaction where we had the opportunity to buy the

12   land under which, upon which the restaurant sat.

13        Q.   When you say, We, you're speaking of?

14        A.   Wilkinson Barker.  I was of counsel there.

15   When this opportunity arose in the summer of 1999, I

16   involved Pierre LaForce because we needed a D.C.

17   acquisition vehicle, and the idea was to form CAI as

18   that.

19        Q.   And when that acquisition vehicle, CAI was

20   formed -- and if I refer to Cauderlier and Associates as

21   CAI, does that suit you?

22        A.   Yep.

Page 23

1      Q.    When CAI was formed, Mr. Cauderlier was the

2   sole shareholder, is that correct?

3      A.    Yes.

4      Q.    The purpose of CAI was to be, I think you

5   said, the acquisition vehicle to acquire the land

6   underneath La Ruche; the land where the restaurant is

7   located.    Is that correct?

8      A.    Correct.

9      Q.    And at the time that CAI was formed was Mr.

10  Cauderlier the one hundred percent shareholder of La

11  Ruche?

12     A.    No shares had been issued to any other owners

13  as of that time.

14     Q.    So that a hundred percent of the capital stock

15  of both companies were owned by Mr. Cauderlier?

16     A.    As of the formation of CAI, that's what the

17  books and records of both those corporations reflected.

18     Q.    Who was keeping the corporate records, at that

19  time, for La Ruche?

20     A.    Shulman Rogers.  I specifically don't know the

21  paralegal then, but it would be the Shulman Rogers

22  Corporate Group and whoever that actual record keeper

Page 24

1    was.

2        Q.    At any time while you were with Shulman

3    Rogers, did that law firm have an attorney-client

4    relationship with Mr. Zambrana?

5        A.    No.

6        Q.    At any point while you were with Shulman

7    Rogers, did Mr. Zambrana ask that he be issued shares in

8    La Ruche, Inc.?

9        A.    Can you give me that again, please?

10        Q.    Sure.  At any time while you were at Shulman

11    Rogers, did Mr. Zambrana ask --

12        A.    Ask me?

13        Q.    Ask you or the firm --

14        A.    Okay.

15        Q.    -- that share in La Ruche, Inc. be issued to

16    him?

17        A.    I don't recall any formal request to Shulman

18    Rogers or me for the issuance of shares to Mr. Zambrana.

19        Q.    Okay.  Are you aware of any request by Mr.

20    Zambrana to anyone that shares be issued to him in La

21    Ruche, Inc.?

22        A.    A specific request for him to have stock

Page 25

1    certificates issued in his name?

2         Q.    Yes.

3         A.    No.

4         Q.    At the time that you first began to represent

5    La Ruche, Inc., Mr. Cauderlier was the one hundred

6    percent owner, at any point between that moment in 1991

7    or 1992 and the formation of CAI in August of 1999 are

8    you aware of any change in the ownership structure of La

9    Ruche?

10        A.    In the actual ownership structure?

11        Q.    Yes.

12        A.    No.

13        Q.    Are you aware of whether Mr. Zambrana at any

14   point between your first association with La Ruche and

15   the formation of CAI in 1999, whether Mr. Zambrana has

16   asserted that he had any ownership interest in La Ruche?

17        A.    He was promised ownership interest in La Ruche

18   by Mr. Cauderlier.  That's why I was so precise in my

19   answers.

20        Q.    And when was this promise made?

21        A.    When the restaurant was renovated sometime in,

22   I think it was in '97 or '98.  You have to understand

Page 42

1    clear recollection, but I believe it was to La Ruche,

2    but I can't be certain.

3        Q.    Did you or Mr. LaForce prepare any documents

4    on the 20th of January, the date of the check, to

5    reflect the transaction with $25,000 going from Mr.

6    Zambrana to La Ruche and something going back to Mr.

7    Zambrana from La Ruche, was there any document, prepared

8    to your knowledge?

9        A.    No.

10        Q.    Did you state to Mr. Zambrana, in words or in

11    substance, that he should have separate counsel because

12    you couldn't represent him?

13        A.    Numerous times I have told Sergio that,

14    numerous and repeated times.

15        Q.    You told him you couldn't protect his interest

16    because you were counsel to Mr. Cauderlier --

17        A.    Yes.

18        Q.    -- or La Ruche --

19        A.    Yes.

20        Q.    -- or CAI?

21        A.    Let me share with you there were times prior

22    to this transaction where some very important

Page 43

1    discussions had to be had between Mr. Cauderlier and Mr.

2    Zambrana, and those had to be done in a very formal way,

3    where I would tell Sergio, "Hey, Sergio, I represent

4    J.C. and the company, you've got to watch out for

5    yourself."

6         Q.    Okay.

7              I'd like to explore those conversations

8    between Mr. Zambrana in which you were present?

9                   MR. HAMBERGER: Could we take a break, at

10   this time, for just few minutes.

11                  VIDEOGRAPHER: Off the record at 10:01.

12                      (Off the record).

13                  VIDEOGRAPHER: On the record at 10:09.

14                      (On the record).

15   BY MR. GREEN:

16     Q.   Mr. Powers, you mentioned that you were

17   present at a number of discussions in which Mr. Zambrana

18   and Mr. Cauderlier were present.

19     A.    Uh-hum.

20     Q.    When do these occur?

21     A.    I worked with these gentlemen for a decade, so

22   I believe when our questioning left off we were speaking

Page 52

```
 1        Q.    So that I'm clear, between the time that CAI

 2    was formed in August of 1999 and closing on January 21st

 3    of 2000.   There were discussions between Mr. Cauderlier

 4    and Mr. Zambrana, in your presence, about an ownership

 5    interest in CAI?

 6        A.    Uh-hum.

 7        Q.    But, to your understanding, there was no

 8    agreement about what that interest would be?

 9        A.    Correct.   There's no quantification of the

10    interest.

11        Q.    Was there any quantification of the amount of

12    money that Mr. Zambrana would have to contribute in

13    order gain an ownership interest CAI?

14        A.    Yes, there was, there was an understanding

15    that the $25,000 that was tendered toward the purchase

16    of the property was funds that was tendered toward

17    Mr. Zambrana's acquisition of an interest in CAI.

18        Q.    But not in La Ruche?

19        A.    It wasn't allocated between the two that was

20    the ambiguity, that was the open issue between the

21    parties.   What percent of interest in each entity should

22    be provided in light of the cash that was tendered on
```

Page 53

1    the eve of the settlement.

2        Q.    Was there any understanding whether more or

3    less should be allocated to La Ruche or to CAI?

4        A.    No.    And that became a discussion subsequent.

5    I'm still in the time frame formation to 121.

6        Q.    Exactly.    At any point did in Zambrana state,

7    in your presence, what ownership interest in La Ruche he

8    felt he was entitled to?

9        A.    Percentage?

10       Q.    Yes.

11       A.    The allusion to this 25% that around the time

12    of renovation in '97-98, I'm not - Mr. Zambrana never

13    came to us and said, give me my shares for that 25%.

14    And I believe that what happened between these

15    individuals as businessmen is, there was a promise, it

16    then got merged into the big transaction, and the

17    question became what allocation as between the two

18    entity Mrs. Zambrana would receive some interest in.

19    But my understanding and my belief was that it was

20    promised both and he would get interest in each.    There

21    was no formula or allocation or weighting as between the

22    two.

Page 54

```
 1          Q.    I'm trying focus more on what Mr. Zambrana

 2     said.

 3          A.    Okay.

 4          Q.    Rather than your belief.

 5          A.    All right.

 6          Q.    In your presence, did Mr. Zambrana state what

 7     percentage he believed he was entitled to in La Ruche?

 8          A.    He had, at times, referred to the 25% promise.

 9     That's all.

10          Q.    Did he state, in your presence, did Mr.

11     Zambrana state, in your presence, what interest he

12     believed he was entitled to in CAI?

13          A.    Only by way of discussion and trying to figure

14     out what the range of interest might be.  So, we had

15     discussions, J.C., Sergio and I about, what does $25,000

16     represent in relationship to the over all value of what

17     we have here, both land and business.  So you have a

18     million dollar piece of dirt, and you have a business

19     that has what, fair market value, and the discussion

20     was, what does 25 represent.  There was discussions

21     about it's either 25% represents 1/40th of the value of

22     land that CAI just bought or 2.5% or it represent this
```