1    in La Ruche.  There was never a definitive agreement
2    reached, in my presence, between these parties as to
3    that allocation.
4                    (Exhibit Number 6 marked).
5        Q.    Mr. Powers, we've been talking about this
6    $25,000 check.
7        A.    Uh-hum.
8        Q.    And I have put before you Exhibit 6 which is a
9    check dated the 21st of year 2000 for $25,000 on
10   Mr. Zambrana's, appears to be his personal checking
11   account, payable to La Ruche.
12       A.    Right.
13       Q.    Did you ever have custody of this check?
14       A.    I don't recall.
15       Q.    Were you present when Mr. Zambrana signed the
16   check?
17       A.    I don't think I was.
18       Q.    I note that the check is payable to La Ruche,
19   Inc., did you have any discussion with Mr. Zambrana
20   about who the payee of the check should be?
21       A.    No.
22       Q.    Do you have any understanding of why the check

1   a copy of that.

2       Q.   Were you present when Mr. Cauderlier signed

3   the note?

4       A.   I don't recall.  I don't think I was.

5       Q.   Do you have any understanding of how the

6   original was delivered to Mr. Mahesh I mean

7   Mr. Naithani?

8       A.   No, there was a very friendly deal.

9   Mr. Naithani was then floating in cash.  He had just

10  sold a large business, so he was very magnanimous.  And

11  what he did, I believe, that J.C., they did direct

12  payments themselves.  J.C. paid him for a period of

13  time, they self-dealt.  Mr. Naithani is a sophisticated

14  businessman and J.C., so they administered that

15  relationship directly, I did not need to and was not

16  present during any of those things, I didn't need to be.

17  I helped draft the note and sent it to Mahesh and to

18  J.C., and said look, here is a real simple note.  J.C.,

19  this is awesome for you, if Mahesh will take it.  No

20  interest simple straight and he took it.  So I think I

21  got a very favorable note for J.C.

22      Q.   After the closing occurred, after CAI had

Page 62

1  acquired the Georgetown property, did you have any
2  discussion with Mr. Zambrana about an ownership interest
3  in CAI?
4       A.   I did.
5       Q.   Other than you and Mr. Zambrana and
6  Mr. Cauderlier was anyone else present?
7       A.   No.
8       Q.   Okay.  On how many different occasions did
9  this conversation take place?
10      A.   Subsequent to the closing, there was an
11 expectation from Sergio that something was going to be
12 done as to the promise that had been made to him.
13      Q.   How do you come to that understanding?
14      A.   J.C. said, Sergio's asking about what he gets,
15 what do we do?
16      Q.   All right, so Mr. Zambrana had an expectation
17 that something was going to happen?
18      A.   Correct.
19      Q.   So you had a conversation, you participated in
20 a conversation between Mr. Zambrana, Mr. Cauderlier and
21 yourself?
22      A.   I called a meeting on it.

```
 1      Q.   Where was the meeting?
 2      A.   In the shell of the recently acquired
 3 townhouse.  I reversed these.  I even did during the
 4 deal.  Either 1035 is the restaurant or 1031 is the
 5 restaurant, 1033 would be the garden, 1035 would be the
 6 other building.  Whatever the building, not the
 7 restaurant is, it was in that building.  In the shell,
 8 the former Yes Bookstore.
 9      Q.   When did this conversation take place?
10      A.   I would estimate February or March I had - I'd
11 just gotten engaged, I was about to get engaged.
12 That's why it's such an incredibly dense time of life, I
13 gotten engaged, my wife got pregnant, and I had my
14 daughter all within this year and half time frame.  So I
15 believe it was February, March, the meeting was in the
16 shell.
17      Q.   How long did the meeting last?
18      A.   The tour of the building, we arrived, the
19 demolition had commenced in the shell so it was a
20 largely cut out shell.  We walked the property where
21 J.C. visually toured through how he was going to
22 retrofit it, combine the back kitchens, create a dining,
```

1   a catering facility over here for leasing out. So, we
2   did a tour of the building for about 45 minutes where
3   Sergio and J.C. talked about plans and dreams and
4   aspirations and how they'd transform this into the La
5   Ruche catering center, or a prep kitchen was another
6   idea that it would be a prep facility. So they were
7   exploring ideas they could do with the shell. And
8   eventually we wound our way up to the second floor and
9   at the top of the stairs over looking the garden; we had
10  kind of bruising discussion about what we do here
11  because this issue had come to a head.
12       Q.   What did Mr. Zambrana say?
13       A.   Words to the effect, J.C. what do I get? What
14  am I getting here? When are you going to give me my
15  shares?
16       Q.   So, as of this meeting, February or March of
17  2000 there was no agreement or understanding about what
18  interest, if any Mr. Zambrana would have in either of
19  the businesses?
20       A.   No, there was an understanding as a promise
21  made with no quantity as to some interest in La Ruche.
22  And there was an understanding of some interest to be

1  given in CAI, and that was the purpose of the

2  discussion.

3       Q.   And Mr. Zambrana asked specifically for an

4  interest in CAI?

5       A.   Yes.

6       Q.   And what did Mr. Cauderlier say?

7       A.   Mr. Cauderlier said words to the effect of,

8  Well, we still have to figure out how you hold this

9  interest, what you get.   And J.C. tried to offer

10 Sergio, in this meeting, interest in La Ruche alone.  To

11 which Sergio indicated, No, I tendered money for the

12 building, I want a piece of CAI which owns the building

13 and that was my understanding of our deal, or our

14 understanding, J.C. when I came forward and gave you

15 this money, that I was helping you buy the building and

16 therefore I should receive an interest in that building.

17            VIDEOGRAPHER: This is the end of tape one

18 off the record at 10:35.

19            (Off the record).

20            VIDEOGRAPHER: This is the beginning of

21 tape two in the deposition of James Power on the record

22 at 10:41.

```
1    BY MR. GREEN:
2         Q.   Mr. Powers before the break we were discussing
3    this meeting that occurred in February or March of 2000
4    that occurred at the restaurant or in the shell of the
5    building that was under construction.  At this February
6    or March 2000 meeting, Mr. Zambrana said, in words or in
7    substance, what do I get, what are my shares?
8         A.   Correct --
9         Q.   Well, if I misstated it.
10        A.   When, do I get, not what do I get.
11        Q.   When do I get my shares.  Mr. Cauderlier's
12   response was what?
13        A.   Well, let's discuss.  And J.C. then tried to
14   offer him interest only in La Ruche.
15        Q.   And Mr. Zambrana's response to the offer of an
16   interest only in La Ruche was what?
17        A.   That's not what you promised me, J.C.
18        Q.   At that point, what did Mr. Cauderlier say?
19        A.   Well, let's talk about that, how do we
20   approach this.  At that point, I'd indicated that J.C.,
21   and I told J.C. this I said, you indicated to Sergio he
22   was to receive some interest but you guys never agreed
```

1  on what interest.  So let's talk about that.  I tried
2  to, within my role as an advocate of Mr. Cauderlier
3  personally and of La Ruche and as counsel to CAI, I
4  tried to work with the parties that were having a
5  dispute, having successfully bought the building, as to
6  what they should do between themselves having achieved
7  that success.
8       Q.  What suggestion did you make?
9       A.  That there should be an allocation of the
10 interest in both companies because the restaurant or the
11 La Ruche, Inc. stock alone, and I said this to J.C. and
12 Sergio was illusory or, of potentially no value, because
13 without the land and the lease upon which the restaurant
14 presided on that land, you don't have a restaurant.  So
15 having an interest in the restaurant alone from a
16 tactical and a real point of view was an illusory asset
17 because it could be taken out from under you.  And I
18 indicated to Sergio and J.C. that my understanding of
19 their deal was that there was to be an allocation of an
20 interest in both.  And I suggested to them that we
21 discuss and explore what that should be.
22      Q.  And after you made this suggestion, what did

1  Mr. Zambrana say?

2      A.   Mr. Zambrana and Mr. Cauderlier actually
3  talked about it and there was an agreement that the
4  money tendered and the past promises for La Ruche stock
5  would be honored by an allocation of stock to Sergio in
6  both entities.

7      Q.   And what was the allocation to be?

8      A.   That's when we started doing some of those
9  math exercises that had come up before. What percent of
10 the money that Sergio had tendered represented the value
11 of the deal. Discussion or figures I recalled, 2.5% in
12 the CAI entity which represented the almost mathematical
13 ratio of the funds tendered by Mr. Zambrana toward the
14 value of asset acquired. There was also the reference
15 to the La Ruche stock, and I suggested that they resolve
16 their affairs comprehensively and just do one
17 understanding.

18     Q.   Was there any agreement?

19     A.   Yes, there was. There was an agreement by J.C.
20 that stock would be given in both companies. We
21 recognized that a grant to La Ruche alone was not a
22 grant of significant or real value. I think he

Page 69

1   recognized the equity of the situation and offered to

2   Sergio that which he had promised Sergio which was

3   interest in the entity, which I believe Sergio was

4   promised in exchange for the cash that he came up with.

5        Q.   And what was the percentage of CAI that he

6   agreed to?

7        A.   The minimum percentage that he said that he

8   could possibly see was 2.5%.  That was a straight --

9        Q.   Who could agree to?

10       A.   J.C.  That's the mathematical ratio of the

11  amount of dollars that were tendered, $25,000, against

12  the deal value.  We used the deal of just calling the

13  building a million, that was just for working purposes

14  so $25,000 works out to be 2.5% of a million.

15       Q.   And that was the minimum that Mr. Zambrana was

16  willing to accept or that Mr. Cauderlier was willing to

17  give?

18       A.   Willing to give.  J.C. had said, I can see

19  2.5%.  And then he looked to giving him value in La

20  Ruche, almost saying I've covered you on the money and

21  I'll give you something in La Ruche, too.  That's where

22  it was substantially left.

1    Q.    So at the conclusion of this meeting in
2    February or March of 2000 --
3    A.    Uh-hum.
4    Q.    -- there was no agreement?  A comprehensive
5    agreement?
6    A.    I believe there was an agreement to grant
7    stock, there wasn't quantification of stock to be
8    granted.  I believe it was an absolute meeting of the
9    minds.  That both parties said you'll get interest in
10   both corporations.  The quantum of that interest is not
11   yet fixed.  So, if you use comprehensive, as indicating
12   that both the grant and the quantum of the grant
13   representing comprehensive, there was not a
14   comprehensive agreement reached at that time.
15   Q.    After this meeting, were there any further
16   meetings in which you participated with Mr. Cauderlier
17   and Mr. Zambrana in which the issue of ownership in CAI
18   or La Ruche came up?
19   A.    Not that I recall, because, I was drawn away
20   from the affairs of J.C. about a month or two after
21   that.  I was separating from Shulman Rogers, was going
22   off on my own.

1    Q.    I'm confused.

2    A.    I'm sorry, it's Wilkinson, moving out of WBK
3    going over to Comscore. I joined Comscore in July of
4    2000.

5    Q.    Is it accurate to say that your active
6    representation of CAI, La Ruche, Mr. Cauderlier's
7    stopped when you left Wilkinson?

8    A.    I think that - it's accurate to say my
9    substantive and real material representation, but J.C.
10   and I stayed in touch. It was still very amicable
11   between us throughout that, 2000 for many, many months.
12   He came to my wedding in October of 2000, and it was
13   exquisite then. It wasn't till about 12-8 months after
14   that. I would offer this, it tapered down. After the
15   deal was done as I was moving out of Wilkinson over into
16   being corporate counsel for dot com. J.C. to my
17   understanding knew that I couldn't be a lawyer in
18   addition to being a general counsel at a privately held
19   company, so yes, my work tapered off. And then on
20   October 6th of 2000 he and his new wife were at my
21   wedding, Jennifer and I got married at the Washington
22   International School. Things were good between us. By

1   then I was not doing any active work.

2   Q.   Do you know whether Mr. LaForce continued to
3   do work for the corporations or Mr. Cauderlier in
4   person?

5   A.   I don't, but about two years later, and maybe
6   it was when this thing was starting to heat up Pierre
7   called me, and said, You know, what do you want to do
8   with these files.  I said, I'm not representing them
9   anymore, you have to do what you've got to do, it's a
10  firm client, get Andy Tolland, who is the managing
11  partner or someone else to guide you.  I suggest you
12  contact J.C., see what he wants to do with his files, I
13  don't want 'em because I was -

14  Q.   During late 1999, after August through the
15  closing?

16  A.   Okay.

17  Q.   Did you have in Wilkinson, did you have a
18  separate account for CAI, a separate account for La
19  Ruche?

20  A.   You know, I don't recall.  I know the billing
21  by matter, I believe it was opened up - I think La Ruche
22  was the original client, I think the subsequent matters

1   that were opened were probably called CAI matter,

2   billing might have been by virtue of establishing the

3   account originally La Ruche, Inc.

4              I don't know if there was a separate retainer

5   agreement established for the entity. I believe the

6   entity was formed pursuant to the instruction of Mr.

7   Cauderlier, as an individual and working through La

8   Ruche, Inc. for La Ruche to form this sub-entity, CAI,

9   that was going to be a purchase entity. I do believe it

10  was a matter that we opened, I believe because I believe

11  J.C. came on first. He was one of the clients that I

12  came down from, or come out of. April, leave Shulman

13  Rogers. May, June, July started Wilkinson.

14       Q.   But when CAI was formed, the capital stock was

15  held by Mr. Cauderlier, is that correct?

16       A.   Yes.

17       Q.   Not by La Ruche?

18       A.   Again, I both defered and didn't do that work,

19  so, you know, that's not mine, I don't have actual

20  knowledge. I'm sorry, I do, as CAI; it was J.C.'s

21  entity from formation as of that summertime period.

22       Q.   After this meeting in February or March of

1   2000, did Mr. Zambrana come to you either by telephone

2   or personally and say where are my -- where are my

3   shares, where's my ownership interest?

4       A.   No, not that I recall.

5       Q.   Was it clear to you that as of this meeting,

6   this February, March 2000 meeting that Mr. Zambrana

7   believed that he was entitled to an ownership interest

8   CAI?

9       A.   Yes.

10      Q.   And as of that meeting, February/March meeting

11  he believed he had an ownership interest in La Ruche?

12      A.   By virtue of past promises as well.

13      Q.   And, as of this February/March, 2000 meeting,

14  to your knowledge, no shares in either corporation were

15  given, issued to Mr. Zambrana, is that correct?

16      A.   You are correct.

17      Q.   And you had made it quite clear to Mr.

18  Zambrana that you could not and did not represent his

19  interest?

20      A.   Correct.

21      Q.   And you suggested to him that he seek his own

22  counsel to protect his interest?

1    A.   I've done that repeatedly.

2    Q.   To your knowledge, did he ever engage counsel

3  on this matter?

4    A.   Yeah, I learned that first I heard the name

5  Kass, Benny Kass, who is a litigator I had heard about.

6  So yes, after the retention of counsel by Sergio I had

7  learned of it.  I forget exactly how, but, I will tell

8  you, I knew that if they did not resolve it directly it

9  would end up in the hands of counsel.  I told J.C. that

10 same thing about he and Mahesh.  Saying, Look, if you

11 guys ever get not nice on this one, I created the

12 instrument, I'm a witness to it, you'll lose me both.

13 You'll lose me as an advocate because I'll be a fact

14 witness and lawyer is precluded from being, if you know

15 you're likely to be a witness in a matter, I can't do

16 it.  I told J.C. that and he knew it.  Mahesh, he's very

17 sophisticated, a relatively experienced individual.

18 And Sergio repeatedly I would tell him, Sergio, get

19 yourself your own representative and you got to do what

20 you got to do Sergio.  You know, Bob, it's very

21 uncomfortable where you work for your client, where a

22 client secures benefits from a party by promising

Page 76

1  something and the other side comes to you and says

2  where's my stuff. And you say to the other side, Of

3  course, we're not giving it to him because you're

4  getting his cooperation without giving the promise or

5  fulfilling the promise. So I had a very difficult

6  position with Mr. Zambrana constantly coming forward and

7  talking about the situation. I just had to kind of

8  stand silent and we can continue to get a way with

9  benefits and work with things without granting a promise

10 that's tactically to my client's advantage.

11     Q.  At some point Mr. Cauderlier called you and

12 asked you to prepare a statement, is that true?

13     A.  He wrote to me, and he called me.

14     Q.  And in response to the request, you did

15 prepare an affidavit? Correct?

16     A.  Uh-hum.

17     Q.  Did you send a copy to him?

18     A.  I sent a copy to you -

19     Q.  You did not send a copy to me, sir, at the

20 time the request was made. I did not represent him.

21     A.  At the time the request was made, I recall

22 sending e-mails to both - oh, yeah, then it was probably