# EXHIBIT 4

LEXSEE 2007 DEL. CH. LEXIS 59

McKee v. McKee

C.A. No. 17773-VCN

**COURT OF CHANCERY OF DELAWARE, KENT**

2007 Del. Ch. LEXIS 59

December 5, 2006, Submitted
May 3, 2007, Decided

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**COUNSEL:** [*1] R. Karl Hill, Esquire, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE.

Edward M. McNally, Esquire, Fotini Antonia Skouvakis, Esquire, Morris James LLP, Wilmington, DE.

**JUDGES:** John W. Noble, Judge.

**OPINION BY:** John W. Noble

**OPINION**

Plaintiff, the Estate of George L. McKee, Sr. (the "Estate"), seeks to vindicate the claim of George L. McKee, Sr. ("George") to a one-half equity interest in the Delaware City Marina owned by his former wife, Defendant JoAnn Barnard McKee ("JoAnn"). Because George and JoAnn were never able to reach an express agreement for shared ownership, the Estate is forced to rely upon the doctrines of promissory estoppel, constructive trust, and resulting trust. This letter opinion sets forth the Court's post-trial findings of fact and conclusions of law.

\* \* \*

In early 1989, Ezekiel C. Barnard, III ("Zeke") and JoAnn bought the Delaware City Marina.[1] Shortly thereafter, they hired George as a part-time employee. By July 1989, George had become a full-time employee as manager of the Marina. Zeke and JoAnn divorced in June 1990 and JoAnn became the sole owner of the Marina. George and JoAnn married in May 1992. JoAnn fired George as an employee of the Marina in March 1999, and their divorce became [*2] final in July 1999. George died in 2005.[2]

1  Pretrial Stipulation ("Pretrial Stip.") at P II.3. They acquired both the business and the real estate. They formed a corporation known as Barnard's Delaware City Marina, Inc. as the operating entity. In 1995, the corporation's name was changed to Delaware City Marina, Inc. *Id.* at P II.6. For convenience, these assets will be referred to as the "Marina." The corporation is also a Defendant in this action. During the pendency of this proceeding, JoAnn sold the Marina and half of the net proceeds were escrowed. *See id.* P II.13; PX 37; PX 38.

2  Pretrial Stip. PP II.2, 8. George brought this action in 2000; the Estate has been substituted as party plaintiff.

Not long after he became a full-time employee of the Marina, George was formally terminated as an employee of The NewsJournal Company because of disability.[3] Nonetheless, he was able to perform vigorous work at the Marina. George and JoAnn divided the work in substantially the same way as Zeke and JoAnn had done. George did the "outside" work--towing, mechanical work, and salvage[4] --and JoAnn did the "inside" work--bookkeeping and managing.[5]

3  *See* DX 4.

4  Pretrial Stip. P II.10.

5  George was important [*3] to the successful operation of the Marina. JoAnn recognized the potential consequences of a loss of his services by having the Marina acquire "key man" insurance on him. *Id.* P II. 11.

From near the beginning of his full-time employment, George consistently expressed his desire to obtain an equity interest in the Marina; indeed, he aspired to an

equal share. No draft of an agreement granting George an equity interest in the Marina was produced. Various agreements were drafted to define their business relationships, but none was ever accepted or signed by George. A brief review of those efforts is appropriate.

Two draft agreements, with a projected effective date of January 1, 1991, were an employment agreement between George and the Marina [6] and a partnership agreement between George and JoAnn for GoJo Boats which would have pursued the buying, reconditioning, and sale of used boats. [7] Neither agreement was ever signed. The employment agreement provided for a salary and a bonus, a right of first refusal on the sale of the Marina, and a share of the proceeds from any sale of the Marina to a third party. [8] No equity interest, as such, was to have been conferred. Modifications, such as a [*4] revision of the salary amount and an extension of the agreement's duration, were proposed. [9] Even though he never executed any employment agreement, George, nevertheless, remained an employee of the Marina and, based on the evidence, received a fair salary for the work which he performed. [10]

6   DX 16.

7   DX 17.

8   George would have received 10% of any net increase in price above the 1990 value of the Marina.

9   See DX 18; DX 19.

10   See DX 5; Pretrial Stip. P II.14. More specifically, the Estate has not proved that George received less than fair or reasonable compensation. No evidence was adduced as to proper compensation for comparable work or the compensation that George might have received from any other employment opportunity.

Although George also rejected the GoJo Boat agreement, George and JoAnn did engage in a separate business venture that involved the acquisition of rental real estate properties. Eventually, those properties were held jointly by George and JoAnn. [11] Thus, George and JoAnn did pursue a separate business venture as equal partners.

11   See DX 21; DX 26.

George's interest in acquiring an equity interest in the Marina never waned. At some time in the mid-1990s, JoAnn and he considered [*5] a partnership agreement drafted by her attorney. [12] George rejected that agreement; the primary reason--and it may have been his only one--was that it did not grant him an equal share of the business.

12   No draft of this agreement was presented at trial.

George and JoAnn met with George's friend and lawyer to discuss the draft partnership agreement. The lawyer-friend recounted an exchange between George and JoAnn during that meeting. George, in substance, told JoAnn: "Listen, I was told I was going to be a partner. I have left The News-Journal. I have put money into this marina. I have worked 24/7. I have been here. And I have helped build the business. And you know, you are not making me an equal partner." [13] When George's lawyer-friend sided with him and suggested to JoAnn that the agreement, as drafted, was unfair, JoAnn acknowledged the unfairness and stated that "this is the way the lawyer prepared it." Nothing more, however, apparently came from this effort.

13   Trial Transcript ("Tr.") 170.

It is reasonably clear that George anticipated (and understood the need for) a written agreement with JoAnn in order to obtain an equity interest in the Marina. No written agreement, acceptable [*6] to him, was ever generated. [14]

14   In 1998, George sought a loan to finance the purchase of the Marina. The application was denied. DX 27. There is no persuasive explanation for why George would seek to buy the Marina if he already owned half of it.

The Estate invokes other events in the history of George's involvement with the Marina to bolster its claim to an equity interest. For example, on numerous occasions, JoAnn acknowledged in public that George was a principal in the Marina business. George and JoAnn wrote a letter on October 5, 1991, demanding that vessel be removed from "our property." [15] In a 1993 boat loan application, George was listed as a co-owner of the Marina. [16] In a 1996 letter to the United States Army Corp of Engineers, both George and JoAnn signed a letter regarding "our business." [17] Also, George routinely signed necessary documents on behalf of the Marina and, from time to time, was an officer of the corporation. [18]

15   PX 18.

16   PX 26.

17   PX 32. See also PX 30; PX 35; PX 14; PX 22. JoAnn explains her statements by stating that she did not want to embarrass him. Tr. 46-47.

18 Pretrial Stip. P II.12. One, of course, may be an officer of a corporation without holding an [*7] equity interest. The Estate also notes that George guaranteed a loan to the Marina, a loan that JoAnn also guaranteed in her individual capacity. *Id.* P II.7; PX 3. It is, however, not unusual for the spouse of the owner of a small business to be called upon to co-sign debt instruments. Thus, George's acts as guarantor of Marina debt do not advance the Estate's cause.

In addition, Brian McKee, George's son and a one-time employee of the Marina, testified that in late 1998, JoAnn told him that "we [George and JoAnn] finally came to an agreement. Now your father is half owner . . . of the Marina." [19]

19 Tr. 139.

As the end of their marriage drew near, JoAnn prepared a handwritten list of strategies to follow to protect (or enhance) her interests. [20] In this document, JoAnn considers ways to make certain that George gives up any interest that he may have in the Marina. [21] The document self-paints JoAnn as someone worried about her self-interest in the event of a divorce, [22] and it reflects more of a concern about claims George might assert in Family Court than it does the validity of any such claim. [23]

20 PX 23. This exhibit also contains a two-page, typewritten note to "Jo" and signed "A [*8] friend." Its origin is the subject of much speculation and little knowledge. Indeed, JoAnn argues that it may have been prepared by George to discredit her. That, too, is rank speculation. In short, it can be given no weight because it cannot fairly be ascribed to JoAnn. It does, however, contain some troubling entries, such as: (i) "need to bug phones"; (ii) "[c]onvince the local police any bruises you get are from G[eorge, even though they are not caused by George]"; (iii) "[g]et agreement for sign-off of Marina-try to do this when G[eorge] is busy signing normal papers-slip agreement paper in without his knowledge ASAP"; and (iv) "[b]egin hiding assets." There is, however, no evidence that any of these actions were ever carried out.

21 The handwritten notes have an entry: "Papers ready to sign off of Marina."

22 For example, JoAnn asked the question: "[s]eparate, will I lose home?" Although not sufficient to justify linking the typewritten note to JoAnn, it should be noted that some phraseology is common to the two documents. For instance, the handwritten notes, concededly in JoAnn's handwriting, refer to "sign-off of Marina" and the typewritten note contains "agreement for sign-off [*9] of Marina." That similarity may tend to support the Estate's argument, but it also is not inconsistent with JoAnn's contention that George prepared the typewritten note after discovering her notes. In short, the typewritten note is of no help in this matter.

23 The relationship between this Court's jurisdiction and the jurisdiction of the Family Court must be addressed briefly. The Family Court considered and resolved the marital property division dispute between George and JoAnn. The Family Court's opinion and order (the "Order") appears at Post-Tr. Br. of Defs. Ex. A. If, for example, George had earned (*e.g.*, as the result of any promise by JoAnn) an interest in the Marina, it presumably would have been marital property and subject to the Family Court's division. The Family Court, however, did not address the disposition of any equity interest in the Marina that may have been held by George. Instead, it implicitly deferred to resolution in this forum; the Order, at 2, provides: "In a Chancery Court proceeding, presenting pending, [George] is seeking an award of some interest in [JoAnn's] solely owned Delaware corporation, Delaware City Marina, Inc." The Family Court, *see* Order at 2, [*10] 7-9, did consider and reject (for reasons generally not germane to these proceedings) George's efforts to obtain an "award in the premarital real estate of [JoAnn] on which the Delaware City Marina is located." In substance, George was seeking to share in the appreciation of non-marital property during the course of the marriage. The Court does not now dwell on an apparent inconsistency between George's position in Family Court (a claim to the increase in value of non-marital real estate during the course of the marriage) and the Estate's position here (George owned one-half of the real estate at issue).

* * *

The Estate first argues that it has demonstrated the right to an interest in the Marina through the doctrine of promissory estoppel.

> In order to establish a claim for promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the

promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise. [24]

24  *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000). [*11] The Estate's burden--proof by clear and convincing evidence--is important--not only for its promissory estoppel claim, see *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003), but also for its constructive trust, see *Shuttleworth v. Abramo*, 1992 Del. LEXIS 40, 1992 WL 25756, at *1 (Del. Ch. Feb. 6, 1992), and resulting trust claims as well. See *Quill v. Malizia*, 2005 Del. Ch. LEXIS 37, 2005 WL 578975, at *8 (Del. Ch. Mar. 4, 2005); *Blue Rock Liquors, Inc. v. Reilly*, 1994 Del. Ch. LEXIS 220, 1994 WL 698622, at *3 (Del. Ch. Nov. 28, 1994) (employing clear and convincing standard where no claim to real estate presented). The Estate has failed to prove any entitlement, even if evaluated under a preponderance of the evidence.

The Estate has failed to meet its burden. George and JoAnn discussed, on many occasions, George's acquisition of an ownership interest in the Marina. They never reached common ground and there is no credible direct evidence that JoAnn ever promised George a one-half (or any other specific fractional) interest in the Marina. [25] A principal problem of the Estate's proof involves timing. [26] Early on, George was an employee. His relationship with JoAnn, as time went by, evolved. It is difficult to assess a promise [*12] without context while on a continuum when it is not clear when the Estate believes the promise was made. The same promise, of course, can be made many times but, in this instance, it is not possible to link any promise to any particular conduct by either JoAnn or by George. With unspecified timing, other questions arise: Was the promise (if made) to induce George to start work or to continue working? Was it made within the employer-employee relationship, or the husband-wife relationship? Without the context, a fair assessment of reliance is problematic. [27] Moreover, the Estate has not shown what forbearance JoAnn sought from George and, more importantly, what actions George took to his detriment. [28] George had been terminated by The News Journal; he may have been able to return, but there is no credible evidence (his lawyer-friend speculated that he could return) that he was, in fact, able to return and under what circumstances or conditions. [29] In addition, nothing in the record materially informs the Court of the nature of any job with The News Journal or its financial benefits. [30] George was paid a salary and bonus by the Marina; there is no suggestion that that compensation was [*13] unfair or unreasonable for the work performed. How that compensation may have compared to The NewsJournal's compensation (no other potential employment was ever identified) is unclear. As such, the Estate has not proved that George ever relied to his detriment on any promise made by JoAnn. [31] Accordingly, his promissory estoppel claim fails.

25  Tr. 40, 70, 99. There is one possible exception to this broad statement. See note 31, *infra.* As JoAnn points out, the income tax returns of the Marina show JoAnn as the sole owner. DX 6-DX 14.

26  The Court, of course, does not have the benefit of George's version of the facts.

27  It appears that George enjoyed his job at the Marina.

28  The Estate apparently sought (but failed) to prove that it was George's remaining as an employee of the Marina.

29  *See* DX 4.

30  George's lawyer-friend referred to a "good salary, a benefits package, a retirement package," at The NewsJournal (Tr. 170), but (putting aside the acknowledgement that it was only his "understanding") there is no way to compare effectively or quantitatively the job at The NewsJournal (assuming that it was available without negative conditions) and the compensation George received from the Marina.

31  The [*14] testimony of George's son to the effect that JoAnn and his father had finally agreed to the transfer of an equity interest suffers from these shortcomings. The conversation which the son recounts occurred near the end of George and JoAnn's relationship, probably in 1998. It is, however, clear that George did not engage in any conduct in reliance upon that promise. He had worked at the Marina for many years; even though he had not obtained that equity interest which he so vigorously sought, he had remained an employee (and spouse). The son's reporting of the conversation, at most, proves that JoAnn promised to grant an equity interest at that time. Without some sort of reliance on the commitment (or, perhaps, evidence that JoAnn's statements

were in recognition of the work that had been performed by George)--and there is no credible evidence of that--the Estate has merely proven that one spouse promised to make a gift to another spouse. One can argue that, as an ethical matter, such commitments ought to be honored; a promise, however, to make a gift such as this is not enforceable, without more.

* * *

The Estate also seeks imposition of either a constructive trust or a resulting trust [*15] for its benefit over the assets of the Marina. "A constructive trust may be imposed when a defendant's fraudulent, unfair, or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he is owed some duty." [32] "A resulting trust gives effect to the intention of the parties, as evidenced by the circumstances surrounding the transaction, where it appears that the beneficial interest was not intended to follow the legal title." [33] Constructive and resulting trusts are not causes of action; they are equitable remedies imposed to correct certain wrongs, such as, for example, when unjust enrichment is rectified by use of constructive trust.

> 32  *Wagner v. Hendry,* 2000 Del. Ch. LEXIS 33, 2000 WL 238009, at *7 (Del. Ch. Feb. 23, 2000) (citation omitted).
>
> 33  *Quill,* 2005 Del. Ch. LEXIS 37, 2005 WL 578975, at *8 (citation omitted); see *Hudak v. Procek,* 727 A.2d 841, 843 (Del. 1999); *Adams v. Jankouskas,* 452 A.2d 148, 152 (Del. 1982).

* * *

The Estate focuses on two reasons for finding the type of inequitable conduct that might support a constructive trust.

First, it contends that JoAnn was unjustly enriched by all of the hard work that George performed. George worked hard; part of the job was dangerous. George, however, [*16] was regularly paid salary and bonuses, and there is no evidence from which the Court can reasonably infer that the salary was unfair or inadequate. George was paid--reasonably, it appears--for his services; that he was not paid more does not suggest that JoAnn was unjustly enriched.

Second, the Estate looks to the list of tactics prepared by JoAnn shortly before the end of the marriage. It contends that the lists (both the handwritten and typewritten notes) demonstrate inequitable conduct. The simple answer is that there is no evidence that any of the questionable ideas were ever implemented. Moreover, the Court cannot conclude that JoAnn is the party responsible for the handwritten notes. If George did not have any interest, mere speculation about how to protect JoAnn from any claim (even a claim without any basis) that George might assert is, without more, harmless but, more importantly, cannot create an interest that would not otherwise exist.

* * *

As to the use of a resulting trust to implement the shared intentions of the parties, the evidence does not demonstrate that JoAnn and George ever intended that George would have an equal ownership interest. The testimony of George's son [*17] and the ambiguous comment by JoAnn in the presence of George's lawyer-friend, even when all of the instances in which the husband and wife referred to their "own" business, do not provide the necessary evidentiary heft. [34]

> 34  George's persistence in seeking confirmation of an ownership interest reveals that he was not misled by any of the these statements of joint ownership. Whether a third party might have been justified in relying upon such pronouncements is a different question.

* * *

Although conceptually different, constructive trusts and resulting trusts are traditional remedies for unfair, overbearing, or fraudulent conduct. At bottom, they are used to place property in the hands of the rightful owner. If George had an enforceable contract--either by written agreement or through a *quasi*-contract, such as promissory estoppel--resort to amorphous equitable notions would not have been necessary. The Marina belonged to JoAnn. There must be, in order for the Estate to prevail, some reason to divest a portion of her interest for the benefit of the Estate. It cannot arise out of the employee-employer relationship by way of enforceable promise because there was none. Moreover, George received [*18] what appears to have been fair compensation for his services. In short, the Estate has not proved that George had any quasi-contract right to an interest. That leaves it with needing to prove either some sort of enforceable gift or the fundamental unfairness or improper conduct that would support intervention of equity. JoAnn, no doubt, talked about giving--to her husband and coworker--an interest in the Marina. Perhaps it was an equal interest; perhaps not. Whatever she may have offered to give through written agreement, George rejected it. He was never satisfied and he continued--almost throughout the relationship--to seek from JoAnn that which she never, in fact, gave--an equal share in the Marina. When George rejected whatever was offered, that was the end of any conceivable right based on the gift offered. There is not anything fundamentally unfair

or inequitable about JoAnn's failure to renew the gift or to increase the gift. For these reasons, neither a constructive trust nor a resulting trust is warranted.[35]

[35] Whether the facts--even if found as the Estate would want--would support an implied trust, especially a resulting trust, need not be explored. *See Taylor v. Jones,* 2006 Del. Ch. LEXIS 100, 2006 WL 1510437 (Del. Ch. May 26, 2006).

* [*19] * *

For the foregoing reasons, the Court concludes that the Estate does not hold any interest in the Marina. Accordingly, judgment is entered in favor of the Defendants and against the Plaintiff. The parties shall bear their own costs.

**IT IS SO ORDERED.**

*/s/ John W. Noble*